# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE LANG COMPANIES, LLC, et al.,[1] | ) Case No. 09-12543 (KJC) |
| | ) |
| Debtors | ) (Joint Administration Pending) |
| | ) |
| | ) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) (I) AUTHORIZING AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING

The Lang Companies, LLC ("Lang Companies") and its affiliated debtors and

debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move

(the "Motion") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1) and 364(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for

entry of interim and final orders (together, the "DIP Orders") (i) authorizing the Debtors to

obtain postpetition secured financing from Sun Lang Finance, LLC (together with any parties

who subsequently become lenders in accordance with the terms of the DIP Credit Agreement (as

hereinafter defined), the "DIP Lenders"); (ii) granting liens and security interests and providing

superpriority administrative expense status to the Debtors' obligations under the DIP Credit

Facility (as hereinafter defined); (iii) authorizing the use of cash collateral and granting adequate

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Lang Holdings, Inc. (9551); Turner Acquisition, Inc. (2115); Avalanche Publishing Acquisition, Inc. (3038); The Lang Companies, LLC (9182); Avalanche Publishing, Inc. (9793); and The Lang Store, Ltd. (2398). The mailing address of each of the Debtors is 514 Wells Street, Delafield, Wisconsin 53018.

protection to the Prepetition Lenders (as hereinafter defined); (iv) scheduling a final hearing on the Motion pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (v) granting related relief. In support of this Motion, the Debtors rely on the Declaration of Laurie Gilner in Support of Chapter 11 Petitions and First Day Relief (the "Gilner Declaration") filed concurrently herewith. In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.     The Court has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sough herein are sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

## GENERAL BACKGROUND

2.     On the date hereof (the "Petition Date"), the Debtors each commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     As of the date hereof, no request for appointment of a chapter 11 trustee or examiner has been made, and no official committee has been appointed.

4.     Information regarding the Debtors' history and business operations and the events leading up to the commencement of these chapter 11 cases can be found in the Gilner Declaration, which is incorporated by reference as if set forth fully herein.

2

## DEBTORS' PREPETITION SECURED INDEBTEDNESS

5.      Debtors Lang Companies, The Lang Store Ltd. ("Lang Stores"),

Avalanche Publishing, Inc. ("Avalanche"), and Turner Acquisition, Inc. ("Turner") (collectively,

the "Prepetition Borrowers") are borrowers under a senior secured credit facility (the

"Prepetition Secured Credit Facility") with Bank of America, N.A., as Agent (the "Prepetition

Agent") for itself and the various lender parties thereto (together with their successors and

assigns, collectively, the "Prepetition Lenders").  The Prepetition Credit Facility is governed by a

certain Credit Agreement (as amended, supplemented or modified prior to the Petition Date, the

"Prepetition Credit Agreement" and, together with all other agreements, instruments, and

documents relating thereto, as amended, supplemented or modified prior to the Petition Date, the

"Prepetition Loan Documents").

6.      The Prepetition Credit Facility consists of (i) an $11,000,000 term loan,

(ii) a revolving credit facility which is subject to a $25,000,000 cap with a $3,000,000 over-

advance provision and (iii) a letter of credit subfacility which is subject to a $5,000,000 cap on

outstanding letter of credit obligations.  As of the Petition Date, there were an outstanding

principal balances of $6,083,333 under the term loan (together with accrued but unpaid interest

and fees, the "Prepetition Term Loan Obligations") and $12,849,534 on account of revolving

loans (together with accrued but unpaid interest and fees, the "Prepetition Revolving

Obligations"), and $110,000 in face amount of issued but undrawn letters of credit (the

"Prepetition LC Obligations" and, together with the Prepetition Term Loan Obligations and the

Prepetition Revolving Credit Obligations, the "Prepetition Indebtedness").

7.      Pursuant to the Prepetition Loan Documents, the Prepetition Indebtedness

is secured by valid, binding, enforceable and perfected first-priority liens and security interests

3

(collectively, the "Prepetition Liens") in substantially all tangible and intangible personal property of the Prepetition Borrowers (subject to certain Permitted Liens set forth in Schedule 1.3 to the Prepetition Credit Agreement)[2] (the "Prepetition Collateral").

## IMMEDIATE NEED FOR POSTPETITION FINANCING

8.      The Debtors are on the verge of a very capital-intensive stage in their business cycle wherein they must build up inventory for sale in the upcoming back-to-school and holiday seasons.  However, the Debtors have no further availability under the Prepetition Credit Agreement and do not have sufficient available sources of working capital to continue to operate their businesses without additional financing.  Simply put, without an immediate infusion of working capital the Debtors will be unable to continue as a going concern and will have no choice but to shut down operations and liquidate their assets immediately.  This would destroy the Debtors' businesses and harm the Debtors' employees, customers, trade vendors and other creditors.

9.      The Debtors were unable to obtain additional equity financing prior to the Petition Date, and could not obtain unsecured financing or secured financing junior to the liens of the Prepetition Agent.  The Prepetition Agent would not consent to the Debtors obtaining financing through a third party secured by liens in the Prepetition Collateral senior to, or *pari passu* with, the liens of the Prepetition Agent, and it would only agree to provide further financing in the context of a chapter 11 debtor-in-possession ("DIP") facility.  The Debtors negotiated in good faith with the Prepetition Agent on the terms of a possible DIP facility, but the parties were unable to come to a final agreement.

