# EXHIBIT 1

## DIP CREDIT AGREEMENT

**SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of July [16], 2009**

among

**THE LANG COMPANIES, LLC**

as debtor and debtor-in-possession and as the Borrower,

**THE GUARANTORS NAMED HEREIN,**

each as debtor and debtor-in-possession,

**The Lenders Party Hereto,**

**AND**

**SUN LANG FINANCE, LLC**

as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| 1.01 | DEFINED TERMS | 3 |
| 1.02 | Other Interpretive Provisions | 23 |
| 1.03 | Accounting Terms | 24 |
| 1.04 | Rounding | 24 |
| 1.05 | Times Of Day | 24 |

## ARTICLE II
### THE COMMITMENTS AND CREDIT EXTENSIONS

| | | |
|---|---|---|
| 2.01 | The Term Loans | 25 |
| 2.02 | Borrowings Of Term Loans | 25 |
| 2.03 | [Reserved] | 26 |
| 2.04 | [Reserved] | 26 |
| 2.05 | Prepayments | 26 |
| 2.06 | Termination Or Reduction Of Commitments | 27 |
| 2.07 | Repayment Of Term Loans | 27 |
| 2.08 | Interest | 27 |
| 2.09 | Fees | 28 |
| 2.10 | Computation Of Interest And Fees | 28 |
| 2.11 | Evidence Of Indebtedness | 28 |
| 2.12 | Payments Generally; Administrative Agent's Clawback | 29 |
| 2.13 | Sharing Of Payments By Lenders | 31 |
| 2.14 | Priority and Liens | 32 |
| 2.15 | Security | 34 |

## ARTICLE III
### TAXES, YIELD PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| 3.01 | Taxes | 34 |
| 3.02 | [Reserved] | 36 |
| 3.03 | [Reserved] | 36 |
| 3.04 | [Reserved] | 36 |
| 3.05 | Compensation For Losses | 36 |
| 3.06 | Mitigation Obligations | 37 |
| 3.07 | Survival | 37 |

K&E 15141964.11

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

| | | |
|---|---|---|
| 4.01 | Conditions Of Initial Credit Extension | 37 |
| 4.02 | Conditions To All Credit Extensions | 40 |

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 5.01 | Existence, Qualification and Power; Compliance with Laws | 40 |
| 5.02 | Authorization; No Contravention | 41 |
| 5.03 | Governmental Authorization; Other Consents | 41 |
| 5.04 | Binding Effect | 42 |
| 5.05 | Financial Statements; No Material Adverse Effect | 42 |
| 5.06 | Litigation | 43 |
| 5.07 | No Default | 43 |
| 5.08 | Ownership Of Property; Liens; Investments | 43 |
| 5.09 | Environmental Compliance | 44 |
| 5.10 | Insurance | 45 |
| 5.11 | Taxes | 45 |
| 5.12 | ERISA Compliance | 45 |
| 5.13 | Subsidiaries; Equity Interests; Loan Parties | 46 |
| 5.14 | Margin Regulations; Investment Company Act | 47 |
| 5.15 | Disclosure | 47 |
| 5.16 | Intellectual Property; Licenses, Etc | 48 |
| 5.17 | Secured Superpriority Obligations | 48 |
| 5.18 | Casualty, Etc. | 48 |

## ARTICLE VI
## AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| 6.01 | Statements | 49 |
| 6.02 | Certificates; Other Information | 50 |
| 6.03 | Notices | 52 |
| 6.04 | Payment of Postpetition Obligations | 52 |
| 6.05 | Preservation Of Existence; Business, Etc. | 53 |
| 6.06 | Maintenance Of Properties | 53 |
| 6.07 | Maintenance Of Insurance | 53 |
| 6.08 | Compliance With Laws | 53 |
| 6.09 | Books and Records | 53 |
| 6.10 | Inspection Rights | 54 |
| 6.11 | Use Of Proceeds; Maximum Cash-On-Hand | 54 |
| 6.12 | Covenant to Guarantee Obligations and Give Security | 54 |
| 6.13 | Compliance With Environmental Laws | 56 |
| 6.14 | Preparation Of Environmental Reports | 56 |
| 6.15 | Further Assurances | 56 |
| 6.16 | Compliance With Terms Of Leaseholds | 57 |

K&E 15141964.11

| | | |
|---|---|---|
| 6.17 | Post-Closing Matters | 57 |
| 6.18 | Cash Management System | 57 |

ARTICLE VII
NEGATIVE COVENANTS

| | | |
|---|---|---|
| 7.01 | Liens | 57 |
| 7.02 | Indebtedness | 59 |
| 7.03 | Investments | 60 |
| 7.04 | Fundamental Changes | 60 |
| 7.05 | Dispositions | 61 |
| 7.06 | Restricted Payments | 62 |
| 7.07 | Change In Nature Of Business; Activities of Palmer | 62 |
| 7.08 | Transactions With Affiliates | 62 |
| 7.09 | Burdensome Agreements | 63 |
| 7.10 | Borrowing Base; Financial Covenants | 63 |
| 7.11 | Amendments Of Organization Documents | 64 |
| 7.12 | Accounting Changes | 64 |
| 7.13 | Partnerships, Etc | 64 |
| 7.14 | Speculative Transactions | 64 |
| 7.15 | Formation Of Subsidiaries | 64 |

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

| | | |
|---|---|---|
| 8.01 | Events Of Default | 64 |
| 8.02 | Remedies Upon Event of Default | 69 |
| 8.03 | Application Of Funds | 69 |
| 8.04 | Protective Advances | 70 |

ARTICLE IX
ADMINISTRATIVE AGENT

| | | |
|---|---|---|
| 9.01 | Authorization and Action | 71 |
| 9.02 | Agent's Reliance, Etc | 71 |
| 9.03 | Agents Entitled to Act as Lender | 72 |
| 9.04 | Lender Credit Decision | 72 |
| 9.05 | Indemnification Of Agents | 72 |
| 9.06 | Successor Agents | 73 |
| 9.07 | [Reserved] | 74 |
| 9.08 | [Reserved] | 74 |
| 9.09 | Collateral and Guaranty Matters | 74 |
| 9.10 | Delegation of Duties | 75 |

ARTICLE X
MISCELLANEOUS

| | | |
|---|---|---|
| 10.01 | Amendments, Etc | 75 |

K&E 15141964.11

| | | |
|---|---|---|
| 10.02 | Notices and Other Communications; Facsimile Copies | 75 |
| 10.03 | No Waiver; Cumulative Remedies | 78 |
| 10.04 | Expenses; Indemnity; Damage Waiver | 78 |
| 10.05 | Payments Set Aside | 80 |
| 10.06 | Successors and Assigns | 80 |
| 10.07 | Treatment of Certain Information; Confidentiality | 83 |
| 10.08 | Right of Setoff | 84 |
| 10.09 | Interest Rate Limitation | 85 |
| 10.10 | [Reserved] | 85 |
| 10.11 | Counterparts; Integration; Effectiveness | 85 |
| 10.12 | Survival Of Representations and Warranties | 85 |
| 10.13 | Severability | 86 |
| 10.14 | USA Patriot Act Notice | 86 |
| 10.15 | Governing Law; Jurisdiction; Etc. | 86 |
| 10.16 | WAIVER OF JURY TRIAL | 87 |

SIGNATURES ............................................................................................ S-1

K&E 15141964.11

# EXHIBITS

FORM OF

| | |
|---|---|
| Exhibit A | Assignment and Assumption |
| Exhibit B | Budget |
| Exhibit C | Committed Loan Notice |
| Exhibit D | Compliance Certificate |
| Exhibit E | Guaranty |
| Exhibit F | Interim Order |
| Exhibit G | Security Agreement |
| Exhibit H | Borrowing Base Report |
| Exhibit I | Variance Report |

# SCHEDULES

| | |
|---|---|
| Schedule I | Designated Accounts |
| Schedule 1.1 | Foreign Receivable Insurance Policies |
| Schedule 2.01 | Commitments and Applicable Percentages |
| Schedule 5.05 | Indebtedness |
| Schedule 5.06 | Litigation |
| Schedule 5.08(b) | Existing Liens |
| Schedule 5.08(c) | Owned Real Property |
| Schedule 5.08(d)(i) | Leased Real Property (Lessee) |
| Schedule 5.08(d)(ii) | Leased Real Property (Lessor) |
| Schedule 5.09 | Environmental Matters |
| Schedule 5.13 | Subsidiaries and other Equity Investments; Loan Parties |
| Schedule 5.16 | Intellectual Property Matters |
| Schedule 6.17(a) | Post-Closing Matters |
| Schedule 6.17(b)(i) | Cash Management System Requirements |
| Schedule 6.17(b)(ii) | Landlord Waivers |
| Schedule 7.03(f) | Existing Investments |
| Schedule 7.05(k) | Permitted Dispositions |
| Schedule 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

K&E 15141964.11

# SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of July **[16]**, 2009, among **THE LANG COMPANIES, LLC**, a Delaware limited liability company and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), as the borrower, the Guarantors party hereto, each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and Sun Lang Finance, LLC, a Delaware limited liability company, as Administrative Agent and Collateral Agent.

## PRELIMINARY STATEMENTS:

1.     On July **[16]**, 2009 (the "Filing Date"), Borrower, Borrower's parent, Lang Holdings, Inc. (the "Parent") and each of their direct and indirect subsidiaries and certain of its affiliates filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.     Borrower has requested that the Lenders provide a secured, multi-draw term loan credit facility to the Borrower in an aggregate principal amount not to exceed the Aggregate Commitment (the "Credit Facility").

3.     The proceeds of the Credit Facility will be used (i) to pay related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower and the Guarantors subject to the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Loan Parties' advisors and the advisors to any Creditor's Committee, in each case associated with the Cases and (iv) to make any other payments permitted to be made in the Orders or in the First Day Orders or by the Bankruptcy Court to the extent permitted under the Budget and not prohibited by this Agreement, or as otherwise consented to by the Required Lenders.

4.     To provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, each of the Loan Parties will provide to the Collateral Agent (for the benefit of the Secured Parties) the following (all as more fully described herein):

     (a)     pursuant to Section 364(c)(1) of the Bankruptcy Code and the Orders, as applicable, a Superpriority Claim in the Cases having priority over any claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out,

K&E 15141964.11

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code and the Orders, as applicable, a perfected first priority Lien on all unencumbered property and assets of the Loan Parties of any kind subject only to the Carve-Out,

(c)     pursuant to Section 364(c)(3) of the Bankruptcy Code and subject to clause (d) below, a perfected Lien on all property and assets of the Loan Parties as more fully described in the Loan Documents subject to (i) unavoidable valid and perfected Liens in existence at the time of the commencement of the Cases other than with respect to the Primed Liens, (ii) unavoidable valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (the Liens described in clause (i) above and this clause (ii), being "Existing Liens"), other than with respect to the Primed Liens, (iii) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, (iv) easements, rights-of-way, covenants, conditions, zoning variances and similar encumbrances that do not materially interfere with the use or the value of the property subject thereto, (v) mechanic's, materialmen's, warehousemen's or similar Liens that arise by operation of law, (vi) post-petition Capitalized Leases or purchase money financings permitted to be entered into hereunder (the Liens described in clauses (iii) through this clause (vi), being "Permitted Liens") and (vii) the Carve-Out, and

(d)     pursuant to Section 364(d)(1) of the Bankruptcy Code and the Orders, as applicable, a perfected first priority, senior, priming Lien on all the property of the Loan Parties of any kind that secure obligations under the Prepetition Facility and any Liens that are junior to such Liens, all of which existing Liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Collateral Agent, which senior priming Liens in favor of the Collateral Agent shall also prime any Liens arising after the commencement of the Cases to provide adequate protection in respect of any Primed Liens, subject only to Permitted Liens and the Carve-Out.

In consideration of the premises and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01    DEFINED TERMS.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth in Section 10.14.

"Administrative Agent" means Sun Lang Finance, LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account maintained by the Administrative Agent identified in writing by the Adminstrative Agent to the Borrower and the Lenders, or such other office or account of any servicer or sub-agent appointed by the Administrative Agent, in each case as the Administrative Agent or such servicer or sub-agent may from time to time notify to the Borrower and the Lenders.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent (including any sub-agent or servicer appointed by either such Person pursuant to Section 9.10 hereof).

"Aggregate Borrowing Base Amount" shall have the meaning ascribed to such term in the definition of "Borrowing Base" herein.

"Aggregate Commitment" means $16,000,000. The Aggregate Commitment may be reduced from time to time pursuant to the provisions of this Agreement. If the Commitment is terminated pursuant to the provisions of this Agreement, the Aggregate Commitment shall thereafter be zero.

"Agreement" means this Credit Agreement.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, subject to any subsequent adjustment or reduction pursuant to the terms and conditions hereof.

"Approval" has the meaning specified in Section 8.01(w).

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), in substantially the form of Exhibit A.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic

4

Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capitalized Lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Parent and its Subsidiaries for the fiscal year ended March 31, 2008, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Parent and its Subsidiaries, including the notes thereto.

"Avalanche" means Avalanche Publishing, Inc., a California corporation and debtor and debtor in possession.

"Avalanche Acquisition" means Avalanche Publishing Acquisition, Inc., a Delaware corporation and debtor and debtor in possession.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Borrower" has the meaning specified in the introductory paragraphs to this Agreement.

"Borrowing" means a borrowing of a Term Loan made by each of the Lenders pursuant to Section 2.01.

"Borrowing Base" means the sum of (i) 85% of Eligible Accounts, (ii) 40% of the Net Fixed Assets Value (provided, that the maximum amount included in the Borrowing Base under this clause (ii) shall not exceed $1,400,000), and (iii) (a) from July 1 through and including February 28, 65% of Eligible Inventory and (b) from March 1 through and including June 30, 75% of Eligible Inventory (provided, that the maximum amount included in the Borrowing Base under this clause (iii) shall not exceed $20,000,000) (collectively, the "Aggregate Borrowing Base Amount"); minus (x) the then-outstanding principal amount of the Term Loan and (y) $8,000,000; provided, however, that to the extent the Aggregate Borrowing Base Amount exceeds the Aggregate Commitment (the amount of such excess being hereinafter referred to as the "Collateral Overage"), the amount of such Collateral Overage shall be deducted from the then outstanding principal amount of the Term Loan solely for the purpose of determining the amount referred to in subsection (x) above.