---

[2]      Permitted Liens consist primarily of liens in certain leased equipment and fixtures.

10.     The Debtors were ultimately able to procure a commitment from the DIP Agent, on behalf of itself and the DIP Lenders, for a superpriority, priming, multi-draw term-loan secured DIP credit facility (the "DIP Credit Facility") conditioned on (i) the Prepetition Lenders' assignment of their rights under the Prepetition Loan Documents to an affiliate of the Debtors (the "Sponsor"), which would become the sole Prepetition Lender by virtue of such assignment, and (ii) the consent of the Sponsor, in its capacity as Prepetition Lender, to priming of the Prepetition Liens by the liens granted to the DIP Lenders in connection with the DIP Credit Facility.

11.     The Debtors, with the assistance of and in consultation with their financial advisors, have prepared a budget (as amended from time to time, the "Budget")[3] that shows the Debtors' projected operating cash expenditures during the period from the Petition Date to October 16, 2009 (as may be extended from time to time, the "Budget Period") and estimates the period in which such cash expenditures will either need to be paid or accrue. At this time, the Debtors anticipate that their cash on hand and receipts from operations will be insufficient to satisfy their operating cash needs during the Budget Period. Accordingly, additional financing is necessary in order to permit the Debtors to continue operating as a going concern during these chapter 11 proceedings. Given their financial circumstances and the general state of the credit markets, the Debtors believe that the DIP Credit Facility is the only available source of such financing.

12.     The DIP Credit Facility is on reasonable market terms, and the terms and conditions of the DIP Credit Agreement (as defined below) were negotiated by the parties in good faith and at arm's length, and were instituted for the purpose of enabling the Debtors to

---

[3]     The Budget is attached as Exhibit 2 to the proposed Interim Order.

meet ongoing operational expenses while in chapter 11 and to implement a sale of their business as a going concern for the benefit of creditors. In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets on a going-concern basis.

## RELIEF REQUESTED

13.     By this Motion, the Debtors request entry of an interim order (the "Interim Order"), substantially in the form attached to this Motion:

(a)     authorizing the Debtors to obtain postpetition financing pursuant to the terms set forth in the Superpriority Priming Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"),[4] substantially in the form attached to the proposed Interim Order as Exhibit 1, in an aggregate maximum amount of $16,000,000;

(b)     providing that, pursuant to section 364(c) and (d) of the Bankruptcy Code, all financing under the DIP Credit Facility shall

(i)     have priority over any and any claims of any entity, including, without limitation, any claims specified in or ordered pursuant to sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out; and shall be secured by

(ii)     a perfected first priority, senior, priming Lien in the Prepetition Collateral, subject only to the Permitted Liens and the Carve-Out;

(iii)     a perfected junior Lien on all property and assets of the Debtors of any kind that is encumbered by a Permitted Lien, subject only to the Carve-Out; and

(iv)     a perfected first priority Lien on all unencumbered property and assets of the Debtors of any kind, subject only to the Carve-Out;

(c)     granting the Prepetition Lenders adequate protection of their interests in the Prepetition Collateral;

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

(d)  authorizing the Debtors, on an interim basis, to obtain financing in an amount up to approximately $8.5 million[5] pursuant to the terms of the DIP Credit Agreement; and

(e)  scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rule 4001 within fifteen (15) days of the entry of the Interim Order for this Court to consider entry of a final order (the "Final Order") authorizing and approving the balance of the terms of the DIP Credit Agreement.

## TERMS AND CONDITIONS OF DIP CREDIT FACILITY AND PROPOSED ADEQUATE PROTECTION PACKAGE FOR THE PREPETITION LENDER

### A.  Summary of Material Terms of the DIP Credit Agreement

14.  The material terms of the DIP Credit Agreement are as follows, which is presented by way of summary only and is qualified in its entirety by the terms of the Interim Order or the DIP Credit Agreement (together with related documents, the "DIP Loan Documents"), which shall govern, as applicable:

| | |
|---|---|
| **Borrower:** | Lang Companies (in such capacity, the "Borrower") |
| **Guarantors:** | Lang Holdings, Inc. ("Parent"); Turner; Avalanche Publishing Acquisition, Inc.; Avalanche; Lang Store, and each of Parent's other subsidiaries (other than the Borrower), whether directly or indirectly owned, at any time in existence (collectively, in such capacity, the "Guarantors," and together with the Borrower, the "Loan Parties") |
| **Administrative and Collateral Agent:** | Sun Lang Finance, LLC (in such capacities, collectively, the "DIP Agent") |
| **DIP Lenders:** | Sun Lang Finance, LLC and other lenders from time to time party to the DIP Credit Agreement (in such capacity, collectively, the "DIP Lenders") |

---

[5]  $8.5 million represents the amount of borrowing availability the Debtors estimate they will need through August 7, 2009.  Depending on when the final hearing to consider the Motion is scheduled, the Debtors may need to seek additional incremental borrowing availability in the Interim Order, and they reserve all rights to do so at the interim hearing.