"Budget" means, initially, the budget for the Loan Parties for the period from the Closing Date through October 16, 2009, attached hereto as Exhibit B.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York, New York.

"Capital Expenditures" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset

(excluding normal replacements and maintenance which are properly charged to current operations). For purposes of this definition, the purchase price of equipment that is purchased substantially contemporaneously with the trade-in or sale of similar existing equipment or with insurance proceeds therefrom shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted by the seller of such equipment for the equipment being traded in at such time or the proceeds of such sale or the amount of such insurance proceeds, as the case may be.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Carve-Out" has the meaning assigned in Section 2.14.

"Carve-Out Trigger Notice" has the meaning assigned in Section 2.14.

"Cases" means the cases of Borrower and the Guarantors currently pending under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Collateral" means "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"Cash Collateral Account" means the deposit account established in the name of "Sun Lang Finance LLC- Lang Cash Collateral Account", over which the Administrative Agent shall have the sole dominion and control pursuant to arrangement satisfactory to the Administrative Agent.

"Cash Equivalents" means any of the following types of Investments:

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c) commercial paper in an aggregate amount of no more than $10,000,000 per issuer outstanding at any time issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 270 days from the date of acquisition thereof; and

6

(d)   Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Catterton Partners" means Catterton Partners V, L.P., a Delaware limited partnership and its affiliates.

"Cash Management System Requirement" means delivery to the Administrative Agent of duly executed deposit account control agreements in form and substance satisfactory to the Administrative Agent with respect to each of the accounts listed on Schedule 6.17(b)(i) and the Designated Account.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means, an event or series of events by which:

(a)   the Sponsor shall cease to own and control legally and beneficially, either directly or indirectly, equity securities in Parent representing more than 51% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of such Person on a fully-diluted basis;

(b)   a majority of the members of the board of directors or other equivalent governing body of Parent or the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the Closing Date, or (ii) who were appointed by the Sponsor;

(c)   Parent shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Borrower; or

(d)   Borrower shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Guarantors other than the Parent.

"Change in Management" means Tom S. O'Donoghue or a substitute member of equal or greater seniority of CRG Partners Group LLC acceptable to the Administrative Agent ceases to be the chief restructuring officer of the Borrower.

K&E 15141964.11

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all of the "Collateral" and/or "DIP Collateral" referred to in the Orders or the Collateral Documents and all of the other property and assets that are or are intended under the terms of the Orders or the Collateral Documents to be subject to Liens in favor of the Collateral Agent for the benefit of the Secured Parties.

"Collateral Agent" means Sun Lang Finance, LLC in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent.

"Collateral Documents" means, collectively, the Security Agreement, the Guaranty, the Orders, the Intellectual Property Security Agreement, and any other mortgages, collateral assignments, security agreement supplements, pledge agreements or other similar agreements delivered to the Collateral Agent pursuant to Section 6.12 from time to time, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"Collateral Overage" shall have the meaning ascribed to such term in the definition of "Borrowing Base" herein.

"Commitment" means, as to each Lender, the product of such Lender's Applicable Percentage and the Aggregate Commitment then in effect, as the same may be reduced from time to time, or, if such Commitment is terminated pursuant to the provisions hereof, zero.

"Committed Loan Notice" means a notice of a Borrowing substantially in the form of Exhibit C.

"Company Intellectual Property" shall have the meaning as specified in Section 5.16.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Extension" means a Borrowing.

K&E 15141964.11

"Credit Facility" has the meaning specified in the preliminary statements hereto.

"Creditor's Committee" means any official committee appointed in the Cases.

"Current Assets" means, with respect to any Person, all assets of such Person that, in accordance with GAAP, would be classified as current assets on the balance sheet of a company conducting a business the same as or similar to that of such Person, after deducting appropriate and adequate reserves therefrom in each case in which a reserve is proper in accordance with GAAP.

"Customer" means and includes the account debtor with respect to any of the accounts receivables or the prospective purchaser with respect to nay contract right or any party who enters into or propose to enter into any contract or other arrangement with any Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, with respect to any of the Obligations, an interest rate equal to the interest rate otherwise applicable to such Term Loan plus 3.0% per annum.

"Designated Account" means the deposit account of the Borrower identified on Schedule I.

"Delayed-Draw Term Loans" has the meaning specified in Section 2.01(b).

"Disclosure Statement" means the disclosure statement accompanying the Plan of Reorganization.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Equity Interests owned by such Person, or any notes or accounts receivable or any rights and claims associated therewith.

"Dollar" and "$" mean lawful money of the United States.

"Eligible Accounts" means an account owing to any Loan Party (the owner of any Eligible Account, whether one or more, is referred to herein as the "Account Owner"), less any amount reserved for discounts, which meets all of the following specifications and which is not dated prior to the performance of the service or delivery of the goods represented on that invoice:

> (i) it arose from the performance of services by the Account Owner, or from a bona fide sale of goods, which have been delivered or shipped to the Customer and for which the Account Owner has genuine invoices, shipping documents or receipts;

> (ii) it is not more than 90 days past the date of invoice; provided, the parties understand that this requirement shall not apply to invoices payable to any Loan Party by: (x) Waldenbooks, Borders, Calendar Club, Barnes & Noble, and other

9

companies acceptable to the Agent, all of which invoices are due as of December 31 of each calendar year and (y) Premier Gift, Ltd., all of which invoices are due on a net 30 day or net rolling 90 day basis (but in no event later than October 30 of each calendar year); provided, further that notwithstanding the foregoing, the Agent and the Lenders expressly agree that for accounts with respect to which the Borrowers are regularly paid in two installments, with the first such installment due in December of the applicable selling season and the second following reconciliation beginning in March or April of the year following, to the extent such account otherwise meets the other specifications set forth in this definition of "Eligible Accounts" (and subject to any other reduction in accordance therewith): (i) 100% of any such account shall be deemed an "Eligible Account" for a period of forty-five (45) days following such December due date; and (ii) thereafter, such account shall be shall be deemed an "Eligible Account" in an amount not to exceed 50% of its original balance through and including the date that is one hundred fifty (150) days following such December due date;

(iii) it is owned by one or more Loan Parties free of all Liens (other than the Lien of the Lenders hereunder);

(iv) not more than 25% of the accounts owing by the Customer are more than 90 days past due; provided, however, that invoices payable to any Loan Party by the parties identified in subsection (ii), above, shall not be deemed past due if they are paid within the time periods specified therein;

(v) it is enforceable against the Customer for the amount shown as owing in the statements furnished by the Loan Parties to the Lenders. No return, rejection or repossession in excess of 10% of the amount shown as owing has occurred. It and the transaction out of which it arose comply in all material respects with all applicable laws and regulations. The merchandise or services have been accepted by the Customer without dispute in excess of 10% of the amount shown as owing and the account is not subject to any setoff, credit allowance or adjustment in excess of 10% of the amount shown as owing, nor is it subject to any defenses or counterclaims of which any Loan Party has knowledge. Notwithstanding the foregoing, the Agent and the Lenders expressly agree that to the extent that the Borrowers or their Customers reserve, in the ordinary course of business, for amounts relating to the payment of any account for returns, rejections or repossessions in excess of 10% but not more than 29% of the face amount, such account shall remain an "Eligible Account" to the extent of its face amount less the amount of such reserves with respect thereto, so long as such account otherwise meets the specifications set forth in the other clauses of this definition of "Eligible Accounts";

(vi) the Customer is not a Loan Party or a Governmental Authority;

(vii) the Agent is, and continues to be, reasonably satisfied with the creditworthiness of the Customer in relation to the amount of credit extended and has not notified the Borrower or any of the other Loan Parties orally (to be confirmed in writing) that the account or Customer is unsatisfactory with respect to the creditworthiness of the Customer in relation to the amount of credit extended;

10

(viii) the Customer has its principal place of business in the United States or Canada, or the account is secured by a letter of credit satisfactory to the Agent in favor of the Account Owner, which letter of credit has been delivered to the Agent, or the account is covered by a foreign receivable insurance policy as identified on <u>Schedule 1.1</u> attached hereto (provided, that the amount of such accounts to be included as "Eligible Accounts" hereunder shall not exceed the Dollar amounts set forth on such Schedule); and

(ix) the Agent has not notified the Borrowers orally (to be confirmed in writing) that the Agent has determined in its reasonable discretion that the account or Customer is unsatisfactory in any respect.

"<u>Eligible Assignee</u>" means (a) a Lender, an Affiliate of a Lender or an Approved Fund and (b) any other Person (other than a natural person) approved by the Administrative Agent. "Eligible Assignee" shall not include the Borrower or any of the Borrower's Affiliates or Subsidiaries.

"<u>Eligible Inventory</u>" means inventory, excluding office supplies and packaging supplies, which meets these specifications:

(i) it is owned by the Loan Parties free of all Liens (other than the Lien of the Lenders hereunder);

(ii) no financing statement (other than those of the Agent's for the benefit of the Lenders) is on file covering its products or proceeds;

(iii) it is in good condition and, in the case of goods held for sale, it is new and unused and not obsolete;

(iv) the Agent has not notified the Borrower or any of the other Loan Parties orally (to be confirmed in writing) that the Agent has determined in its reasonable discretion that any of the Inventory is unsatisfactory; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Agent and the Lenders expressly agree that the Agent shall not deem ineligible or unsatisfactory any non-dated Inventory that has been in stock for over one year but that the Borrowers have determined in their reasonable discretion to be saleable, so long as such inventory otherwise meets the specifications set forth in the other clauses of this definition of "Eligible Inventory";

(v) if it is stored at a location other than a location that is owned by a Borrower, and if the book value of such Inventory at such locations exceeds five percent (5%) of the book value of the Loan Parties' inventory at all locations, the Agent shall have received Landlord Waivers in respect of such locations, subject to the time period referenced in Section 6.17(b);

(vi) if it is in transit in the ordinary course of the Loan Parties' business, the Borrower has appropriate documentation satisfactory to the Administrative Agent evidencing (1) that the title has passed to and is held by a Loan Party, (2) that it is located in the United States or on the water en route to the United States, and (3) that it is insured

11

for full value, and all payments obligations owed to the shipper or carrier have been satisfied in full; and

(vii) it is not inventory held on consignment, bill-and-hold or similar arrangement.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements, governmental restrictions or common law relating to public health and safety, worker health and safety, pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to wastewater or public water systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Laws.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under

Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate or (g) the failure of any Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, and (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a).

"Existing Indebtedness" means Indebtedness of each Loan Party and its Subsidiaries outstanding immediately before the occurrence of the Closing Date set forth on Schedule 5.05.

"Existing Liens" has the meaning assigned in the recitals hereto.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not included in a line item in the Budget or not in the ordinary course of business, including, without limitation, pension plan reversions, tax refunds, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"Filing Date" has the meaning assigned in the recitals hereto.

"First Day Orders" has the meaning set forth in Section 4.01(f).

13

"Final Order" means the final order of the Bankruptcy Court in the Cases authorizing and approving this Credit Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance substantially similar to the Interim Order and otherwise satisfactory to the Required Lenders.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning specified in Section 10.06(h).

"Guarantee" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee at any time shall be deemed to be an amount then equal to the stated or

14

determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranty" means a guaranty substantially in the form of Exhibit E hereto, as supplemented and amended.

"Guarantors" means, collectively, the Parent, Lang Store, Turner and Avalanche, Avalanche Acquisition and each of the Parent's other subsidiaries (other than the Borrower), whether directly or indirectly owned, at any time in existence.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes and materials that are considered or deemed to be, or regulated as, hazardous, toxic, infectious or dangerous under applicable Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any swap contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than postpetition trade accounts payable and other accrued expenses (other than professional fees) in the ordinary course of business which are not outstanding for more than 60 days after the same are billed or invoiced or 90 days after the same are created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements); provided that if such indebtedness shall not have been assumed by such Person and is otherwise non-recourse to such Person, the amount of such obligation treated as Indebtedness shall not exceed the value of such property securing such obligations.

(f)     all Attributable Indebtedness;

K&E 15141964.11

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at its liquidation preference; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent that such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any swap contract on any date shall be deemed to be the swap termination value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnified Costs" has the meaning specified in Section 9.05(a).

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" shall mean all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights and copyrightable works; (iv) registrations and applications for any of the foregoing; (v) trade secrets, confidential information, know-how and inventions; (vi) computer software (including but not limited to source code, executable code, and documentation) and databases; and (vi) all other intellectual property.

"Intellectual Property Security Agreement" means an intellectual property security agreement, substantially the form of Exhibit [C] to the Security Agreement, together with each other  intellectual property security agreement and any supplement delivered pursuant to Section 6.12, in each case as amended.

"Initial Term Loan" has the meaning specified in Section 2.01.

"Interest Payment Date" means the last day of each Interest Period and the Maturity Date.

"Interest Period" means, with respect to each Term Loan, initially the period commencing on the Closing Date and ending on July 31, 2009 and thereafter commencing on the last day of the immediately preceding Interest Period and ending on the last Business Day of the immediately following calendar month.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

16

"Interim Availability Amount" means the maximum amount permitted to be borrowed under this Agreement in accordance with the Interim Order.

"Interim Order" means the order of the Bankruptcy Court in the Cases in substantially the form attached hereto as Exhibit F authorizing and approving this Credit Agreement on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code and entered at a preliminary hearing under Bankruptcy Rule 4001, in form and substance satisfactory to the Required Lenders and the Borrower.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.01 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Landlord Waivers" means landlord waivers in form and substance satisfactory to the Administrative Agent with respect to the properties listed on Schedule 6.17(b)(ii).

"Lang Companies" means The Lang Companies, LLC, a Delaware limited liability company and debtor and debtor in possession.