7

| | |
|---|---|
| **Type and Amount of the DIP Facility:** | Secured, multi-draw term loan credit facility in the aggregate principal amount of $16,000,000, consisting of an Initial Term Loan of $4,000,000 on the Closing Date and a Delayed-Draw Term Loan available in multiple Borrowings (subject to compliance with the Budget and Borrowing Base availability). |
| **Closing Date:** | The first date all the conditions precedent in § 4.01 of the DIP Credit Agreement have been satisfied or waived in accordance with § 10.01 thereof; in any event, no later than July 17, 2009. |
| **Maturity:** | The earliest of (i) 5:00 p.m. on July 17, 2009, unless the Closing Date shall have occurred on or prior to such date, (ii) the date which is 20 days after the date that the Interim Order was entered on the Bankruptcy Court's docket if the Final Order shall not have been approved by the Bankruptcy Court on or before such date, (iii) October 15, 2009, (iv) the effective date of a Plan of Reorganization, as specified in such plan or plans, or, if earlier, the date that is one Business Day after the date of entry of an order entered by the Bankruptcy Court approving the sale of all or a substantial part of the Loan Parties' assets or businesses and (v) the date of termination in whole of the Commitments pursuant to § 2.06 or § 8.02, or the acceleration of the Term Loans pursuant to § 8.02, of the DIP Credit Agreement. |
| **Purpose:** | Proceeds of the DIP Credit Facility will be used, subject to the Budget, (i) to pay related fees and expenses associated with negotiation, execution and delivery of the DIP Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower and the Guarantors subject to the Budget and to the extent not prohibited under the DIP Credit Agreement, (iii) to pay fees and expenses of the Loan Parties' advisors and the advisors to any Creditor's Committee, in each case associated with the Cases and (iv) to make any other payments permitted to be made in the DIP Orders or in the First Day Orders or by the Bankruptcy Court to the extent permitted under the Budget and not prohibited by the DIP Credit Agreement, or as otherwise consented to by the Required Lenders. |
| **Interest:** | Fifteen percent (15%) per annum, calculated on the basis of a 360-day year and actual days elapsed, and payable monthly in arrears commencing July 31, 2009, and thereafter on the last Business Day of each calendar month. |

DB02:8409276.2

068626.1001

| | |
|---|---|
| **Default Interest:** | Three percent (3%) per annum in excess of the applicable rate then in effect. |
| **Fees:** | Commitment Fee:  One-half percent (0.5%) per annum times the actual daily amount by which the Aggregate Commitment exceeds the Outstanding Amount, calculated monthly in arrears.<br><br>Closing Fee:  Three percent (3%) of the Aggregate Commitment in effect immediately prior to the Initial Term Loan, or $480,000, payable on the Closing Date.<br><br>Exit Fee:  An aggregate of two percent (2%) of the Aggregate Commitment in effect immediately prior to the Initial Term Loan, or $320,000, earned in full on the Closing Date and payable together with each payment or prepayment (including by way of credit bid) in an amount equal to 2% of the amount paid, repaid, or prepaid. |
| **Mandatory Prepayments:** | If any Loan Party or any of its Subsidiaries Disposes of any property or assets (other than any Disposition of any property or assets permitted by §§ 7.05(b), (c)(ii), (d), (e), (g), (h), or (i) of the DIP Credit Agreement), the Borrower shall within one Business Day after receiving such proceeds prepay an aggregate principal amount of Term Loans equal to 100% of such Net Cash Proceeds.<br><br>Upon any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, and not otherwise included in the preceding sentence, the Borrower shall prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom within one Business Day upon receipt thereof by any Loan Party or such Subsidiary (or, within five Business Days of such receipt in the case of an Extraordinary Receipt consisting of a Tax refund).<br><br>If for any reason the Total Outstanding at any time exceeds the Borrowing Base amount then in effect or the amount permitted by the Budget to be outstanding, the Borrower shall immediately prepay the Term Loans in an aggregate amount sufficient to eliminate such excess.<br><br>Each prepayment of Term Loans pursuant to the foregoing provisons shall be applied first, to reimburse the DIP Agent for any costs and expenses incurred by it (including legal fees and expenses), and second, to prepay Term Loans outstanding at such time until all such Term Loans are paid in full, the amount remaining, if any, after the prepayment in full of all Term Loans |

9

| | |
|---|---|
| | outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.<br><br>Amounts repaid or prepaid may not be reborrowed. |
| **Priority and Security under DIP Credit Facility:** | As security for the Debtors' obligations under the DIP Loan Documents (collectively, the "<u>DIP Obligations</u>"), DIP Lenders shall be granted allowed super-priority administrative claims pursuant to Bankruptcy Code § 364(c)(1), which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, <u>inter alia</u>, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 and/or 364(c)(1) (the "<u>DIP Facility Superpriority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre and postpetition property of the Debtors and all proceeds thereof ( including, without limitation, proceeds of Avoidance Actions upon entry of the Final Order), <u>provided</u>, <u>however</u>, that the DIP Facility Superpriority Claims shall be subordinate only to the Carve-Out to the extent specifically provided for in paragraph 8 of the Interim Order.<br><br>As additional security for the DIP Obligations, pursuant to Bankruptcy Code §§ 364(c)(2), (c)(3), and (d) and the consent of the Prepetition Lenders and the Prepetition Agent, the DIP Lenders shall be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, control agreements, pledge agreements, lock box agreements financing statements, or otherwise) the following DIP Facility Liens; provided, however that such liens and security interests shall not include proceeds of Avoidance Actions until the entry of the Final Order:<br><br>    (i) pursuant to Bankruptcy Code § 364(c)(2), valid, perfected, enforceable and non-avoidable first priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, are not subject to valid, perfected and non-avoidable liens, including, without limitation, any unencumbered cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, |

plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds and products of all the foregoing, including, without limitation, proceeds of Avoidance Actions upon entry of the Final Order;