"Lang Store" means The Lang Store, Ltd., a Wisconsin limited liability company and debtor and debtor in possession.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other) or charge or preference or priority over

17

assets or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Guaranties, (iii) the Collateral Documents, and (iv) any document that has been approved in writing by the Borrower appointing any sub-agent or servicer pursuant to Section 9.10.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, properties, liabilities (actual or contingent), operations, financial condition or prospects of the Borrower and the Guarantors taken as a whole; or (b) a material impairment of the rights and remedies of any Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party.

"Material Customer" means [_____ ] or any customer representing over ten percent (10%) of the aggregate revenue of Parent and its Subsidiaries as of the date of determination.

"Material Customer Revenue Reduction" means a material percentage reduction in the gross revenues generated by the services provided by Parent and its Subsidiaries on a consolidated basis to any single Material Customer, determined on the basis of an aggregate decrease in monthly revenues levels.

"Material Customer Termination Event" means (i) the occurrence and continuation of a Material Customer Revenue Reduction or (ii) any material contract with any Material Customer is terminated or amended in a manner that is materially adverse to Parent or any of its Subsidiaries, as the case may be, or to be material to the Administrative Agent's or the Lenders' interests.

"Maturity Date" means the earliest of (i) 5:00pm on July 17, 2009 unless the Closing Date shall have occurred on or prior to such date, (ii) the date which is 20 days after the date that the Interim Order was entered on the Bankruptcy Court's docket if the Final Order shall not have been approved by the Bankruptcy Court on or before such date, (iii) October 15, 2009, (iv) the effective date of a Plan of Reorganization, as specified in such plan or plans, or, if earlier, the date that is one Business Day after the date of entry of an order entered by the Bankruptcy Court approving the sale of all or a substantial part of the Loan Parties' assets or businesses and (v) the date of termination in whole of the Commitments pursuant to Section 2.06 or Section 8.02 or the acceleration of the Term Loans pursuant to Section 8.02.

"Maximum Rate" has the meaning specified in Section 10.09.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is

obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by an Existing Lien (other than a Primed Lien) on the applicable asset and that is, or is required to be, repaid in connection with such transaction (other than Indebtedness under the Loan Documents) and which Indebtedness is permitted to be so repaid in the Cases and (B) the out-of-pocket expenses incurred by any Loan Party or such Subsidiary in connection with such transaction.

"Net Fixed Assets Value" means the value of the Loan Parties' fixed assets net of accumulated depreciation as determined in accordance with GAAP and reported on a monthly basis.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Term Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses, charges and disbursements. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of obligation described in clause (a) that the Administrative Agent or any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"Orders" means the Interim Order and, if any, the Final Order, as applicable.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made

hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means with respect to Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans occurring on such date.

"Palmer" means Palmer, LLC, a Delaware limited liability company.

"Parent" has the meaning specified in the introductory paragraphs to this Agreement.

"Participant" has the meaning specified in Section 10.06(d).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Funding Rules" shall mean the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date as to any such Plan of the Pension Protection Act of 2006, Sections 401(a)(29) and 412 of the Code and Part 3, Subtitle I, of Title I of ERISA each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Sections 412 and 430 through 436 of the Code and Part 3, Subtitle I, of Title I of ERISA each as in effect from time to time.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan of Reorganization" means a plan or plans of reorganization in respect of the Cases.

"Pledged Debt" has the meaning specified in Section 2(d)(iv) of the Security Agreement.

"Pledged Interests" has the meaning specified in Section 2(d)(iii) of the Security Agreement.

"Prepetition Facility" means that certain Credit Agreement, dated as of November 4, 2003, among Borrower, the Guarantors, the lenders party thereto, Bank of America, N.A. as successor to LaSalle Bank National Association, as agent, and all documents, instruments and agreements (including, without limitation, all collateral and security documents) executed or delivered in connection therewith (as the credit agreement and each other document, instrument and agreement has been amended, waived, modified, supplemented or restated prior to the Filing Date).

"Primed Liens" has the meaning assigned in the recitals hereto.

"Professionals" has the meaning specified in Section 2.14(a).

"Professional Expense Cap" has the meaning specified in Section 2.14(a).

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, sub-agents, servicers, trustees, attorneys and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Request for Credit Extension" means, with respect to a Borrowing, a Committed Loan Notice.

"Required Lenders" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments.

"Responsible Officer" means the (i) chief restructuring officer and (ii) chief executive officer, president, chief financial officer, treasurer or assistant treasurer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent of any thereof), or on account of any option, warrant or other right to acquire any such dividend or other distribution or payment.

21

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" has the meaning specified in Section 3 of the Security Agreement.

"Secured Parties" means, collectively, the Agents and the Lenders.

"Security Agreement" means a security agreement substantially in the form of Exhibit G hereto, as supplemented and amended.

"Security Agreement Supplement" has the meaning specified in Section 23(b) of the Security Agreement.

"SPC" has the meaning specified in Section 10.06(h).

"Specified Default" has the meaning specified in Section 8.04.

"Sponsor Tranche" has the meaning specified in Section 8.04.

"Sponsor" means, collectively, Catterton Partners and investment Affiliates of Catterton Partners that are controlled by Catterton Partners.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim" means a claim under Section 364(c)(1) of the Bankruptcy Code against Borrower or any Guarantor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges of any kind whatsoever imposed by any

22

Governmental Authority, including any interest, additions to tax or penalties applicable thereto, whether disputed or not.

"Term Loans" has the meaning specified in Section 2.01.

"Threshold Amount" means $100,000.

"Total Outstanding" means the aggregate Outstanding Amount of all Term Loans.

"Transaction" means the execution, delivery and performance by Borrower and Guarantors of this Agreement and the other Loan Documents to which they may be a party, the creation of the Liens in the Collateral in favor of the Collateral Agent, the borrowing of the Term Loans and the use of the proceeds thereof.

"Turner" means Turner Acquisition, Inc., a Delaware corporation and debtor and debtor in possession.

"Unaccrued Indemnity Claims" means claims for indemnification that may be asserted by the Agents, any Lender or any other Indemnitee under the Loan Documents that are unaccrued and contingent.

"United States" and "U.S." mean the United States of America.

"UST" means the United States Trustee appointed to serve in the Cases.

"Variance Report" has the meaning specified in Section 6.01(e).

1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified,

23

refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03    Accounting Terms.

(a)     Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.04    Rounding. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05    Times Of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

2.01    The Term Loans. Subject to the terms and conditions hereof, (a) each Lender severally agrees to make a term loan (an "Initial Term Loan") to the Borrower on the

Closing Date in an aggregate amount equal to $ 4,000,000; provided that the aggregate principal amount of Initial Term Loan shall not exceed the Interim Availability Amount; (b) each Lender severally agrees to make a term loan (a "Delayed-Draw Term Loan"; the Delayed-Draw Term Loans and Initial Term Loans, together, the "Term Loans") to the Borrower on the date specified in a Committed Loan Notice in an amount equal to the amount requested in the applicable Committed Loan Notice; provided that after giving effect to any Borrowing, the Total Outstanding shall not exceed the least of (i) the Aggregate Commitments, (ii) the Borrowing Base then in effect and (iii) the amount permitted to be outstanding under the Budget for such period less the amount of cash on-hand (specified in such Committed Term Loan Notice) in excess of $1,000,000. The Commitment of each Term Lender shall be reduced by the amount of Term Loans made by such Lender and shall automatically terminate at 5:00 P.M., on the Maturity Date. Once repaid, a Term Loan may not reborrowed.

2.02    Borrowings Of Term Loans.

(a)    Each Borrowing shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 1:00 p.m. on the Business Day prior to the Closing Date, and thereafter, one Business Day prior to the requested date of any Borrowing of Term Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower, but the failure to provide such written Committed Loan Notice shall not affect the validity of the request. Each Borrowing of Loans shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Term Loans to be borrowed. No more than two (2) Borrowings shall be permitted during any one week period.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender in writing or by telecopier or other electronic communication of the amount of its Applicable Percentage of the requested Term Loans. In the case of a Borrowing, each Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds to the Designated Account.

2.03    [Reserved].

2.04    [Reserved].

2.05    Prepayments.

K&E 15141964.11

(a)     Optional. The Borrower may, upon notice to the Administrative Agent at any time or from time to time, voluntarily prepay Term Loans in whole or in part without premium or penalty; provided that (A) such notice must be received by the Administrative Agent not later than 1:00 p.m. one Business Day prior to any date of prepayment of Term Loans; and (B) any partial prepayment shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment, the payment amount specified in such notice shall be due and payable on the date specified therein and each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentages.

(b)     Mandatory.

(i)   If any Loan Party or any of its Subsidiaries Disposes of any property or assets (other than any Disposition of any property or assets permitted by Section 7.05(b), (c)(ii), (d), (e), (g), (h), or (i)), the Borrower shall within one Business Day after receiving such proceeds prepay an aggregate principal amount of Term Loans equal to 100% of such Net Cash Proceeds.

(ii)   [Reserved].

(iii)   [Reserved].

(iv)   Upon any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, and not otherwise included in clause (i) of this Section 2.05(b), the Borrower shall prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom within one Business Day upon receipt thereof by any Loan Party or such Subsidiary (or, within five Business Days of such receipt in the case of an Extraordinary Receipt consisting of a Tax refund).

(v)   If for any reason the Total Outstanding at any time exceed the Borrowing Base amount then in effect or the amount permitted by the Budget to be outstanding, the Borrower shall immediately prepay the Term Loans in an aggregate amount sufficient to eliminate such excess.

(vi)   Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied as follows: first, to reimburse the Agents for any costs and expenses incurred by them (including legal fees and expenses), and second, shall be applied to prepay Term Loans outstanding at such time until all such Term Loans are paid in full, the amount remaining, if any, after the prepayment in full of all Term Loans outstanding at such time may be retained by the Borrower for use in the ordinary course of its business.

2.06   Termination Or Reduction Of Commitments.

K&E 15141964.11

(a)     Optional.  The Borrower may, upon written notice to the Administrative Agent, terminate the Commitments, or from time to time permanently reduce the Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 1:00 p.m. one (1) Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall in an aggregate amount of at least $250,000 or an integral multiple of $250,000 in excess thereof.

(b)     Application of Commitment Reductions; Payment of Fees.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of any Commitment under this Section 2.06.  Upon any reduction of Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of the amount by which the Credit Facility is reduced.  All fees accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

2.07   Repayment Of Term Loans.  The Borrower shall repay to the Administrative Agent on the Maturity Date the aggregate principal amount of all Term Loans and all other Obligations (other than Unaccrued Indemnity Claims) outstanding on such date.

2.08   Interest.

(a)     Subject to the provisions of Section 2.08(b), each Term Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to 15%.

(b)     (i) If any amount payable by any Loan Party under any Loan Document is not paid when due (with regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)   Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Term Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof.

2.09   Fees.

(a)     Commitment Fee.  The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee of 0.50% per annum times the actual daily amount by which the aggregate Commitments exceed the Outstanding Amount.  The commitment fee shall be calculated monthly in arrears.

(b)     Closing Fee.  On the Closing Date, the Borrower shall pay to the Administrative Agent for the account of each Lender a closing fee in the aggregate amount equal to 3% of the Aggregate Commitment in effect immediately prior to the Initial Term Loan.

27

(c)  Exit Fee.  Together with each payment or prepayment (including by way of credit bid) of Term Loans (including a mandatory or voluntary prepayment, and a payment upon acceleration or at the Maturity Date), the Borrower shall pay (in addition to the amount paid, repaid or prepaid) an exit fee equal to 2% of the amount paid, repaid or prepaid, such fee for the account of each Lender in accordance with its Applicable Percentage.  The exit fee, in aggregate, shall equal 2% of the Aggregate Commitment in effect immediately prior to the Initial Term Loan and shall be fully earned upon the Closing Date.

2.10  Computation Of Interest And Fees.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Term Loan for the day on which the Term Loan is made, and shall not accrue on a Term Loan, or any portion thereof, for the day on which the Term Loan or such portion is paid; provided that any Term Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.11  Evidence Of Indebtedness.

(a)  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)  [Reserved]

(c)  Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(b), and by each Lender in its account or accounts pursuant to Section 2.11(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

2.12  Payments Generally; Administrative Agent's Clawback.

(a)  General.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  All payments by the Borrower hereunder shall be made to the Administrative Agent, for the account

28

of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    (i) <u>Funding By Lenders; Presumption By Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may (but shall not be so required), in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Federal Funds Rate and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to the Term Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Term Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii) <u>Payments By Borrower; Presumptions By Administrative Agent</u>. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be so required), in reliance upon such assumption, distribute to the Lenders, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Rate.

(iii) A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Subsection (b) shall be conclusive, absent manifest error.

(c)     Failure To Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Term Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations Of Lenders Several.  The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Term Loan or make payments pursuant to Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or make payments pursuant to Section 10.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Term Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Term Loan in any particular place or manner.

(f)     Authorization.  The Borrower hereby authorizes each Lender, if and to the extent payment owed to such Lender is not made when due hereunder to charge from time to time against any or all of the Borrower's accounts with such Lender any amount so due. The Borrower hereby authorizes the Administrative Agent, from time to time without prior notice to the Borrower, to charge all interest and fees (when due and payable), all fees and expenses required to be reimbursed by the Borrower under this Agreement and the other Loan Documents (as and when incurred) all fees and costs provided for in Section 2.09 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Term Loans hereunder (regardless of whether the conditions thereto are satisfied) and shall accrue interest at the rate then applicable to Term Loans hereunder.  Any interest not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Term Loans hereunder (regardless of whether the conditions thereto are satisfied) and shall accrue interest at the rate then applicable to Term Loans hereunder.

(g)     Insufficient Payment.  Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Agents and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Agents and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Applicable Percentage of the Outstanding Amount of all Term Loans outstanding at such time in repayment or prepayment of such of the outstanding Term Loans or other Obligations then owing to such Lender.

K&E 15141964.11

2.13    Sharing Of Payments By Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Term Loans made by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Term Loans and accrued interest thereon greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Term Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans and other amounts owing them; provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans, other than to the Borrower or any Subsidiary (as to which the provisions of this Section shall apply).