(ii) pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by Bankruptcy Code § 546(b) (other than assets and property that are subject to the existing liens which shall be primed as referred to below) (such liens described in this claums, as are in existence on the Petition Date, the "Permitted Encumbrances");

(iii) pursuant to Bankruptcy Code § 364(d), valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral and the proceeds and products thereof. Such security interests and liens shall be senior in all respects to (i) the interests in such property of the Prepetition Agent and the Prepetition Lenders arising from current and future liens of the Prepetition Agents and the Prepetition Lenders (including, without limitation, the Adequate Protection Liens (defined below)) and (ii) the interests in such property held by any party whose interests are junior to the interests of the Prepetition Agent and Prepetition Lenders; and

(iv) the DIP Facility Liens and the Adequate Protection Liens (defined below) shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code § 551 or (B) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (ii) subordinated to or made pari passu with any other lien or security interest under Bankruptcy Code § § 363 or 364 or otherwise other than as set forth in the Interim Order. The DIP Facility Liens shall not be subject to Bankruptcy Code § § 510, 549 or 550.

DB02:8409276.2
068626.1001

| | |
|---|---|
| **Carve-Out** | Liens, security interests and super-priority administrative expense claims of the Prepetition Lenders, the Prepetition Agent, the DIP Agent and the DIP Lenders shall be subject to and subordinate only to (a) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) (collectively, the "UST/Clerk Fees"); (b) unpaid and allowed fees and expenses of professional persons, retained by any Debtor or any Committee (collectively, the "Professionals"), in each case, incurred on and prior to delivery of a notice (the "Carve-Out Trigger Notice") to the Debtors, their counsel, the U.S. Trustee and counsel to the Creditors' Committee, if applicable, in an amount not in excess of the aggregate amounts permitted under the Budget through the period from the Closing Date to the date of the Carve-Out Trigger Notice; and (c) unpaid and allowed fees and expenses of Professionals incurred subsequent to delivery of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000 (the "Professional Expense Cap"); provided, however, that the Professional Expense Cap shall be reduced, dollar for dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals subsequent to delivery of a Carve-Out Trigger Notice; provided, further, that the payment of compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331 as set forth in paragraph 9 of the Interim Order shall not reduce the Carve-Out prior to the delivery of a Carve-Out Trigger Notice. The Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and shall be subject only to the allowed claims of the Professionals for such fees and expenses as may be awarded by the Court under Bankruptcy Code §§ 327 or 328; provided, however, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtors or the Creditors' Committee or any other party-in-interest incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (1) invalidating, setting aside, avoiding, subordinating, in whole or in part, the DIP Obligations or the Prepetition Indebtedness or any lien and security interest securing the DIP Obligations or the Prepetition Indebtedness; or (2) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Prepetition Lenders or the DIP Lenders or enforcement by the Prepetition Lenders or the DIP Lenders or enforcement by the Prepetition Lenders or the DIP Lenders of its liens or realization upon any of the respective Collateral; or |

| | |
|---|---|
| | (3) challenging the postpetition liens or claims seeking an affirmative recovery from the Prepetition Lenders or the DIP Lenders; provided that the Carve-Out may be used to investigate the Prepetition Indebtedness and the validity and perfection of the liens and security interests securing the Prepetition Indebtedness. |
| **Conditions Precedent to the Closing of the DIP Credit Facility:** | Customary and required conditions regarding, e.g., documentation, certification of material facts, obtaining necessary third-party consents, approvals, and waivers, and Bankruptcy Court approval.  In addition:<br><br>(i) Borrower shall have paid all accrued fees and expenses of the DIP Agent (including the reasonable and documented expenses of Kirkland & Ellis LLP), whether incurred prior to or after the Petition Date, on or before the Closing Date; and<br><br>(ii) DIP Agent shall have determined in its reasonable discretion that there has not occurred since July 13, 2009, any change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect. |
| **Conditions Precedent to Loans on Each Draw Date:** | Customary and required conditions regarding the continued truth and correctness of all representations of the Borrower, the absence of a default, the provision of a valid borrowing request, the continued efficacy of the DIP Orders. |
| **Representations and Warranties:** | Customary and required representations and warranties including, e.g., corporate existence, qualification and power, compliance with laws, absence of default or Material Adverse Effect, fairness and accuracy of financial statements. |
| **Affirmative Covenants:** | Customary and required covenants concerning, e.g., the provision of periodic Borrowing Base certifications, Variance Reports, and financial statements to the DIP Agent, the notification of the DIP Agent and the DIP Lenders with respect to certain material occurrences, the payment of post-petition obligations, the preservation of corporate existence and business operations, maintenance of properties and insurance, compliance with laws, maintenance of proper books and records, and the DIP Agent's visitation and inspection rights. |