(b)    Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14    Priority and Liens.

(a)    Superpriority Claims and Liens.  Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order or the Final Order, whichever is then in effect, the Obligations of Borrower and the Guarantors under the Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several allowed superpriority administrative expense claims in the Cases having priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of Borrower and the Guarantors that is not subject to Existing Liens or post-petition Permitted Liens; (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of Borrower and the Guarantors that is subject to Existing Liens (other than Primed Liens described in clause (iv) below) and to post-petition Permitted Liens, junior to such Existing Liens and such Permitted Liens; and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority, senior priming Lien on all of the tangible and intangible property of Borrower and the Guarantors that is subject to existing Liens

31

that secure Borrower's and the Guarantors' Indebtedness and other obligations under the Prepetition Facility and any Liens that are junior thereto, including any Liens granted on or after the Filing Date to provide adequate protection in respect of the Prepetition Facility (but subject to any Existing Liens to which the Liens being primed hereby are subject or become subject subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code or any Permitted Liens); in the case of each of clauses (i) through (iv) subject only to, the Carve-Out (as defined below); provided that, except as otherwise provided in the Interim Order or the Final Order, whichever is then in effect, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of Borrower and the Guarantors owing to the lenders, agents or indemnified parties under the Credit Facility or to the collateral securing the Prepetition Facility; provided, however, that a portion of the Carve-Out up to an amount specified in the Orders may be utilized by the Creditor's Committee to investigate (but not commence or prosecute any action, suit or other proceeding by motion, objection or otherwise) the priority and validity of the obligations under the Prepetition Facility and the Liens securing the same. "Carve-Out" means the (a) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of professional persons, retained by any Debtor or any Committee (collectively, the "Professionals"), in each case, incurred on and prior to delivery of a notice (the "Carve-Out Trigger Notice") to the Borrower, its counsel, the UST and counsel to the Creditors' Committee, if applicable in an amount not in excess of the aggregate amounts permitted under the Budget through the period from the Closing Date to the date of the Carve-Out Trigger Notice and (c) unpaid and allowed fees and expenses of Professionals incurred subsequent to delivery of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000 (the "Professional Expense Cap"). The Professional Expense Cap shall be reduced, dollar for dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals subsequent to delivery of a Carve-Out Trigger Notice. The Lenders agree that Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out prior to the delivery of a Carve-Out Trigger Notice. The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Agents and the Lenders to object to the allowance and payment of such amounts.

(b)  Real Property. Subject in all respects to the terms of the Interim Order or the Final Order, whichever is then in effect, the priorities set forth in Section 2.14(a) above and to the Carve-Out, Borrower and each Guarantor grant to the Collateral Agent on behalf of the Secured Parties a security interest in, and mortgage on, all of the right, title and interest of Borrower and the Guarantors in all real property owned by Borrower or any of the Guarantors (including leasehold interests), together in each case with all of the right, title and interest of Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto and all proceeds thereof. Borrower and each Guarantor shall acknowledge that, pursuant to the Interim Order or the Final Order, whichever is then in effect, the Liens in favor of the Collateral Agent on behalf of the Secured Parties of such real property shall be perfected without the recordation of any instruments of mortgage or assignment. Borrower and each Guarantor agrees that upon the reasonable request of the Collateral Agent, Borrower and such Guarantor shall promptly enter into separate

mortgages on owned real property in recordable form with respect to such properties on terms reasonably satisfactory to the Collateral Agent.

(c)     Set-Off. Subject to Article VIII hereof (including, without limitation, Section 8.02), upon the occurrence and during the continuance of any Event of Default, each Agent and each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than payroll, trust, withholding and tax accounts) at any time held and other indebtedness at any time owing by each Agent and each such Lender to or for the credit or the account of Borrower or any Guarantor against any and all of the obligations of Borrower or such Guarantor under the Loan Documents, whether or not such obligations are then due. The applicable Agent and/or the applicable Lender shall notify the Borrower of such setoff and application, provided, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Lender and each Agent under this Section 2.14(c) are in addition to other rights and remedies which such they may have upon the occurrence and during the continuance of any Event of Default under the Loan Documents or the Interim Order or the Final Order, whichever is then in effect.

(d)     Discharge. Borrower and each Guarantor agree that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and Borrower and each Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Interim Order or the Final Order, whichever is then in effect, and described in Section 2.14(a) and the Liens granted to the Collateral Agent pursuant to the Interim Order or the Final Order, whichever is then in effect, and the Collateral Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

(e)     In the event and to the extent that the provisions of this Section 2.14 shall conflict with what is set forth in the Orders, the Orders shall govern.

2.15    Security. Upon entry of the Interim Order or the Final Order, whichever is then in effect, as security for the prompt payment and performance of all Secured Obligations of Borrower, Borrower has granted, in accordance with the provisions of the Collateral Documents applicable to Borrower and the Interim Order or the Final Order, whichever is then in effect, to the Collateral Agent for the benefit of the Secured Parties a security interest in all of its right, title and interest in and to all of its Collateral. Additionally, upon entry of the Interim Order or the Final Order, whichever is then in effect, all Secured Obligations shall be guaranteed by each Guarantor under the Guaranties, to the extent provided therein, and the obligations of the Guarantors under the Guaranties shall be secured pursuant to the terms of the Collateral Documents required to be executed and delivered by them hereunder and the Interim Order or the Final Order, whichever is then in effect. In the event and to the extent that the provisions of this Section 2.15 shall conflict with what is set forth in the Orders, the Orders shall govern.

K&E 15141964.11

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes and for the full amount of any Taxes of any kind; provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) any Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes By The Borrower.  Without limiting the provisions of Subsection (a) above, the Borrower shall timely pay any Indemnified or Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification By The Borrower.  The Borrower shall indemnify each Agent, and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by such Agent or such Lender as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for Tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law and as are reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by

the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that the Borrower is resident for Tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

> (i)    duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

> (ii)    duly completed copies of Internal Revenue Service Form W-8ECI,

> (iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

> (iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

> (f)    [Reserved]

3.02    [Reserved].

3.03    [Reserved].

3.04    [Reserved].

3.05    Compensation For Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of any failure by the Borrower (for a reason other than the failure of such Lender to make a Term Loan) to prepay or borrow any Term Loan on the date or in the amount notified by the Borrower; including any loss of anticipated profits and any loss or expense arising from the

35

liquidation or reemployment of funds obtained by it to maintain such Term Loan or from fees payable to terminate the deposits from which such funds were obtained.

3.06    Mitigation Obligations.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole discretion of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

3.07    Survival.  This Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01    Conditions Of Initial Credit Extension.  The obligation of each Lender to make the initial Credit Extension hereunder is subject to satisfaction, or waiver in accordance with Section 10.01, of the following conditions precedent:

(a)    The Administrative Agent and the Lenders shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or as of a recent date prior to the Closing Date, each in form and substance satisfactory to the Administrative Agent and each of the Lenders and in such number of copies as may be requested by the Administrative Agent:

(i)    duly executed counterparts of this Agreement and the Guaranty;

(ii)    the Security Agreement, duly executed by each Loan Party, together with:

(A)    certificates representing the Pledged Interests referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank to the extent the pre-petition collateral agent under the Prepetition Facility has returned the possession of such certificates to the Loan Parties prior to the Closing Date, and

(B)    completed requests for information, dated on or before the date of the initial Credit Extension, listing

all other effective financing statements filed that name any Loan Party as debtor, together with copies of such financing statements;

(iii)   the Intellectual Property Security Agreement, duly executed by each Loan Party;

(iv)   such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v)   such documents and duly executed certifications as the Administrative Agent or the Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing and in good standing in the jurisdiction where it is formed;

(vi)   a favorable written opinion of Young Conaway Stargatt & Taylor, LLP, counsel to the Loan Parties, addressed to each Agent and each Lender, in form and substance acceptable to the Administrative Agent;

(vii)   a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied and (B) as of the Closing Date, since June 30, 2009, there has been no change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect, excluding Borrower's petition for bankruptcy protection;

(viii)   the Budget;

(ix)   a Committed Loan Notice relating to the initial Credit Extension; and

(x)   the Administrative Agent shall have received evidence satisfactory to it that the Sponsor or an Affiliate is the sole lender under the Prepetition Facility.

(b)      The Borrower shall have paid all accrued fees and expenses of the Administrative Agent (including the reasonable and documented fees and expenses of Kirkland & Ellis LLP) on or before the Closing Date.

(c)      The Closing Date shall have occurred on or before July 17, 2009.

(d)      All governmental authorizations and all third party consents and approvals necessary in connection with the Transaction and the other transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not

reasonably acceptable to the Lenders) and shall remain in effect; all applicable governmental filings shall have been made and all applicable waiting periods in connection with the Transaction shall have expired without, in either case, any action being taken by any Governmental Authority, and no Law or regulation shall be applicable in the reasonable judgment of the Administrative Agent and the Lenders that restrains, prevents or imposes materially adverse conditions upon the Transaction or the other transactions contemplated thereby or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(e)     The Interim Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Required Lenders, and shall not have been stayed pending appeal.

(f)     All of the "first day orders" and related orders submitted on or about the date of the commencement of the Cases shall be in form and substance reasonably satisfactory to the Administrative Agent and the Borrower and, as entered, shall not deviate from the form thereof approved by the Administrative Agent in any material respect which is adverse to the interests of the Lenders (such orders hereinafter being referred to as "First Day Orders"; it being understood and agreed that notwithstanding anything herein to the contrary, the relief sought in all such First Day Orders approved by the Administrative Agent shall be permitted herein and the consent of the Required Lenders to such relief therein shall be deemed to have been obtained).

(g)     The Administrative Agent shall have determined in its reasonable discretion that there has not occurred since July 13, 2009 any change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(h)     Each Lender shall have received, prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(i)     The Administrative Agent shall have been given access to all information it reasonably requests related to the Borrower, its business, customers, assets, liabilities, operations, financial condition and prospects (other than attorney-client privileged information) and the Borrower shall have made its advisors and senior management available to the Administrative Agent to discuss the same as the Administrative Agent may reasonably request.

(j)     The Administrative Agent shall have received a letter agreement in form and substance satisfactory to it, duly executed by the agent and 100% of the lenders under the Prepetition Facility, pursuant to which, among other things, such agent and lenders confirm that any and each of the account control agreements and landlord or similar waivers entered into in connection with the Prepetition Facility remains valid and enforceable in accordance with

their terms, and agree that the rights of such agent and lenders thereunder shall be exercised solely upon the Administrative Agent's direction and solely for the Secured Parties' benefit (including directing any bank to transfer funds to the Administrative Agent or its designated account and permitting the Administrative Agent to gain access to any leased premises).

4.02     Conditions To All Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

(a)     The representations and warranties of the Borrower contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty shall be true and correct in all respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty shall be true and correct in all respects) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a), (b) and (c) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(b) and (d), respectively.

(b)     As of the date of the applicable Credit Extension, no Default (other than a Change in Management for which the grace period set forth in Section 8.01(k)(ii) has not expired) or Event of Default has occurred and is continuing, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)     The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(d)     The Interim Order and/or the Final Order, as applicable, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Required Lenders.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents and warrants to the Agents and the Lenders on the Closing Date and on each date of a Credit Extension that:

5.01     Existence, Qualification and Power; Compliance with Laws.  Each Loan Party (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to the entry of the Orders, has all

requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect and (ii) subject to Bankruptcy Court approval, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (A) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (B) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.02    Authorization; No Contravention.  Subject to entry of the Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, and the consummation of the Transaction, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Loan Party's Organization Documents; (b) after giving effect to the Orders, conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan Party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.  No Loan Party or any of its Subsidiaries is in violation of any Law or in breach of any such Contractual Obligation, the violation or breach of which could be reasonably likely to have a Material Adverse Effect.

5.03    Governmental Authorization; Other Consents.  Other than Bankruptcy Court approval, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, any other Loan Document, or for the consummation of the Transaction, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (iv) the exercise by any Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the entry of the Interim Order or the Final Order, authorizations, approvals, actions, notices and filings that have been (or contemporaneously herewith will be) duly obtained, taken, given or made and are (or, upon obtaining, taking, giving or making any such authorization, approval, action, notice or filing, will be) in full force and effect.

5.04    Binding Effect.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered and upon entry of the Interim Order or the Final Order, as applicable, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is

K&E 15141964.11

party thereto in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws relating to or affecting creditor's rights generally, and the effect of general principles of equity, whether applied by a court of law or equity.

### 5.05   Financial Statements; No Material Adverse Effect.

(a)     The financial statements as of May 30, 2009 (i) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby prepared in a manner consistent with prior usual practice of such Person throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) show all material indebtedness and other liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness.

(b)     The most recent quarterly unaudited consolidated financial statements of the Parent and its Subsidiaries delivered pursuant to Section 6.01(b), and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     The most recent monthly unaudited consolidated financial statements of the Parent and its Subsidiaries delivered pursuant to Section 6.01(d), and the related consolidated statements of income or operations and cash flows for the fiscal month ended on that date, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(d)     As of the Closing Date, (i) part (a) of Schedule 5.05 sets forth all Existing Indebtedness of each Loan Party and its Subsidiaries, and (ii) part (b) of Schedule 5.05 sets forth all material Indebtedness and other material liabilities, direct or contingent, of the Parent and its Subsidiaries as of the Closing Date, including liabilities for Taxes and material commitments, to the extent that the same would be included in annual audited financial statements prepared in accordance with GAAP.

(e)     Since the Closing Date, there has been no change, event, circumstance or development that, individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(f)     The Budget delivered to the Lenders pursuant to Section 4.01(a)(viii) or most recently pursuant to Section 6.01(e) were prepared in good faith on the basis of the assumptions and qualifications stated therein, which assumptions and qualifications were

41

reasonably believed by the Borrower or its advisors to be fair and reasonable in light of the conditions existing at the time of delivery of such Budget and at the Closing Date, as applicable, and represented, at the time of delivery, the Borrower's and the chief restructuring officer's best estimate of its future financial needs (it being understood and agreed that projections, forecasts and budgets, whether delivered on, before or after the Closing Date and whether delivered pursuant to this Section or any other provision in this Agreement or the other Loan Documents, are not be viewed as facts and are by their nature speculative and uncertain, subject to significant contingencies and are not a guarantee of financial performance and that actual results may differ from the Budget and the projections therein and such variations may be material).