DB02:8409276.2 068626.1001

| | |
|---|---|
| **Negative Covenants:** | Customary and required covenants prohibiting, e.g., creation of liens upon or granting security interests in the Debtors' property, the incurrence of additional indebtedness by the Borrower or Guarantors, investments by the Borrower, certain transactions between affiliates, changes in corporate structure or existence, and certain Dispositions of property. |
| **Financial Covenants:** | Borrower shall not permit the Borrowing Base for any period to be less than the Outstanding Amount plus the amount of any proposed borrowings (the "Borrowing Base Covenant"). <br><br> During any calendar week period, permit (i) the aggregate disbursements made through such period since the Closing Date to be more than 110% of the disbursements contemplated in the Budget to be made during the period from the Closing Date through the last day of such calendar week or (ii) the aggregate cash receipts actually received during the period from the Closing Date through the last day of such calendar week to be less than 90% of the cash receipts contemplated in the Budget to be received; provided, however, if the difference between actual cash receipts to the amount contemplated in the Budget is less than $250,000, the Loan Parties shall be deemed to be in compliance with this clause (c)(ii), and if the difference between actual cash receipts to the amount contemplated in the Budget is within the 10% variance permitted hereby but in excess of $500,000, the Loan Parties shall be deemed not to be in compliance with this clause (c)(ii) (the "Budget Compliance Covenant"). |
| **Events of Default:** | Customary and required events of default including, e.g., nonpayment, failure to observe covenants under the DIP Credit Agreement or other DIP Loan Documents, material breaches of representations or warranties, Loan Parties' inability to pay post-petition debts as they become due, conversion of the chapter 11 cases or appointment of a chapter 11 trustee or examiner with expanded powers, and the grant of stay relief with respect to any property securing the DIP Obligations (collectively, the "DIP Collateral"). In addition, it shall be an Event of Default if <br><br> (i) any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of |

| | |
|---|---|
| | any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or |
| | (ii) Tom S. O'Donoghue or a substitute member of equal or greater seniority of CRG Partners Group LLC acceptable to the DIP Agent ceases to be the chief restructuring officer of the Borrower; |
| | (iii) any Loan Party or any of its Subsidiaries shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by § 553 of the Bankruptcy Code) without the express prior written consent of the DIP Agent and the approval of the Bankruptcy Court other than as provided for in any First Day Orders, or the Prepetition Lender shall seek any of the foregoing; or |
| | (iv) Any Loan Party or any of its Subsidiaries shall file a motion in the Case (a) to recover from any portions of the DIP Collateral any costs or expenses of preserving or disposing of such Collateral under § 506(c) of the Bankruptcy Code, to cut off rights in the DIP Collateral under § 552(b) of the Bankruptcy Code, or (b) to take any other action or actions materially adverse to the DIP Agent, the DIP Lenders or the Prepetition Lender; or |
| | (v) the Final Order shall not have been entered within twenty (20) days after entry of the Interim Order. |
| **Sale Process Defaults** | It shall also be an Event of Default under the DIP Credit Agreement if: |
| | (i) the Loan Parties shall fail to file a motion (in form and substance satisfactory to the DIP Agent, the "Sale Procedures Motion") within 30 days after the Petition Date seeking to designate a "stalking-horse" bidder for all or substantially all of the Loan Parties' assets or businesses and approving auction and sale procedures; or |
| | (ii) the Loan Parties shall fail to obtain entry of an order approving the Sale Procedures Motion within 51 days after the Petition Date; or |
| | (iii) the Loan Parties shall fail to conduct an auction in compliance with the requirements set forth in the Sale Procedures Motion approved by the Bankruptcy Court, within |

DB02:8409276.2

068626.1001

| | |
|---|---|
| | 85 days after the Petition Date; <u>provided</u> that if there are no qualified bidders other than the "stalking-horse" bidder, it shall not constitute an Event of Default if an auction is not conducted; or |
| | (iv) the Loan Parties shall fail to obtain entry of an order in form and substance satisfactory to the DIP Agent approving the sale, pursuant to § 363 of the Bankruptcy Code, of all of substantially all of the Loan Parties' assets or businesses, within 87 days after the Petition Date and requiring the payment of the Obligations in full in cash as of the closing date of such sale; or |
| | (v) the closing of the sale contemplated by the Sale Order shall have not occurred within 89 days after the Petition Date; or |
| | (vi) the Loan Parties shall have accepted as a bid or bids as winning that, when aggregated, would fail to provide the Loan Parties on the closing date or dates thereof with sufficient cash or other consideration acceptable to the DIP Agent to repay in full in cash (or in other consideration) the DIP Obligations |
| **Remedies:** | If any Event of Default occurs and is continuing, with two (2) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditor's Committee, the U.S. Trustee and the Bankruptcy Court) and without further order of or application to the Bankruptcy Court, the DIP Agent shall at the request of, or may, with the consent of, the Required Lenders, exercise any or all rights and remedies available under applicable law and the DIP Loan Documents, including, without limitation, acceleration of the Term Loans and causing the termination of Cash Collateral usage. |
| | In the event that an Event of Default has occurred as a result of a Debtor's failure to comply with the Borrowing Base Covenant and clause (ii) (the Budget Compliance Covenant (the "<u>Specified Defaults</u>"), the Sponsor may, within 5 days from the first date of the occurrence of such Event of Default, provide an irrevocable written notice to the DIP Agent of a commitment to provide up to $5,000,000 of the Term Loans or, if less, the difference between $16,000,000 and the Term Loans then outstanding (the "<u>Sponsor Tranche</u>"). Upon receipt of the foregoing written notice, the DIP Agent shall agree in writing to forbear for no longer than 30 days from exercising remedies with respect to the Specified Defaults, but shall no longer have any obligation to fund any Term Loans unless and until the conditions in § 4.02 of the DIP Credit Agreement are satisfied |