5.06    Litigation. Except for the Cases and such matters listed on Schedule 5.06 hereof, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document or the consummation of the Transaction, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.07    No Default. Neither any Loan Party nor any of its Subsidiaries is in default (other than resulting from the filing of the Cases) under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (other than resulting from, the filing of the Cases). No Default (other than any Default due to a Change in Management for which the cure period under Section 8.01(k)(ii) has not expired) has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.08    Ownership Of Property; Liens; Investments.

(a)    Each Loan Party has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    The property of the Borrower and the Guarantors is not subject to any Liens, other than Liens set forth on Schedule 5.08(b), or as otherwise permitted by Section 7.01.

(c)    Set forth on Schedule 5.08(c) hereto is a complete and accurate list of all real property owned by any Loan Party as of the Closing Date, showing as of the date hereof the street address, county or other relevant jurisdiction, state, record owner. Each Loan Party has good, marketable and insurable fee simple title to such real property, free and clear of all Liens, other than Liens created or permitted by the Loan Documents.

(d)    (i) Set forth on Schedule 5.08(d)(i) hereto is a complete and accurate list of all material leases of real property under which any Loan Party is the lessee, showing as of the Closing Date the street address, county or other relevant jurisdiction, state,

42

lessor, lessee as of the Closing Date, expiration date and annual rental cost thereof. Each such lease to which any Loan Party remains a party, whether in effect on the Closing Date or thereafter (excluding leases of real property involving less than 1,500 square feet), is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws relating to or affecting creditor's rights generally, and the effect of general principles of equity, whether applied by a court of law or equity.

(ii)   Set forth on Schedule 5.08(d)(ii) hereto is a complete and accurate list of all material leases of real property under which any Loan Party is the lessor as of the Closing Date, showing as of the Closing Date the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof. Each such lease to which any Loan Party remains a party, whether in effect on the Closing Date or thereafter (excluding leases of real property involving less than 1,500 square feet), is the legal, valid and binding obligation of the lessee thereof, enforceable in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws relating to or affecting creditor's rights generally, and the effect of general principles of equity, whether applied by a court of law or equity.

5.09   Environmental Compliance.

(a)      Except as otherwise set forth on Schedule 5.09, each Loan Party and each of their respective Subsidiaries is and has been in compliance with all Environmental Laws, except for such noncompliance which could not, individually or in the aggregate, result in liabilities in excess of the Threshold Amount.

(b)      Except as otherwise set forth on Schedule 5.09, (i) none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; (ii) there are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; (iv) none of the properties owned or operated by any Loan Party or any of their respective Subsidiaries is subject to any liens or land use restrictions arising under Environmental Laws; and (v) Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of it Subsidiaries, except in each case above, which would not, individually or in the aggregate, result in liabilities in excess of the Threshold Amount.

(c)      Except as otherwise set forth on Schedule 5.09, no Loan Party is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any

43

actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Laws, nor has any Loan Party received any request, notice, claim or other information alleging or relating to any such investigatory or response obligations or liabilities; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party has been disposed of in a manner not reasonably expected to result in liability to any Loan Party, except in each case above, which would not, individually or in the aggregate, result in liabilities in excess of the Threshold Amount.

5.10    Insurance. The properties of each Loan Party are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Loan Party operates.

5.11    Taxes. Each Loan Party has filed all federal, state and other material post-petition Tax returns and reports required to be filed, and have paid all federal, state and other material Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no material proposed Tax assessment against the Borrower. No Loan Party is party to any tax sharing agreement.

5.12    ERISA Compliance.

(a)    Except as set forth on Schedule 5.12(a), no Loan Party or ERISA Affiliate sponsors, contributes to, or has any liability or potential liability with respect to any Multiemployer Plan or Pension Plan. Each Plan sponsored by any Loan Party is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan sponsored by any Loan Party that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from, or may rely on a favorable opinion letter issued by, the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. No Plan fiduciary (as defined in SEction 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

(b)    There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan sponsored by any Loan Party that could be reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan sponsored by any Loan Party that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) No ERISA Event has occurred or is reasonably expected to occur that could reasonably be expected to result in a Material Adverse Effect or the imposition of a lien on the property of Loan Party or any ERISA Affiliate, pursuant to the Pension Funding

Rules or Section 4068 of ERISA; (ii) no Loan Party or ERISA Affiliate has failed to make timely any payment to a Pension Plan required by the Pension Funding Rules (determined without regard to any waiver) and no application for a waiver of the minimum funding standard has been filed with respect to any Pension Plan; (iii) neither any Loan Party nor, to the knowledge of the Loan Parties, any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor, to the knowledge of the Loan Parties, any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) as of the date hereof, the current value of the assets of each Pension Plan exceeds the present value of the accrued benefits and other liabilities of such Pension Plan and neither the Loan Parties nor any ERISA Affiliates knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither the Loan Parties nor any of their ERISA Affiliates maintains or contributes to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; and (vii) neither any Loan Party nor, to the knowledge of the Loan Parties, any ERISA Affiliate has engaged in a transaction that could reasonably be expected to result in a liability to a Loan Party by reason of Sections 4069 or 4212(c) of ERISA.

5.13    Subsidiaries; Equity Interests; Loan Parties. As of the Closing Date, each of the Borrower and the Guarantors has no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents or permitted hereunder. As of the Closing Date, no Loan Party has any Equity Interests or other equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13 or as otherwise permitted under Section 7.03. All of the outstanding Equity Interests in each Loan Party have been validly issued, are fully paid and non-assessable and are owned by such Person or Persons and in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents or otherwise permitted hereunder. As of the Closing Date, all of the outstanding Equity Interests in Holdings have been validly issued and are fully paid and non-assessable and are owned by such Person or Persons and in the amounts specified on Part (c) of Schedule 5.13, free and clear of all Liens. Set forth on Part (d) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identification number as of the Closing Date. As of the Closing Date, the copy of the charter of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a)(v) is a true and correct copy of each such document, each of which is valid and in full force and effect.

(b)    As of the Closing Date, the Borrower owns 51% of the membership interests of Palmer, and Palmer owns assets and property having a fair market value of not more than $50,000.

5.14    Margin Regulations; Investment Company Act.

45

(a)     The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(b)     No Loan Party, nor any Person Controlling any Loan Party or any Subsidiaries of any Loan Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.  Neither the making of any Term Loan, nor the application of the proceeds or repayment thereof by the Borrower, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of any such Act or any rule, regulation or order of the SEC thereunder.

5.15     Disclosure.  The Borrower has disclosed to the Administrative Agents and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time; and provided further that no representation is made in this Section 5.15 with respect to any materials delivered to the Administrative Agent or the Lenders pursuant to Section 6.02(g), (h) or (k) or other materials that may be delivered by the Borrower or its Subsidiaries (other than materials required to be delivered pursuant to the Loan Documents ) that the Borrower or such Subsidiary specifies in writing at the time of delivery is not intended to be subject to this Section 5.15.

5.16     Intellectual Property; Licenses, Etc.  Except as set forth on Schedule 5.16: (i)     the Parent and its Subsidiaries own and possess all, right, title and interest in and to, or have a valid and enforceable license to use pursuant to a written license agreement set forth on Schedule 5.16, all Intellectual Property necessary for the operation of the Parent's  and its Subsidiaries' business as presently conducted (collectively, the "Company Intellectual Property"); (ii) the Company Intellectual Property is not subject to any liens, security interests or other encumbrances, and is not subject to any restrictions or limitations regarding use or disclosure other than pursuant to a written license agreement set forth on the Schedule 5.16; (iii) the Parent and its Subsidiaries have not infringed, misappropriated or otherwise conflicted with, and the operation of the Parent 's and its Subsidiaries' business as currently conducted will not infringe, misappropriate or otherwise conflict with, any Intellectual Property of any third party, the Parent and Subsidiary are not aware of any facts that indicate a likelihood of any of the foregoing and have not received any notices regarding any of the foregoing (including, without limitation, any demands or offers to license any Intellectual Property from any third party); and

46

(iv) no third party has infringed, misappropriated or otherwise conflicted with any of the Company Intellectual Property and the Parent and Subsidiaries are not aware of any facts that indicate a likelihood of any of the foregoing.

5.17    Secured Superpriority Obligations.  On and after the Closing Date and the entry of the Interim Order, the Interim Order or the Final Order, as applicable, and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.14 of this Agreement and the Orders (it being understood and agreed that in the event and to the extent that the provisions of Section 2.14 shall conflict with what is set forth in the Orders, the Orders shall govern).  The Interim Order (or, if there is no Interim Order, the Final Order) is in full force and effect and has not been vacated, reversed, modified, amended, rescinded or stayed without the prior written consent of the Administrative Agent, the Collateral Agent and the Required Lenders.

5.18    Casualty, Etc.  Neither the business nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that could be reasonably likely to have a Material Adverse Effect.

# ARTICLE VI
# AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Term Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied the Loan Parties shall, and shall cause each Subsidiary to:

6.01    Statements.  Deliver to the Administrative Agent, in form reasonably satisfactory to the Administrative Agent:

(a)    [Reserved];

(b)    [Reserved];

(c)    by no later than Tuesday of each week (or if such day is not a Business Day, the next succeeding Business Day), and, in any case, one day prior to each Borrowing date set forth in any Committed Loan Notice, if such date would be on or prior to Tuesday of the relevant week, deliver to the Administrative Agent a report showing the Borrowing Base as of the last day of the immediately prior calendar week, such report to be substantially in the form of Exhibit H hereto;

(d)    within 30 days after the end of each fiscal month commencing with the fiscal month ending June 30, 2009, the unaudited consolidated balance sheets of the Parent and its Subsidiaries as at the end of such month, and the related consolidated statements of income or operations, and consolidated cash flows for such month and for the portion of the Parent's fiscal year then ended, all in reasonable form and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of

operations and cash flows of the Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(e) not later than Wednesday of each week (or if such day is not a Business Day, the next succeeding Business Day), a variance report in substantially the form of Exhibit I hereto (a "Variance Report") setting forth (i) actual cash receipts and (ii) actual disbursements, in each case for the calendar week period most recently ended prior to the date when such Variance Report is due, setting forth all variances from the correlated line-item and period set forth in the Budget. Each Variance Report shall include explanations for all variances, shall be certified by the Responsible Officer as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

(f) within 5 days of receipt, copies of any requests by professionals for payment of fees and/or expenses under any interim compensation or similar procedures; and

(g) promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any Subsidiary with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Borrower or any Subsidiary to any official committee appointed in the Cases.

As to any information contained in materials furnished pursuant to Section 6.02(d), the Borrower shall not be separately required to furnish such information under Section 6.01(d), but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Sections 6.01(d) at the times specified therein.

6.02    Certificates; Other Information.  Deliver to the Administrative Agent and each Lender requesting the same, in form satisfactory to the Administrative Agent:

(a) [Reserved];

(b) concurrently with the delivery of the financial statements referred to in Sections 6.01(b), (c), (d) and (e), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide, if necessary for the determination of compliance with Section 7.10, a statement of reconciliation conforming such financial statements to GAAP;

(c) promptly after any written request by the Administrative Agent, copies of any detailed audit reports, final management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

(d) promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of any Loan Party, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or

15(d) of the Securities Exchange Act of 1934, or with any Governmental Authority that may be substituted therefor, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

(f)     promptly and in any event within three Business Days, notice of (i) any Material Customer Revenue Reduction or Material Customer Termination Event and (ii) if the same involves any substantial likelihood of having a Material Adverse Effect, any significant adverse change in any Loan Party's relationship with, or any significant event or circumstance which is likely to adversely affect any Loan Party's relationship with, any customer (or related group of customers), or any supplier which, in either case, is material to the operations of Parent and its Subsidiaries considered as an entirety;

(g)     promptly and in any event within five Business Days after receipt thereof by any Loan Party or any of its Subsidiaries, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any of its Subsidiaries;

(h)     promptly upon receipt thereof, copies of all notices, requests and other documents received by any Loan Party or any of its Subsidiaries under or pursuant to any instrument, indenture, or loan or credit or similar agreement, in respect of Indebtedness having an aggregate principal amount in excess of the Threshold Amount;

(i)     promptly after the assertion or occurrence thereof, notice of any Environmental Liability of or any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) exceed the Threshold Amount or (ii) cause any property to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Laws;

(j)     promptly after the assertion or occurrence thereof, notice of any action or claim or threatened action or claim by any Person against any Loan Party relating to any Intellectual Property of any Loan Party, or of any infringement of the Company Intellectual Property, or of any termination or revocation of, or default under, any license agreement.

(k)     promptly after the receipt thereof, copies of all Revenue Agent Reports (Internal Revenue Service Form 886), or other written proposals of the Internal Revenue Service, that propose, determine or otherwise set forth positive adjustments to the federal income Tax liability of the affiliated group (within the meaning of Section 1504(a)(1) of the Code) of which the Borrower is a member aggregating $100,000 or more; and

(l)     promptly, such additional non-privileged information regarding the business, financial, legal or corporate affairs (including, without limitation, customers, assets,

liabilities, operations, financial condition and prospects (other than attorney-client privileged information)) of the Borrower or any of its Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative may from time to time reasonably request in writing.