DB02:8409276.2   068626.1001

| | |
|---|---|
| | (if at all). The Sponsor Tranche shall be Term Loans under the DIP Credit Agreement, provided that no interest or fees in respect thereof may be paid in cash unless and until all other DIP Obligations owed to the DIP Agent and the Secured Parties (other than the Lenders under the Sponsor Tranche) have been paid in full in cash. Holders of the Sponsor Tranche shall have no voting rights hereunder and shall be disregarded for the purpose of determining Required Lenders. The parties providing the Sponsor Tranche and the DIP Agent and DIP Lenders shall enter into a participation agreement evidencing the foregoing in order to implement the foregoing and as a condition precedent to any forbearance and funding of the Sponsor Tranche. Upon the occurrence of any Default other than a Specified Default, or other than a Default or Event of Default arising under § 7.10(c) of the DIP Credit Agreement, the forbearance by the DIP Agent and DIP Lenders shall be automatically terminated and all Defaults and Events of Default shall continue to exist (unless cured or waived in accordance with the terms hereof) and the DIP Agent shall not be limited in exercising any of its or a DIP Lender's rights and remedies hereunder. Notwithstanding the foregoing agreement to forbear, the DIP Agent may provide the notice referred to in § 8.02 of the DIP Credit Agreement solely to commence the notice period specified therein, and shall not be required to provide any further notice upon termination of such forbearance period. |
| **Indemnification:** | Borrower agrees to pay on demand: |
| | (i) all reasonable documented out-of-pocket costs and expenses of the DIP Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the DIP Loan Documents, and |
| | (ii) all reasonable documented out-of-pocket costs and expenses of the DIP Agent and each DIP Lender in connection with the enforcement or protection of its rights in connection with the DIP Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally and all reasonable documented out-of-pocket costs and expenses of each Agent and each Lender with respect to any negotiations arising out of any Default (including, without limitation, the fees and expenses of counsel for each Agent and each Lender with respect thereto). |
| | In addition, Borrower shall indemnify the DIP Agent, each DIP |

DB02:8409276.2

068626.1001

Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of

(i) the execution or delivery of any DIP Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby,

(ii) any Loan or the use or proposed use of the proceeds therefrom,

(iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or

(iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations under any DIP Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

DB02:8409276.2

068626.1001

**B.**    <u>Use of Cash Collateral and Adequate Protection</u>

15.    During the ordinary course of operations, the Debtors generate cash collateral from the use of the Prepetition Collateral (the "<u>Cash Collateral</u>"). The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments, such as employee payroll, taxes and to purchase goods and services essential to their businesses. It is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion and the DIP Credit Facility because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Credit Facility in order to fund the Debtors' working capital needs and for other general corporate purposes.

16.    The Debtors and the DIP Lenders have agreed that the Prepetition Secured Lenders should receive the following as adequate protection of its interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Lenders' interest in the Prepetition Collateral (collectively, the "<u>Adequate Protection Obligations</u>"):

| **Stipulations, Waivers and Releases Concerning Prepetition Secured Credit Facility** | Subject to the rights of the Creditors' Committee set forth in paragraph 10 of the Interim Order, the Debtors, for themselves, their estates and all representatives of such estates: |
|---|---|
| | (i) stipulate to the amount, validity and enforceability of the Prepetition Indebtedness; and |
| | (ii) release any claim, counterclaim, cause of action, defenses or setoff rights against the Prepetition Lenders and the Prepetition Agent, whether arising under or in connection with the Prepetition Loan Documents or the transactions contemplated thereunder or the Prepetition Liens, including, without limitation, any right to assert any disgorgement or recovery. |
| | The Creditors' Committee, if formed, shall have sixty (60) days from the date of formation (and if no Creditors' Committee is formed, any party-in-interest, other than the Debtors, shall have seventy-five (75) days from entry of this Interim Order) within which to commence an adversary proceeding (collectively, a |