Documents required to be delivered pursuant to Section 6.01(b) or (d) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each requesting Lender and each Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the Administrative Agent and each requesting Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent and any Lender requesting same by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent and any Lender requesting same. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

6.03    Notices. Promptly notify the Administrative Agent and each Lender (in each case, in any event within two (2) Business Days after the Borrower obtains knowledge thereof):

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event;

(d)    of any material change in accounting policies or financial reporting practices by any Loan Party or any of its Subsidiaries;

(e)    of the (i) occurrence of any Disposition of property or assets for which the Borrower is required to make a mandatory repayment pursuant to Section 2.05(b)(i), and (ii) receipt of any Extraordinary Receipt for which the Borrower is required to make a mandatory repayment pursuant to Section 2.05(b)(iv); and

(f)    of any material setoff, claims (including with respect to any Environmental Liability), withholdings or other defenses to which any of the Collateral, or any

of the Agents' or the Lenders' rights with respect to the Collateral, in any material respect, are subject.

Each notice pursuant to Sections 6.03(a) through (f) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04    Payment of Postpetition Obligations. Pay and discharge not later than 45 days after the same shall become due and payable, all its material postpetition obligations and liabilities, including (a) all material postpetition Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets and all lawful postpetition claims which, if unpaid, would by law become a Lien upon its property; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to pay or discharge any such obligation that is being contested in good faith and (where appropriate) by proper proceedings and as to which appropriate reserves are being maintained; and (b) all material postpetition Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

6.05    Preservation Of Existence; Business, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated.

6.06    Maintenance Of Properties. Maintain, preserve, protect and repair all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted.

6.07    Maintenance Of Insurance. Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by the Borrower or such Subsidiary consistent with its historical practice and use commercially reasonable efforts to cause such insurance companies to agree to provide for not less than 30 days' prior notice to the Collateral Agent of termination, lapse or cancellation of such insurance.

6.08    Compliance With Laws. Comply in all material respects with the requirements of all Laws applicable to it or its business or property and all orders, writs, injunctions and decrees binding on it or its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

51

6.09    Books and Records.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of the financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.

6.10    Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants and advisors (at which an authorized representative of the Borrower shall be entitled to be present), all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that during the continuance of an Event of Default, the Administrative Agent (or any of their respective representatives or independent contractors) may do any of the foregoing (accompanied by any Lender electing to do so or its representatives) at the reasonable expense of the Borrower (provided that it has been supplied with reasonable backup documentation) at any time during normal business hours and without advance notice.

6.11    Use Of Proceeds; Maximum Cash-On-Hand.  (a) Use the proceeds of the Credit Extensions (i) to pay related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower and the Guarantors not inconsistent with the aggregate disbursement contemplated in the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Loan Parties' advisors and the advisors to any official committee, in each case associated with the Cases subject to the restrictions thereon set forth in the Orders  and (iv) to make any other payments permitted to be made in the Orders or in the First Day Orders, or by the Bankruptcy Court to the extent not prohibited by this Agreement or the Orders or otherwise consented by the Required Lenders.

(b)    In the event that cash-on-hand (inclusive of any Loans), minus the aggregate disbursements contemplated to be made during the relevant calendar week period under the Budget, shall exceed $2,500,000, promptly (and, in an event, within one Business Day) deposit such excess into the Cash Collateral Account.

6.12    Covenant to Guarantee Obligations and Give Security.  Upon the acquisition of any property by any Loan Party that is not already subject to a perfected first priority security interest (subject to Permitted Liens and Existing Liens (other than Primed Liens)) in favor of the Collateral Agent for the benefit of the Secured Parties, the Borrower shall, in each case at the Borrower's expense:

(i)    within 10 Business Days after such acquisition, furnish to the Collateral Agent a description of the material real and personal properties of the Loan Parties so acquired in detail reasonably satisfactory to the Collateral Agent,

(ii)   upon the reasonable request of the Collateral Agent, within 15 Business Days after such request, duly execute and deliver, and cause each applicable Loan Party to duly execute and deliver, to the Collateral Agent mortgages, pledges, assignments, security agreement supplements and other instruments of the type specified in Section 4.01(a)(ii), in form and substance consistent with the Collateral Documents delivered on the Closing Date and reasonably satisfactory to the Collateral Agent, securing payment of all the Obligations under the Loan Documents and constituting Liens on such assets,

(iii)   upon the reasonable request of the Collateral Agent, within 30 days after such request, take whatever reasonable action (including, without limitation, the recording of mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the mortgages, pledges, assignments, security agreement supplements and security agreements delivered pursuant to this Section 6.12, enforceable against third parties in accordance with their terms,

(iv)   [Reserved],

(v)   as promptly as practicable after such acquisition, deliver, upon the reasonable request of the Collateral Agent, to the Collateral Agent with respect to each material parcel of real property owned or leased by the Borrower or a Guarantor that is the subject of such acquisition, title insurance, surveys and Phase I environmental site assessment report, and such other reports as the Collateral Agent may reasonably request, each in scope, form and substance reasonably satisfactory to the Collateral Agent,

(vi)   upon the occurrence and during the continuance of an Event of Default, with respect to any and all cash dividends paid or payable to it or any of its Subsidiaries from any of its Subsidiaries from time to time upon the Collateral Agent's request, promptly execute and deliver, or cause such Subsidiary to promptly execute and deliver, as the case may be, any and all further instruments and take or cause such Subsidiary to take, as the case may be, all such other action as the Collateral Agent may reasonably deem necessary in order to obtain and maintain from and after the time such dividend is paid or payable a perfected, first priority lien on and security interest in such dividends, and

(vii)   at any time and from time to time, promptly execute and deliver any and all further instruments and documents and take all such other action as the Collateral Agent may reasonably deem necessary in perfecting and preserving the Liens of such mortgages, pledges, assignments, security agreement supplements, and security agreements.

K&E 15141964.11

6.13    Compliance With Environmental Laws. Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action required under Environmental Laws.

6.14    Preparation Of Environmental Reports. In the event that any Agent or the Required Lenders reasonably believe that the Borrower has breached any provision of this Agreement relating to environmental matters, at the written request of such Agent or the Required Lenders from time to time, which shall specify in reasonable detail the basis for such request, provide to the Collateral Agent and the Lenders within 60 days after such request, at the expense of the Borrower, an environmental site assessment report for any of its properties described in such request that are the subject of such suspected breach, prepared by an environmental consulting firm reasonably acceptable to the Collateral Agent, indicating the presence or absence of such breach and the estimated cost of any compliance, removal or remedial action in connection with curing such breach; without limiting the generality of the foregoing, if the Collateral Agent determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Collateral Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Collateral Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto the subject properties to undertake such an assessment.

6.15    Further Assurances. Promptly upon request by any Agent or the Required Lenders through the Collateral Agent, (i) correct any material defect or error in the execution, acknowledgment, filing or recordation of any Loan Document, and (ii) execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further deeds, certificates, assurances and other instruments as any Agent, or any Lender through the Collateral Agent, may reasonably require from time to time in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests now or hereafter intended to be covered by any of the Collateral Documents to the Liens of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights and Liens granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

6.16    Compliance With Terms Of Leaseholds. Make all material post-petition payments and otherwise perform all material post-petition obligations in respect of all leases of real property to which the Borrower or any of its Subsidiaries is a party, as may be required pursuant to Section 365 of the Bankruptcy Code.

K&E 15141964.11

6.17    Post-Closing Matters.  (a) Deliver to the Administrative Agent or Collateral Agent, as the case may be, the items specified on Schedule 6.17(a) within the time specified thereon.

(b)      Within 30 days of the Closing Date, have (i) complied with the Cash Management System Requirement and (ii) delivered the Landlord Waivers.

6.18    Cash Management System.

Maintain its cash management system in form and operation substantially similar to the system described in the Borrower's cash management motion as part of its "first day" motions and be in compliance with the related First Day Order.

# ARTICLE VII
# NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Term Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each of the Loan Parties shall not, nor shall it permit any Subsidiary to, directly or indirectly:

7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Parent or any of its Subsidiaries as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than, in the case of any Loan Party, the following:

(a)      Liens pursuant to any Loan Document and the Orders;

(b)      Liens existing on the date hereof and listed on Schedule 5.08(b);

(c)      Liens for Taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)      landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which, to the extent not subject to Section 362 of the Bankruptcy Code, are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)      pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the ordinary course of business;

(g)     easements, rights-of-way, restrictions and other similar encumbrances affecting real property which either exist as of the Closing Date or, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h) or securing appeal or other surety bonds related to such judgments;

(i)     Liens securing Indebtedness permitted under Section 7.02(c)(iv) or (viii); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases;

(j)     banker's liens, rights of setoff and other similar Liens in favor of depository institutions existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or its Subsidiaries;

(k)     any interest or title of a licensor, sublicensor, lessor or sublessor with respect to any assets under any license or lease agreement entered into in the ordinary course of business; provided that the same (i) do not in any material respect interfere with the business of the Borrower or its Subsidiaries or materially detract from the value of the relative assets of the Borrower or its Subsidiaries and (ii) are subject and subordinate to any Lien on such assets pursuant to the Collateral Documents or the Orders;

(l)     licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business; provided that the same (i) do not in any material respect interfere with the business of the Borrower or its Subsidiaries or materially detract from the value of the relative assets of the Borrower or its Subsidiaries and (ii) are subject and subordinate to any Lien on such assets pursuant to the Collateral Documents or the Orders;

(m)     Liens which arise under Article 4 of the Uniform Commercial Code in any applicable jurisdictions on items in collection and documents and proceeds related thereto; and

(n)     precautionary filings of financing statements under the Uniform Commercial Code of any applicable jurisdictions in respect of operating leases or consignments entered into by the Borrower or its Subsidiaries in the ordinary course of business.

K&E 15141964.11

7.02    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    in the case of the Borrower, Indebtedness owed to a Guarantor, which Indebtedness shall (i) constitute Pledged Debt and (ii) be evidenced by promissory pledged as security for the Obligations of the holder thereof under the Loan Documents to which such holder is a party and delivered to the Collateral Agent pursuant to the terms of the Security Agreement, and

(b)    in the case of any Subsidiary, Indebtedness owed by a Guarantor to the Borrower or to another Guarantor; provided that (i) such Indebtedness (A) shall constitute Pledged Debt, and (B) shall be evidenced by promissory notes pledged as security for the Obligations of the holder thereof under the Loan Documents to which such holder is a party and delivered to the Collateral Agent pursuant to the terms of the Security Agreement; and

(c)    in the case of the Borrower and the Guarantors, without duplication:

(i)    Indebtedness under the Loan Documents;

(ii)    Indebtedness outstanding on the date hereof and listed on Schedule 5.05;

(iii)    Guarantees of the Borrower or any Guarantor in respect of Indebtedness otherwise permitted hereunder of the Borrower or any of the Guarantors;

(iv)    Indebtedness in respect of Capitalized Leases existing on the Closing Date in an aggregate amount not exceeding $[_____], and Capitalized Leases and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i) that do not exceed $250,000 in the aggregate at any one time outstanding;

(v)    [Reserved]; and

(vi)    unsecured Indebtedness in an aggregate principal amount not to exceed $250,000 at any time outstanding.

7.03    Investments.  Make or hold any Investments, except:

(a)    Investments held by the Borrower or such Subsidiary in the form of cash or Cash Equivalents;

(b)    advances to officers, directors and employees of the Loan Parties in an aggregate amount not to exceed $25,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

K&E 15141964.11

(c)     equity Investments of the Borrower in any Guarantor and Investments of any Subsidiary in the Borrower or in a Guarantor;

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e)     Guarantees permitted by Section 7.02;

(f)     Investments existing on the date hereof and set forth on Schedule 7.03(f);

(g)     [Reserved];

(h)     Investments consisting of intercompany debt permitted under Section 7.02(a)(ii) or 7.02(b); and

(i)     prepaid expenses or lease, utility and other similar deposits, in each case made in the ordinary course of business;

(j)     other Investments (including those of the types described in clauses (a) through (i) above) not exceeding $25,000 in the aggregate; provided that such Investment shall not be made in or in respect of Palmer.

7.04     <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)     any Subsidiary may merge with (i) the Borrower; <u>provided</u> that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, <u>provided</u> that when any Subsidiary that is a Guarantor is merging with another Subsidiary, the Guarantor shall be the continuing or surviving Person;

(b)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to a Guarantor; <u>provided</u> that a Guarantor may make such Disposal to the Borrower or another Guarantor; and

(c)     any Subsidiary which is not a Loan Party may dispose of all or substantially all its assets to the Borrower or another Loan Party;

<u>provided</u>, <u>however</u>, that in each case, immediately after giving effect thereto, no Default shall have occurred and be continuing.

7.05     <u>Dispositions</u>.  Without the consent of the Administrative Agent, make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions of obsolete or worn out property or property no longer used or useful in the business of the Loan Parties, whether now or hereafter owned or leased, in the ordinary course of business of such Loan Party;

(b)     Dispositions of inventory in the ordinary course of business;

(c)     Dispositions of equipment, software or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)     Dispositions of property by any Subsidiary to the Borrower or to a Guarantor or by the Borrower to a Guarantor;

(e)     Dispositions permitted by Section 7.04;

(f)     the licensing of intellectual property to third Persons other than an Affiliate on customary terms in the ordinary course of business;

(g)     the sale, lease, sub-lease, license, sub-license or consignment of personal property of the Loan Parties in the ordinary course of business and leases or subleases of real property permitted by clause (a) for which rentals are paid on a periodic basis over the term thereof;

(h)     the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice;

(i)     sale, exchange or other disposition of cash and Cash Equivalents in the ordinary course of business;

(j)     Dispositions by the Loan Parties not otherwise permitted under this Section 7.05; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (f) shall not exceed $250,000 and (iii) 100% of the purchase price for such asset shall be paid to the Loan Parties in cash; and

(k)     Dispositions as set forth on Schedule 7.05(k);

provided, however, that any Disposition pursuant to Section 7.05(a) through Section 7.05(k) shall be for fair market value.

7.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that:

K&E 15141964.11

(a)     each Subsidiary may make Restricted Payments to the Borrower and the Guarantors, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made; and

(b)     the Borrower and its Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person.

To the extent that the Borrower or its Subsidiaries are permitted to make any Restricted Payments pursuant to this Section 7.06, the same may be made as a loan or advance to the recipient thereof, and in such case the amount of such loan or advance so made shall reduce the amount of Restricted Payments that may be made by the Borrower and its Subsidiaries in respect thereof.