| | |
|---|---|
| | "Prepetition Lien/Claim Challenge") with respect to the validity, priority, extent, perfection, and enforceability of the Prepetition Liens or the Prepetition Indebtedness, or any other claims or causes of action against the Prepetition Lenders and relating to the Prepetition Loan Documents. If such a Prepetition Lien/Claim Challenge is not timely commenced within such applicable period set forth above, the stipulations contained in paragraph E of the Interim Order shall be irrevocably binding on the estates, the Creditors' Committee and all parties in interest (including without limitation a receiver, administrator, or trustee appointed in this case or in any jurisdiction. |
| **Replacement Liens** | Effective and perfected upon the entry of the Interim Order and without the necessity of the execution by the Debtors of security agreements, financing statements or other agreements, Prepetition Lenders and Prepetition Agent are granted valid and perfected replacement security interests in and liens upon all Prepetition Collateral of the Debtors and the proceeds thereof solely to the extent of diminution in the value of their interest in the Prepetition Collateral (collectively, the "Adequate Protection Liens"), subject and subordinate only to (i) the Prepetition Liens, (ii) the Liens granted to the DIP Lenders under the Interim Order and pursuant to the DIP Credit Agreement and (iii) the Carve-Out. |
| **§ 506(c) Waiver** | Except for the Carve-Out and upon entry of the Final Order (to the extent approved by this Court), no costs or expenses of administration which already have been, or may hereafter be, incurred in the Debtors' Chapter 11 cases or in any subsequently converted case under Chapter 7 of the Bankruptcy Code shall be charged or asserted by the Debtors against the Prepetition Lenders, their claims or the Prepetition Collateral, pursuant to Bankruptcy Code §§ 105 or 506(c) or otherwise without the prior written consent of the Prepetition Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the Prepetition Lenders in this proceeding). |
| **Limitations on Use of Cash Collateral** | The Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtors or the Creditors' Committee or any other party-in-interest incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (i) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Prepetition Indebtedness or any Prepetition |

| | Lien; or (ii) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Prepetition Lenders or enforcement by the Prepetition Lenders of their liens or realization upon any of the Prepetition Collateral; or (iii) challenging the postpetition liens or claims or seeking an affirmative recovery from the Prepetition Lenders or the DIP Lenders; provided that the Carve-Out may be used to investigate the Prepetition Indebtedness and the validity and perfection of the liens and security interests securing the Prepetition Indebtedness. |
|---|---|

17. The Debtors believe the foregoing adequate protection package adequately protects the Prepetition Lender on account of the priming of the Prepetition Lender's liens and the Debtors' proposed use of Cash Collateral. In addition, the Prepetition Lender has consented to the foregoing Adequate Protection Obligations. Therefore, the Debtors respectfully request that the Adequate Protection Obligations be approved.

C.    **Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2**

18. Provisions of the DIP Credit Agreement and Interim Order required to be highlighted pursuant to Fed. R. Bankr. P. 4001(c)(1)(B)(i)-(xi) and Del. Bankr. L.R. 4001-2(a)(i)(A)-(G), to the extent applicable (collectively, the "Highlighted Provisions"), are as follows:

(a)    Grant of Priority or a Lien on Property of the Estates. DIP Credit Agreement §§ 4, 2.14(a)-(c), 2.15, 6.12, and 6.15; Interim Order ¶¶ 5-7 and 8.

(b)    Adequate Protection or Priority for a Claim that Arose before the Commencement of the Cases. Interim Order ¶¶ F(e) and 7.

(c)    Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Cases. Interim Order ¶¶ E(a)-(f) and F(e).

(d)    Waiver or Modification of the Automatic Stay. DIP Credit Agreement § 8.02; Interim Order ¶¶ 16 and 26.

(e)    Waiver or Modification of Authority to Request Use of Cash Collateral or Request Authority to Obtain Credit. Interim Order ¶¶ 6(a), 14, 17(a), and 31.

DB02:8409276.2                    068626.1001

(f) <u>Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.</u> Interim Order ¶¶ 6(a)-(c), 15, 19, and 29(a)-(c).

(g) <u>Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate.</u> Interim Order ¶¶ E(g) and 10.

(h) <u>Indemnification of Any Entity.</u> DIP Credit Agreement §§ 3.01(c), 3.05, and 10.04(a)-(f); Interim Order ¶ 12.

(i) <u>Release, Waiver or Limitation on Rights under Section 506(c).</u> DIP Credit Agreement § 8.01(r) (event of default); Interim Order ¶ 11 (waiver, effective only upon entry of Final Order).

(j) <u>Liens on Proceeds of Avoidance Actions.</u> Interim Order ¶¶ 5 and 6 (effective only upon entry of Final Order).

19. The Highlighted Provisions were negotiated as material terms to the DIP Credit Facility and are necessary for the Debtors to procure the financing made available under the DIP Credit Agreement in a sufficient amount and on a timely basis.

## BASIS FOR RELIEF

20. Bankruptcy Code Section 364(c) provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

21. Courts have articulated a three-part test to determine whether a debtor is authorized to obtain secured financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

22

(ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  In re Ames Dep't Stores, 115 B.R. at 37-39; see In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

22.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)     the trustee is unable to obtain credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

23.     Based on current capital markets conditions and discussions with potential lenders, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Lender would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these chapter 11 cases.  Moreover, because substantially all of the Debtors' assets are subject to the liens of the Prepetition Lenders, the Debtors were unable to obtain financing secured by liens in their unencumbered assets.  Nor were the Debtors able to obtain financing secured by junior liens in the Prepetition Collateral.

DB02:8409276.2                                                                                     068626.1001

Accordingly, the circumstances of these cases require the Debtors to obtain financing under both sections 364(c) and (d) of the Bankruptcy Code.

24.     The DIP Credit Facility is absolutely essential to the Debtors' continued viability as a going concern. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estate.