7.07     <u>Change In Nature Of Business; Activities of Palmer</u>.  Engage in any line of business different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof.

(b)     Permit Palmer to own, control or have access to any asset or property having a fair market value in excess of $50,000, or permit Palmer to engage in any business or operation of a nature customarily carried on by a Loan Party.

7.08     <u>Transactions With Affiliates</u>.  Enter into any transaction of any kind with Palmer or any Affiliate of the Borrower, whether or not in the ordinary course of business, other than, in the case of an Affiliate other than Palmer, on fair and reasonable terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate; <u>provided</u> that the foregoing restriction shall not apply to (a) transactions between or among the Borrower and any of its wholly-owned Subsidiaries that are Loan Parties or between and among any wholly-owned Subsidiaries that are Loan Parties, (b) transactions, arrangements, fees reimbursements and indemnities specifically and expressly permitted between or among such parties under this Agreement, and (c) reasonable compensation and indemnities to officers and directors of a Loan Party permitted by Section 7.06.

7.09     <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document, the loan documents under the Prepetition Facility and the Senior Subordinated Documents) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrower or any Guarantor, to make intercompany loans or advances to the Borrower or any Guarantor or to repay such loans or advances, or to otherwise transfer property to or invest in the Borrower or any Guarantor, except for any agreement in effect on the date hereof, (ii) of any Guarantor to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; <u>provided</u>, <u>however</u>, that this clause (iii) shall not prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.02(c)(iv) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness nor (B) customary anti-assignment provisions in contracts restricting the assignment thereof; or (b) requires the grant by a Loan

60

Party of a Lien to secure an obligation of such Loan Party if a Lien is granted to secure another obligation of such Loan Party.

7.10    Borrowing Base; Financial Covenants.

(a)    Borrowing Base.

Borrower shall not permit the Borrowing Base for any period to be less than the Outstanding Amount plus the amount proposed to be borrowed, if any, pursuant to a pending Committed Loan Notice.

(b)    [Reserved].

(c)    Budget Compliance.

During any calendar week period, permit (i) the aggregate disbursements made through such period since the Closing Date to be more than 110% of the disbursements contemplated in the Budget to be made during the period from the Closing Date through the last day of such calendar week or (ii) the aggregate cash receipts actually received during the period from the Closing Date through the last day of such calendar week to be less than 90% of the cash receipts contemplated in the Budget to be received through the last day of such calendar week; provided, however, if the difference between actual cash receipts to the amount contemplated in the Budget is less than $250,000, the Loan Parties shall be deemed to be in compliance with this clause (c)(ii), and if the difference between actual cash receipts to the amount contemplated in the Budget is within the 10% variance permitted hereby but in excess of $500,000, the Loan Parties shall be deemed not to be in compliance with this clause (c)(ii).

7.11    Amendments Of Organization Documents.  Amend any of its Organization Documents in a manner that would be adverse to the rights or interests of the Secured Parties.

7.12    Accounting Changes.  Make any change in (i) accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Required Lenders, or (ii) fiscal year.

7.13    Partnerships, Etc.  Become a general partner in any general or limited partnership or joint venture.

7.14    Speculative Transactions.  Engage, or permit any of its Subsidiaries to engage, in any transaction involving commodity options or futures contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the ordinary course of business.

7.15    Formation Of Subsidiaries.  Organize or invest in any new Subsidiary.

K&E 15141964.11

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01     Events Of Default.  Any of the following shall constitute an Event of Default:

(a)     Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Term Loan, or (ii) within two Business Days after the same becomes due, any interest on any Term Loan or any fee due hereunder, or (iii) within three Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)     Specific Covenants.  (i) The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 2.14, 2.15, 6.01(d) or (j), 6.02, 6.03, 6.05, 6.09, 6.10, 6.11, 6.12 or 6.17 or Article VII, (ii) the Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01(e), (f), (g) or (h) and such failure continues for two (2) Business Days, (iii) the Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01(b) or (h) and such failure continues for three (3) Business Days or (iv) the Borrower fails to perform or observe any term, covenant or agreement contained in Section 6.01(c) and such failure continues for five (5) Business Days; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 7 days; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  Any Loan Party or any of its Subsidiaries (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and, except in the case of any such payment due at scheduled maturity or by acceleration, such payment is not made within any applicable grace period, in respect of any Indebtedness or Guarantee incurred postpetition (other than Indebtedness hereunder), having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to

62

repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)     License Agreements.  Any Loan Party or any of its Subsidiaries defaults under any royalty agreement or license agreement (other than a default not enforceable as a result of the Cases); or any royalty agreement or license agreement of any Loan Party or any of its Subsidiaries is terminated.

(g)     Inability To Pay Postpetition Debts.  Any Loan Party becomes unable or admits in writing its inability or fails generally to pay its debts incurred postpetition as they become due; or

(h)     Judgments.  After the Filing Date, there is entered against any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and has not disputed coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, there is a period of 10 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA.  Any Loan Party or its Subsidiaries shall; (i) engage, or permit any ERISA Affilaite to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the Code, (ii) terminate, or permit any member of the Controlled Group to terminate, any Pension Plan, (iii) (x) maintain, or permit any ERISA Affiliate to maintain, or (y) become obligated to contribute to or permit any ERISA Affiliate to become obligated to contribute to, any Multiemployer Plan or Pension Plan not disclosed on Schedule 5.12(a), (iv) incur, or permit any ERISA Affiliate to incur, any withdrawal liability to any Multiemployer Plan; (v) suffer any ERISA Event or fail promptly to notify Lenders of the occurrence of any ERISA Event, (vi) fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (vii) fail to meet, or permit any ERISA Affiliate to fail to meet, any minimum funding requirements under ERISA or the Code or postpone or delay any funding requirement with respect of any Plan, (viii) receive an unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(A) of the Code, or (ix) fail to make a required payment under the Pension Funding Rules applicable to any Pension Plan on or before the due date for such payment, and, as a result of any event or condition described in clauses (i) - (ix) above, together with all other such events or conditions described in clauses (i) - (ix) above), any Loan Party or any of its Subsidiaries shall incur, or in the opinion of Lenders be reasonably likely to incur, a liability to any Loan Party in excess of $100,000 or result in the imposition of a lien on the property of any Loan Party or any of their respective Subsidiaries pursuant to the Pension Funding Rules or Section 4068 of ERISA; or

(j)     Invalidity Of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the

K&E 15141964.11

validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)     Change Of Control.  There occurs any (i) Change of Control or (ii) Change of Management and a new chief restructuring officer for the Borrower with duties and responsibilities substantially equivalent to its predecessor and that is reasonably acceptable to the Administrative Agent is not engaged (subject to Bankruptcy Court approval) within 10 days of such Change in Management and is not approved by the Bankruptcy Court within 20 days of such Change in Management; or

(l)     Collateral Document.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 (after giving effect to the Interim Order and the Final Order) shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby pursuant to the terms and conditions herein and therein; or any Loan Party contests in any manner the validity, perfection or priority of any lien or security interest in the Collateral purported to be covered thereby; or

(m)     Appointment of Trustee or Examiner with Enlarged Powers.  An order (which has not been stayed) with respect to any of the Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party or any of its Subsidiaries shall file an application for an order with respect to any Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(n)     Chapter 7 Order.  An order with respect to any of the Cases shall be entered by the Bankruptcy Court converting such Case to a Chapter 7 case or any of the Loan Parties shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Administrative Agent; or

(o)     Relief from Automatic Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on or affecting any Collateral of any Loan Party, or relating to any leased premises where any Collateral is located, in any case which has a value in excess of the Threshold Amount in the aggregate or permits any third party to commence or continue any litigation against any of the Loan Parties involving a potential liability not covered by insurance in excess of the Threshold Amount in the aggregate, or the agent or any of the lenders under the Prepetition Facility seek relief from the automatic stay applicable under Section 362 of the Bankruptcy Code except as permitted by the Orders; or

(p)     Modifications to Bankruptcy Court Orders; Priority; Liens.  An order with respect to any of the Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (i) to revoke, reverse, stay, modify, supplement or amend any of the Interim Order or the Final Order, (ii) to permit any

K&E 15141964.11

administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Loan Party or any of its Subsidiaries equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for allowed administrative expenses to the extent set forth in the Orders, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien or any Lien in favor of the Secured Parties, or the agent or any of the lenders under the Prepetition Facility shall seek any of the foregoing; or

(q)     Payment of Prepetition Indebtedness. Any Loan Party or any of its Subsidiaries shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) without the express prior written consent of the Administrative Agent and the approval of the Bankruptcy Court other than as provided for in any First Day Orders, or the agent or any of the lenders under the Prepetition Facility shall seek any of the foregoing; or

(r)     Collateral. Any Loan Party or any of its Subsidiaries shall file a motion in the Case (i) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (ii) to take any other action or actions materially adverse to any of the Agents or the Lenders or their respective rights and remedies hereunder or under any of the other Loan Documents or the Agents and the Lenders' interest (as agents and lenders under the Loan Documents) in any of the Collateral; or

(s)     Use of Cash Collateral. The agent under the Prepetition Facility shall have delivered written notice to the Borrower of any failure to comply by the Borrower or any of its Subsidiaries with the material terms, conditions or covenants of any order of the Bankruptcy Court permitting the use of Cash Collateral of the lenders under the Prepetition Facility or the Loan Parties' right to use Cash Collateral shall be materially impaired or terminated; or

(t)     Bankruptcy Court Orders; Commitments. An order shall be entered by the Bankruptcy Court (i) confirming a Plan of Reorganization in any of the Cases which does not (A) contain a provision for termination of all Commitments and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (B) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Agents and the Lenders and priorities until such plan effective date; or (ii) dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof or any of the Loan Parties shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Administrative Agent; or

(u)     Final Order. The Final Order shall not have been obtained within twenty days after entry of the Interim Order; or

K&E 15141964.11

(v)     Filing of Motion to Approve Stalking Horse Bidder and Sale Procedures. The Loan Parties shall fail to file a motion (in form and substance satisfactory to the Administrative Agent, the "Sale Procedures Motion") within 30 days after the Filing Date seeking to designate a "stalking-horse" bidder for all or substantially all of the Loan Parties' assets or businesses and approving auction and sale procedures; or

(w)     Approval of Sale Procedures Motion. The Loan Parties shall fail to obtain entry of an order approving the Sale Procedures Motion within 51 days after the Filing Date; or

(x)     Auction. The Loan Parties shall fail to conduct an auction in compliance with the requirements set forth in the Sale Procedures Motion approved by the Bankruptcy Court, within 85 days after the Filing Date; provided that if there are no qualified bidders other than the "stalking-horse" bidder, it shall not constitute an Event of Default hereunder if an auction is not conducted;

(y)     Sale Order. The Loan Parties shall fail to obtain entry of an order in form and substance satisfactory to the Administrative Agent approving the sale, pursuant to Section 363 of the Bankruptcy Cod, of all of substantially all of the Loan Parties' assets or businesses, within 87 days after the Filing Date and requiring the payment of the Obligations in full in cash as of the closing date of such sale.

(z)     Sale Closing Date. The closing of the sale contemplated by the Sale Order shall have not occurred within 89 days after the Filing Date; or

(aa)     Sale Proceeds. The Loan Parties shall have accepted as a bid or bids as winning that, when aggregated, would fail to provide the Loan Parties on the closing date or dates thereof with sufficient cash or other consideration acceptable to the Administrative Agent to repay in full in cash (or in other consideration) the Obligations.

8.02     Remedies Upon Event of Default. If any Event of Default occurs and is continuing, with two (2) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditor's Committee, the UST and the Bankruptcy Court) and without further order of or application to the Bankruptcy Court, the Administrative Agent or the Collateral Agent shall at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the commitment of each Lender to make Term Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

K&E 15141964.11

(c)　　exercise on behalf of itself, the other Agents and the Lenders all rights and remedies available to it, the other Agents and the Lenders under the Loan Documents and applicable law; and

(d)　　cause the agent and the lenders under the Prepetition Facility to terminate the use of Cash Collateral, and demand from any bank at which any Loan Party maintains deposits that all such deposits be paid to the Administrative Agent.

In the event and to the extent that the provisions of this Section 8.02 conflict with what is set forth in the Orders, the Orders shall govern.

8.03　　Application Of Funds. After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including fees, charges and disbursements of counsel to any Agent and amounts payable under Article III) payable to the Agents in their capacities as such ratably among them in proportion to the amounts described in this clause First payable to them;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loans, and other Obligations;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans;

Fifth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Loan Documents that are then due and payable to the Agents and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full (excluding, for this purpose, any Unaccrued Indemnity Claims), to the Borrower or as otherwise required by Law.

8.04　　Protective Advances. In the event that an Event of Default has occurred as a result of a Loan Party's failure to comply with Section 7.10(a), (b) or (c)(ii) (the "Specified Defaults"), the Sponsor may, within 5 days from the first date of the occurrence of such Event of Default, provide written notice to the Administrative Agent, which notice shall be irrevocable, of a commitment to provide up to $5,000,000 of the Term Loans or, if less, the difference between $16,000,000 and the Term Loans then outstanding (the "Sponsor Tranche"). Upon receipt of the foregoing written notice, the Administrative Agent shall agree in writing to forbear for no longer

than 30 days from exercising remedies with respect to the Specified Defaults, but, for the avoidance of doubt, shall no longer have any obligation to fund any Term Loans unless and until the conditions in Section 4.02 are satisfied (if at all), and any agreement to forbear shall not in any way constitute a waiver of Defaults or Events of Default. The Sponsor Tranche shall be Term Loans hereunder, provided that notwithstanding anything herein or in any other Loan Document to the contrary, or Term Loan constituting a Sponsor Tranche, and no interest or fees in respect thereof, may be paid in cash unless and until all other Obligations owed to the Administrative Agent and the Secured Parties (other than the Lenders under the Sponsor Tranche) have been paid in full in cash. Holders of the Sponsor Tranche shall have no voting rights hereunder and shall be disregarded for the purpose of determining Required Lenders. The parties providing the Sponsor Tranche and the Administrative Agent and Lenders shall enter into a participation agreement evidencing the foregoing in order to implement the foregoing and as a condition precedent to any forbearance and funding of the Sponsor Tranche. Upon the occurrence of any Default other than a Specified Default, or other than a Default or Event of Default arising under Section 7.10(c), the forbearance by the Administrative Agent and Lenders shall be automatically terminated and all Defaults and Events of Default shall continue to exist (unless cured or waived in accordance with the terms hereof) and the Administrative Agent shall not be limited in exercising any of its or a Lender's rights and remedies hereunder. Notwithstanding the foregoing agreement to forbear, the Administrative Agent may provide the notice referred to in Section 8.02 solely to commence the notice period specified therein, and shall not be required to provide any further notice upon termination of such forbearance period.