25.     As set forth more fully above, the Debtors negotiated the DIP Credit Agreement in good faith with the DIP Agent after negotiations with the Prepetition Agent proved unfruitful. Given the Debtors' current financial circumstances, the lack of unencumbered assets to serve as collateral for a new secured credit facility, and the Prepetition Agent's unwillingness to be primed, the Debtors had no alternative but to pursue a three-party DIP financing transaction whereby the Prepetition Lenders' position would be purchased by an entity amenable to being primed by a third-party DIP facility. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

26.     The proposed DIP Credit Facility provided by the DIP Lenders in combination with the Sponsor's acquisition of the Prepetition Lenders' debt position was quite literally the only financing available to the Debtors. Even so, the terms of the DIP Credit Facility were negotiated by the Debtors, the Sponsor, and the DIP Agent in good faith and at arm's length, and are fair and reasonable under the circumstances. For example, the proposed DIP Credit Agreement and the Interim Order provide that the security interests and

administrative expense claims granted to the DIP Agent and the Prepetition Lender are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40. In addition, the DIP Credit Agreement and Interim Order do not provide for an interim 506(c) waiver or grant of liens in chapter 5 avoidance actions, reserving these provisions for consideration on full notice at the final hearing on the Motion.

27.     For the foregoing reasons, among others, the terms of the DIP Credit Agreement are fair, reasonable and adequate, and the DIP Agent and DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

28.     Finally, in accordance with sections 364(d) and 361 of the Bankruptcy Code, the proposed Interim Order provides the Prepetition Lender with adequate protection as described in paragraph 16 above. In light of this adequate protection, the Prepetition Lender has consented to the priming of its liens in the Prepetition Collateral.

29.     In sum, the DIP Credit Facility should be approved as a valid exercise of the Debtors' business judgment consistent with the letter and the spirit of the Bankruptcy Code. See, e.g., In re Snowshoe Co., 789 F.2d at 1088 (approving debtor-in-possession financing necessary to sustain seasonal business); In re Ames Dept. Stores, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

DB02:8409276.2

068626.1001

30.     The Debtors further request that the automatic stay provisions of section 362 of the Bankruptcy Code be vacated and modified to the extent necessary so as to permit the DIP Agent to exercise, upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement and the proposed Interim Order) and the provision of two (2) business days' prior written notice to the Debtors, all rights and remedies provided for in the DIP Loan Documents, including the Credit Agreement and the proposed Interim Order as entered by the Court.

## A.     Interim Approval of the DIP Credit Agreement is Appropriate

31.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to sections 363 and 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

32.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors to obtain up to approximately $8.5 million under the DIP Credit Facility.[6] This relief will enable the Debtors to operate their businesses in a manner that will enable them to preserve and maximize estate value, and to avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. It will provide the Debtors' vendors and suppliers the necessary confidence to continue relationships with the Debtors post-petition and also will be viewed favorably by the Debtors' employees and customers, thereby enhancing the Debtors' efforts to maximize the value of their assets for the benefit of creditors.

---

[6]     See footnote 5, supra.

DB02:8409276.2                                            068626.1001

## C.    Final Hearing

33.    The Debtors further respectfully request that the Court schedule the Final Hearing and authorize the Debtors to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon the: (i) the office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the entities listed on the Consolidated List of Creditors Holding Largest Unsecured Claims Against Each Debtor filed pursuant to Bankruptcy Rule 1007(d) (the "Top 30 List"); (iii) counsel to the Official Committee of Unsecured Creditors, if and when formed; (iv) counsel to the Prepetition Lender; (v) counsel to the DIP Agent; (vi) any party who filed a request for notices in these chapter 11 cases pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Order for service of notice of the Final Hearing; and (vii) any known lien holders of the Debtors. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[7]

## D.    The Section 506(c) Waiver in the Final Order Should Be Approved

34.    The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge the DIP Collateral and the Prepetition Collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re

---

[7]    Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected

Molten Metal Tech., Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000); see In re Nutri/System of

Fla. Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in

obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544,

549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein

debtor waived certain rights — including 506(c) rights — against the lenders in exchange for

valuable consideration).

      35.    The waiver of surcharge rights is particularly appropriate where, as here, it

is tied to the benefit to be received from the Carve-Out. Under the DIP Credit Facility, the

Debtors agree to waive any rights to charge costs and expenses against the DIP Collateral or the

Prepetition Collateral except for the Carve-Out. In other words, the Debtors have waived the

uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the

Debtors' other estate professionals under the Carve-Out. See In re Lunan Family Restaurants

Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of §

506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was

necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily

benefited by the expenditure].") (citing In re Flagstaff, 739 F.2d 73, 77 (2d Cir. 1984) and New

Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers), 112 B.R. 811, 815 (E.D.

La. 1990), rev'd on other grounds sub nom., In re Delta Towers, 924 F.2d 74 (5th Cir. 1991).

---

by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made
on the twenty (20) largest unsecured creditors in the case in lieu of the committee."

DB02:8409276.2           068626.1001

## NOTICE

36.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee, (ii) the Top 30 List, (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; (v) counsel to the Prepetition Agent; and (vi) any known party that has filed a lien against any of the Debtors' assets. Notice of this Motion and any order entered with respect thereto will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
       July 16, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ David R. Hurst
Michael R. Nestor (No. 3526)
David R. Hurst (No. 3743)
Patrick A. Jackson (No. 4976)
Kevin A. Garland (No. 5171)
Pilar G. Kraman (No. 5199)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel for the Debtors and
Debtors in Possession*

DB02:8409276.2                                                 068626.1001