### ARTICLE IX
### ADMINISTRATIVE AGENT

9.01    Authorization and Action. Each Lender hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents, no Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or, if required hereby, all Lenders), and such instructions shall be binding upon all Lenders; provided, however, that no Agent shall be required to take any action that exposes such Agent to personal liability or that is contrary to this Agreement or applicable law. Each Agent agrees to give to each Lender prompt notice of each notice given to it by the Borrower pursuant to the terms of this Agreement.

9.02    Agent's Reliance, Etc. Neither any Agent nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, each Agent:

(a)    may treat any existing Lender as a Lender hereunder until, in the case of the Administrative Agent, the Administrative Agent receives and accepts an Assignment

and Assumption entered into by the existing Lender, as assignor and an Eligible Assignee, as assignee, or, in the case of the Collateral Agent, such Agent has received notice from the Administrative Agent that it has received and accepted such Assignment and Assumption, in each case as provided in Section 10.06; (b) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopier, electronic mail or Internet or intranet posting or other distribution) believed by it to be genuine and signed or sent by the proper party or parties.

9.03    Agents Entitled to Act as Lender.  With respect to its Commitments and the Term Loans made by it, if any, each Agent shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Agent; and the term "Lender" shall, unless otherwise expressly indicated, include each Agent in its individual capacity.  Any Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any Subsidiaries of any Loan Party and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if it was not an Agent and without any duty to account therefor to the Lenders.  No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any Subsidiaries of any Loan Party to the extent such information was obtained or received in any capacity other than as such Agent.

9.04    Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on the financial statements referred to in Section 6.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

9.05    Indemnification Of Agents.  (a) Each Lender severally agrees to indemnify each Agent, or any Related Party (in each case, to the extent not reimbursed by the Borrower) from and against such Lender's Applicable Percentage of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or

K&E 15141964.11

disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent, or any Related Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent, or any Related Party under the Loan Documents (collectively, the "Indemnified Costs"); provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, or any Related Party's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.

(a)     Without limitation of the foregoing, each Lender agrees to reimburse each Agent, or any Related Party promptly upon demand for its Applicable Percentage of any costs and expenses (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) (including, without limitation, reasonable fees and expenses of counsel) payable by the Borrower under Section 10.04, to the extent that such Agent, or any Related Party is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 9.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. The obligations of the Lenders under this Subsection (b) are subject to the provisions of Section 2.12(d).

(b)     The failure of any Lender to reimburse any Agent, or any Related Party, as the case may be, promptly upon demand for its Applicable Percentage of any amount required to be paid by the Lenders to such Agent, or any Related Party, as the case may be, as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent, or Related Party, as the case may be, for its Applicable Percentage of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent, or Related Party, as the case may be, for such other Lender's Applicable Percentage of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 9.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

9.06     Successor Agents. Any Agent may resign at any time by giving 30 days' prior written notice thereof to the Lenders and the Borrower and any Agent may be removed at any time with or without cause by the Required Lenders by providing written notice thereof to such Agent and the Borrower. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent (which, unless an Event of Default has occurred and is continuing at the time of such appointment, shall be reasonably acceptable to the Borrower). If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 45 days after the retiring or removed Agent's giving of notice of resignation or receipt of notice of removal, then the retiring or removed Agent may, on behalf of the Lenders, appoint a successor Agent. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Collateral Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring or removed Agent, and the

retiring or removed Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring or removed Agent's resignation or removal under this Section 9.06 no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or the removed Agent's removal shall become effective, (b) the retiring or removed Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring or removed Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring or removed Agent's resignation hereunder as Agent shall have become effective, the provisions of this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

9.07    [Reserved].

9.08    [Reserved].

9.09    Collateral and Guaranty Matters. The Lenders irrevocably authorize the Collateral Agent and the Administrative Agent, at their option and in their discretion,

(a)    to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders;

(b)    to release any Guarantor from its obligations under the applicable Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i).

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders (or, if necessary, all Lenders) will confirm in writing the authority of the Agents to release its interest in particular types or items of property, or to release any Guarantor from its obligations under the applicable Guaranty pursuant to this Section 9.09. In each case as specified in this Section 9.09, the Administrative Agent and the Collateral Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to release such Guarantor from its obligations under the applicable Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

9.10    Delegation of Duties. Any Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents or servicers appointed by such Agent; provided that, unless

71

an Event of Default shall have occurred and be continuing, the identity of any such sub-agent or servicer shall be subject to the approval of the Borrower (not to be unreasonably withheld). Each Agent and any such sub-agent or servicer may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of Article 9, Section 10.02(d), Section 10.04 and Section 10.05 shall also apply to any such sub-agent or servicer and to the Affiliates of any such sub-agent or servicer, and shall apply to their respective activities as sub-agent or servicer as if such sub-agent or servicer and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent or servicer appointed by an Agent, (i) such sub-agent or servicer shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Loan Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent or servicer, (iii) such sub-agent or servicer shall only have obligations to the appointing Agent and not to any Loan Party, Lender or any other Person and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent or servicer and (iv) any amounts owing to such sub-agent or servicer as a third party beneficiary of this Agreement pursuant to this Section 9.10 shall constitute Obligations and shall be secured by the Lien of the Collateral Agent on the Collateral.

## ARTICLE X
## MISCELLANEOUS

10.01  <u>Amendments, Etc</u>.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than any document appointing a sub-agent or servicer of any Agent pursuant to Section 9.10), and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.02  <u>Notices and Other Communications; Facsimile Copies</u>.

(a)  <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to the Borrower:

c/o The Lang Companies, LLC
514 Wells Street
Delafield, Wisconsin 53018
Attn: Laurie Gilner
Phone: (262) 646-7998
Fax: (262) 646-2465

with a copy to:

Young Conaway Stargatt & Taylor LLP
The Brandwine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Attn: Michael Nestor
Phone: (302) 571-6600
Fax: (302) 576-3321

(ii)   if to the Agent:

Sun Lang Finance, LLC
5200 Town Center Circle
Suite 600
Boca Raton, FL 33486
Attn: C. Deryl Couch
        M. Steven Liff
        Anthony Polazzi
Phone: (561) 394-0550
Fax:  (561) 394-0540
E-mail:  DCouch@suncppart.com
         SLiff@suncappart.com
         APolazzi@suncappart.com

with copies to (which shall not constitute a notice
hereunder):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:  Leonard Klingbaum
Tel: (212) 446-4792
Fax: (212) 446-6460
E-mail: leonard.klingbaum@kirkland.com

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Attn: Douglas C. Gessner, P.C.
Tel: (212) 862-2000
Fax: (212) 862-2299
E-mail: douglas.gessner@kirkland.com

    (iii)  if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified on its signature page hereto or specified on the applicable Assignment and Assumption.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in Subsection (b) below shall be effective as provided in such Subsection (b).

    (b)    <u>Electronic Communications</u>. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

    (c)    <u>Change Of Address</u>, Etc. Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.

    (d)    <u>Reliance By Administrative Agent and Lenders</u>. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notice) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete

K&E 15141964.11

or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.03   No Waiver; Cumulative Remedies.  No failure by any Lender, or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.04   Expenses; Indemnity; Damage Waiver.

(a)     Costs and Expenses.  The Borrower agrees to pay on demand (i) all reasonable documented out-of-pocket costs and expenses of the Agents (including any sub-agent or servicer of the Adminstrative Agent) in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated) (including, without limitation, (A) all reasonable documented fees and expense of counsel due diligence, collateral review, arrangement, syndication (other than fees payable to syndicate members), transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable documented out-of-pocket fees and expenses of counsel for the Agents and one counsel for any sub-agent or servicer appointed under Section 9.10, with respect to advising the same as to its rights and responsibilities, or the perfection, protection, interpretation or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), and (ii) all reasonable documented out-of-pocket costs and expenses of each Agent and each Lender in connection with the enforcement or protection of its rights in connection with the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally and all reasonable documented out-of-pocket costs and expenses of each Agent and each Lender with respect to any negotiations arising out of any Default (including, without limitation, the fees and expenses of counsel for each Agent and each Lender with respect thereto). The Borrower further agrees to pay any stamp or Other Taxes that may be payable in connection with the execution or delivery of any Loan Document.

(b)     Indemnification by the Borrower.  The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and

all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in Subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)     If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)     Payments. All amounts due under this Section shall be payable not later than ten (10) Business Days after written demand therefor.

K&E 15141964.11

(f)     Survival.  The agreements in this Section shall survive the resignation of any Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

10.05   Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent, or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent, or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the applicable Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.06   Successors and Assigns.

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f), or (iv) to an SPC in accordance with the provisions of Section 10.06(h) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments By Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loan of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if

77

"Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 (provided that simultaneous assignments by or to two or more Approved Funds managed by the same investment advisor shall be aggregated for purposes of the minimum assignment amount), unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided that the consent of the Borrower shall not be required for assignments to those entities identified by the Administrative Agent to the Borrower prior to the date hereof; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned; and (iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which shall not be subject to reimbursement by the Borrower); provided that (x) no such fee shall be payable in the case of an assignment to another Lender, an Affiliate of a Lender or an Approved Fund, and (y) in the case of contemporaneous assignments by a Lender to more than one Fund managed by the same investment advisor (which Funds are not then Lenders hereunder) only one such fee shall be payable for all such contemporaneous assignments. Subject to acceptance and recording thereof by the Administrative Agent pursuant to Subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Subsection (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d); provided that in the case of an assignment to an Affiliate of the assigning Lender, such assignment shall be effective as an assignment between such Lender and its Affiliate immediately without compliance with the conditions for assignment under this Section 10.06(b), but shall not be effective with respect to the Loan Parties, the Agents, or any other Lender, and each Loan Party, each Agent and each other Lender shall be entitled to deal solely with such assigning Lender under any such assignment, and such assigning Lender shall continue to be bound by the Loan Documents in its capacity as a Lender, in each case until the conditions for assignment under this Section 10.06(b) have been satisfied.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

K&E 15141964.11

The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice. In addition, at any time that a request for a consent for a material or other substantive change to the Loan Documents is pending, any Lender may request and receive from the Administrative Agent a copy of the Register.

(d)     Participations. Any Lender may at any time, without the consent of, or notice to, any Person, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitments and/or the Loans owing to it; provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant. Subject to Subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)     [Reserved]

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution Of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender

K&E 15141964.11

would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.13. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which shall not be reimbursable by the Borrower), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

        (i)     [Reserved]

        (j)     [Reserved]

      10.07  <u>Treatment of Certain Information; Confidentiality</u>. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and to its Affiliates' respective partners, directors, officers, employees, agents, advisors, trustees and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section 10.07, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any direct or indirect contractual counterparty or prospective counterparty (or such contractual counterparty's or prospective counterparty's professional advisor) to any credit derivative transaction relating to obligations of the Loan Parties; (g) with the consent of the Borrower; (h)

K&E 15141964.11

to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.07 or (ii) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower; (i) to any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; or (j) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender). In addition, the Administrative Agent, and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions. For the purposes of this Section, "Information" means all information received from any Loan Party relating to any Loan Party or its business, other than any such information that is available to the Administrative Agent, or any Lender on a nonconfidential basis prior to disclosure by any Loan Party; provided that, in the case of information received from a Loan Party after the date hereof, such information is clearly identified in writing at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 10.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. The Borrower shall have the right to approve any public advertisement or other public notice issued or placed by the Agents with respect to the Loan Documents and the transactions thereunder, which approval shall not be unreasonably withheld.

10.08   Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have, including under Section 2.14(c). Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.09   Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If any Agent or any Lender shall receive interest in an amount that

81

exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

10.10    [Reserved].

10.11    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.

10.12    Survival Of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.13    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.14    USA Patriot Act Notice. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the

Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act.

10.15 Governing Law; Jurisdiction; Etc.

(a) GOVERNING LAW. THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b) SUBMISSION TO JURISDICTION. THE BORROWER AND EACH OTHER LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, ANY SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE AGENTS, ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. THE BORROWER AND EACH OTHER LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY NEW YORK STATE OR FEDERAL COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

K&E 15141964.11

(d)     SERVICE OF PROCESS. EACH LOAN PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.16  WAIVER OF JURY TRIAL. EACH OF THE BORROWER, THE AGENTS AND THE LENDERS IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE LOANS, THE LETTERS OF CREDIT OR THE ACTIONS OF ANY AGENT OR ANY LENDER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

K&E 15141964.11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**Loan Parties:**

**THE LANG STORE, LTD.**

By: _____
        Name:
        Title:

**LANG HOLDINGS, INC.**

By: _____
        Name:
        Title:

**THE LANG COMPANIES, LLC**

By: _____
        Name:
        Title:

**AVALANCHE PUBLISHING, INC.**

By: _____
        Name:
        Title:

**AVALANCHE PUBLISHING ACQUISITION, INC.**

By: _____
        Name:
        Title:

**TURNER ACQUISITION, INC.**


By: _____

      Name:

      Title:

**Administrative Agent:**

**SUN LANG FINANCE, LLC**, as
Administrative Agent

By: _____
    Name:
    Title:

**Lender:**

**SUN LANG FINANCE, LLC**

By: _____
    Name:
    Title:

Address:
5200 Town Center Circle, Suite 600
Boca Raton, FL 33486