# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LANG HOLDINGS, INC., | ) | Case No. 09-12543 (KJC) |
| a Delaware Corporation, et al.,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | **Obj. Deadline for Bidding Procedures: Aug. 28, 2009 at 4:00 p.m. ET** |
| | ) | **Hearing Date for Bidding Procedures: Sept. 4, 2009 at 2:00 p.m. ET** |
| | ) | **Obj. Deadline for Sale Motion: TBD** |
| | ) | **Hearing Date for Sale Motion: TBD** |
| | ) | |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, 364 and 365 AND FED. R. BANKR. P. 2002, 6004, 6006 AND 9014 FOR ENTRY OF: (I) AN ORDER (A) APPROVING BIDDING PROCEDURES; (B) APPROVING FORM OF ASSET PURCHASE AGREEMENT AND CERTAIN PAYMENTS TO PURCHASER THEREUNDER; (C) APPROVING FORM AND MANNER OF NOTICES; (D) APPROVING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (E) SCHEDULING A SALE HEARING AND ESTABLISHING DATES AND DEADLINES RELATED THERETO; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSET PURCHASE AGREEMENT; (C) APPROVING PROCEDURES AND RIGHTS RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Lang Holdings, Inc., and its affiliated debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of

orders pursuant to sections 105(a), 363, 364 and 365 of title 11 of the United States Code (the

"Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), substantially in the forms attached hereto as Exhibit A and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Lang Holdings, Inc. (9551); Turner Acquisition, Inc. (2115); Avalanche Publishing Acquisition, Inc. (3038); The Lang Companies, LLC (9182); Avalanche Publishing, Inc. (9793); and The Lang Store, Ltd. (2398). The mailing address of each of the Debtors is 514 Wells Street, Delafield, Wisconsin 53018.

Exhibit B, approving Bidding Procedures and the sale of substantially all of the Debtors' assets. In further support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.     Through this Motion, the Debtors are seeking the authority to sell substantially all of their assets pursuant to the terms of that certain asset purchase agreement, dated as of August 19, 2009 (the "Asset Purchase Agreement"), by and between the Debtors and LHI Enterprises, Inc. ( "LHI Enterprises").[2]  As discussed below, Sun Lang Finance, LLC ("Sun Finance") is a signatory to Sections 3.2, 4.2(b)(i) and 4.5 of the Asset Purchase Agreement. Catterton Partners V, LP and Catterton Partners V Offshore, LP (collectively, "Catterton") are also signatories to Sections 3.2, 4.2(b)(ii) and 4.6 of the Asset Purchase Agreement.  LHI Enterprises, Sun Finance and Catterton shall be referred to herein collectively as the "Purchasing Entities."

2.     The Debtors have significant liquidity issues that necessitate a prompt and orderly sale of substantially all of the Debtors' assets (as more specifically defined in Section 2.1(a) of the Asset Purchase Agreement, the "Acquired Assets"), to preserve and maximize the going concern value of such assets.  Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Acquired Assets may be significantly compromised.  Moreover, the Asset Purchase Agreement requires a closing on or before October 15, 2009.

3.     By this Motion, the Debtors request entry of an order approving (i) the Bidding Procedures; (ii) the form of Asset Purchase Agreement and certain payments to the

---

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

stalking horse bidder; (iii) the form and manner of notices; (iv) procedures related to the assumption and assignment of the executory contracts and unexpired leases designated in the Asset Purchase Agreement; and (v) dates and deadlines related thereto.

4.    By this Motion, the Debtors also request entry of an order (i) approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and other interests and consummation of the Transactions (as defined below) contemplated by the Asset Purchase Agreement; (ii) authorizing and approving the execution and delivery of the Asset Purchase Agreement, (iii) approving procedures and rights related to the assumption and assignment of certain executory contracts and unexpired leases; and (iv) granting certain related relief.

## JURISDICTION

5.    This Court has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue over these chapter 11 cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 364 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

**A.    Introduction.**

6.    On July 16, 2009 (the "Petition Date"), the Debtors each commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

DB02:8624737.2

068626.1001

7. As of the date hereof, no request for appointment of a chapter 11 trustee or examiner has been made. On July 27, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in these cases (the "Committee").

**B. The Marketing Process.**

8. Beginning in late March 2009, the Debtors began actively exploring their potential restructuring alternatives, including, among other things, the infusion of new debt or equity capital, the refinancing of their obligations and the sale of their businesses. As part of this process, the Debtors engaged Duff & Phelps Securities, LLC ("Duff & Phelps") on March 23, 2009, to serve as their exclusive financial advisor and investment banker in connection with the potential sale or refinancing of the Debtors' businesses. Duff & Phelps contacted a broad group of potential strategic and financial acquirers and providers of debt and equity capital. With the Debtors' assistance, Duff & Phelps prepared a confidential information memorandum (the "CIM") for distribution to both buyers and potential lenders/financing sources, who had executed confidentiality agreements.

9. Duff & Phelps contacted 203 financial buyers and 83 strategic purchasers, and ultimately distributed 94 CIMs to financial buyers and 19 CIMs to strategic buyers. Additionally, Duff & Phelps contacted 27 potential asset-based loan ("ABL") lenders, of which 15 received CIMs. Duff & Phelps solicited indications of interest from potential acquirers and term sheets from potential lenders.

10. By early May 2009, the Debtors had received 14 preliminary indications of interest from potential buyers and three term sheets from potential ABL lenders. Duff & Phelps arranged for interested parties to have site visits and meetings with the Debtors'

management team and facilitated the due diligence efforts of potential acquirers and lenders through an online data room. Duff & Phelps and the Debtors' management team conducted nine site visits and meetings with interested buyers and two with potential ABL lenders. By early June 2009, the Debtors had received four letters of intent to purchase the Debtors' businesses outside of the chapter 11 process (as well as a letter of intent from another potential acquirer to purchase the Lang brand only).

11. Later in June, the Debtors' prepetition lenders expressed their unwillingness to fund the Debtors' operations outside of the bankruptcy process. At this point, the Debtors had extremely limited availability under their credit facilities (indeed, as of the Petition Date, the Debtors had no remaining availability under their credit facilities), and the Debtors realized that insufficient time existed to refinance their debt. As a result, the Debtors determined that the only viable course of action to preserve their going-concern value would be through an orderly sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code (a "363 Sale"), subject to higher and better bids pursuant to a Court-approved auction process. Duff & Phelps approached several parties about acting as a stalking horse bidder including those parties that previously had expressed an interest in the Debtors' assets. Two parties expressed an interest, but were unable to move forward with a binding proposal to acquire the Debtors' assets in the necessarily expedited timeframe.

12. Although Debtors' prepetition lenders initially expressed their willingness to finance the Debtors' businesses through the completion of an orderly 363 Sale, the Debtors' prepetition lenders reached a business decision in early July 2009 that they would no longer fund the Debtors on a going-forward basis, leaving the Debtors with little hope of avoiding immediate liquidation.

DB02:8624737.2 068626.1001

13.     Despite the apparently slim odds of success, and through the diligent efforts of Duff & Phelps over the period of only a few days, the Debtors were able to procure a commitment from Sun Finance, as Administrative Agent and Collateral Agent on behalf of itself and certain lender parties (collectively, the "DIP Lenders") for a superpriority priming secured debtor-in-possession credit facility pursuant to the DIP Order (as defined below) (the "DIP Facility") conditioned on (i) the Debtors' prepetition lenders' assignment of their rights under the Debtors' prepetition loan facility to Catterton, which would become the Debtors' sole prepetition lender by virtue of such assignment, and (ii) Catterton's consent to the priming of its liens on the prepetition collateral by the liens granted to the DIP Lenders in connection with the DIP Facility.

14.     This three-party transaction ultimately was implemented through entry of an interim order (Docket No. 24) and final order (Docket No. 98) (including any other final orders or modifications thereto, collectively, the "DIP Order") approving the proposed DIP Facility.  Thus, after entry of the DIP Order, (i) Catterton, along with certain of their affiliates (collectively, the "Catterton Entities") owned the substantial majority of the outstanding equity of the Debtors; (ii) Catterton owned the prepetition secured debt of the Debtors (the "Pre-Petition Facility"); and (iii) Sun Finance had committed to provide the Debtors' DIP Facility.[3]

15.     The parties have structured this purchase as a three-step transaction with the intent of ensuring certain tax treatment related to the Acquired Assets.  First, the indirect parent corporation ("GrandCo") has contributed certain of its stock to LHI Enterprises, Inc. ("LHI Enterprises") and sold a promissory note to LHI Enterprises (collectively, the "GrandCo

---

[3]   In addition, Catterton and certain affiliates thereof (Catterton Partners IV., LP, Catterton Partners IV Offshore, LP, Catterton Partners IV Special Purpose, LP, Catterton Partners IV A, LP, Catterton Partners IV B, LP, and Catterton Coinvest I, LLC.) hold collectively a majority of the equity of Lang Holdings, Inc., and three individuals affiliated with Catterton serve as directors of Lang Holdings and its subsidiaries.

Assets", and together with the Acquired Assets, the "Transaction Acquired Assets"). Second, LHI Enterprises will purchase the Acquired Assets in exchange for the GrandCo Assets and the assumption of the Assumed Obligations. Third, Sun Finance and Catterton shall immediately purchase the GrandCo Assets from the Debtors in exchange for the Credit Bid Amount. The Credit Bid Amount shall offset the secured obligations owing to Sun Finance in their entirety under the DIP Facility and a portion of the secured obligations owing to Catterton under the Pre-Petition Facility in the amount of the Pre-Petition Secured Amount. The sale of the Debtors assets and any related transactions under the Asset Purchase Agreement, including, without limitation, those described in this paragraph and section 3.1 and 3.2 of the Asset Purchase Agreement shall be referred to herein collectively as the "Transactions."

### RELIEF REQUESTED

16.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (i) approving the Bidding Procedures; (ii) approving the form of asset purchase agreement and certain payments to LHI Enterprises thereunder; (iii) approving the form and manner of notices; (iv) approving procedures related to the assumption and assignment of executory contracts and unexpired leases; and (v) scheduling a sale hearing with respect to the Acquired Assets and the Transactions contemplated by the Asset Purchase Agreement (the "Sale Hearing") and establishing related dates and deadlines.

17.     The Debtors additionally, by this Motion, seek the entry of an order, substantially in the form attached hereto as Exhibit B (the "Sale Order") (i) approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and interests and consummation of the Transactions contemplated by the Asset Purchase Agreement;

(ii) authorizing and approving the execution and delivery of the Asset Purchase Agreement; (iii) approving procedures and rights related to the assumption and assignment of certain executory contracts and unexpired leases; and (iv) granting certain related relief.

## A.    The Bidding Procedures.

18.    The Debtors request authority to solicit bids for the Acquired Assets utilizing the Bidding Procedures, substantially in the form attached as Exhibit 1 to the Bidding Procedures Order.  The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Successful Bidder (as defined herein).  As provided in the Bidding Procedures, the Debtors will consider all proposals received to acquire all or substantially all of the assets of the Debtors.  The price to be paid by the Successful Bidder for the Acquired Assets and the terms and conditions for the sale of such assets will be established at the Auction (as defined herein).

19.    The Bidding Procedures (as summarized below) were developed consistent with the Debtors' competing needs to conduct an expedited sale process, to promote participation and active bidding and to comply with the terms and conditions of the DIP Order and DIP Facility.  Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion, while ensuring that the highest and best bid is generated for the Acquired Assets.[4]

---

[4]    The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures.  To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

DB02:8624737.2

068626.1001

## Marketing Process

(a)    <u>Contact Parties.</u>  The Debtors, in consultation with their investment banker Duff & Phelps, have developed a list of parties who the Debtors believe may potentially be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing Transaction to that of LHI Enterprises (a "<u>Competing Transaction</u>"), which list includes both potential strategic investors and potential financial investors (each, individually, a "<u>Contact Party</u>", and collectively, the "<u>Contact Parties</u>").  The Debtors and Duff & Phelps are already in the process of contacting the Contact Parties to explore their interest in pursuing a Competing Transaction.  The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.  The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)    <u>Information Package.</u>  The Debtors may distribute to each Contact Party an "<u>Information Package</u>," comprising:

     (i)     A cover letter;

     (ii)    A copy of these Bidding Procedures; and

     (iii)   A copy of a confidentiality agreement.

(c)    <u>Access to Diligence Materials.</u>  To participate in the bidding process and to receive access to due diligence (the "<u>Diligence Materials</u>"), a party must submit to the Debtors an executed ***Confidentiality Agreement and evidence demonstrating the party's financial capability*** with respect to the Competing Transaction as determined by the Debtors.  A party who qualifies for access to Diligence Materials shall be a "<u>Preliminary Interested Investor</u>."  All due diligence requests must be directed to Duff & Phelps.  For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

## Auction Qualification Process

(a)    To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>"), must be determined by the Debtors, in consultation with the Committee, to satisfy each of the following conditions:

                                                

(i)     <u>Good Faith Deposit.</u> Each Bid must be accompanied by a deposit in the amount of $5,000,000 to an interest bearing escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").

(ii)    <u>Same or Better Terms.</u> The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Asset Purchase Agreement. A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "<u>Modified Asset Purchase Agreement</u>"). A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to purchase price); <u>provided</u>, <u>however</u>, that the terms of the Modified Asset Purchase Agreement are substantially similar, the same or better than the terms of the Asset Purchase Agreement. A Bid must propose a Competing Transaction involving substantially all of the Debtors' assets or operations. A Bid must propose a purchase price equal to or greater than (w) the Credit Bid Amount and the Cure Amounts in cash; (x) the dollar value of the Breakup Fee in cash, (y) the dollar value of the Expense Reimbursement in cash, and (z) $250,000 in cash. The Competing Transaction must provide for the immediate payment of the Breakup Fee and Expense Reimbursement to LHI Enterprises in cash from the proceeds of the purchase price of such Bid. The Competing Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.

(iii)    <u>Corporate Authority.</u> The Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; <u>provided</u>, <u>however</u>, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(iv)    <u>Proof of Financial Ability to Perform.</u> ***The Bid must include written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction. Such information must include, inter alia, the following:***

    a.    contact names and numbers for verification of financing sources;

    b.    evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments, from a recognized banking institution in the amount of the cash portion of

such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Competing Transaction;

c. the Bidder's current financial statements (audited if they exist); and

d. any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Competing Transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(v) Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(vi) Irrevocable. A Bid must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(vii) Bid Deadline. Regardless of when a party qualifies as a Preliminarily Interested Investor, the following parties must receive a Bid in writing, on or before the date established by the Court in the Bidding Procedures Order or such later date as may be agreed to by the Debtors (the "Bid Deadline"): (i) the Debtors, Lang Holdings, Inc., 514 Wells Street, Delafield, Wisconsin 53018, Attn: Laurie Gilner; (ii) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391, Attn.: Michael R. Nestor and David R. Hurst; (iii) counsel to the Official Committee of Unsecured Creditors (the "Committee"), Lowenstein Sandler PC, 65 Livingston Ave., Roseland, New Jersey 07068, Attn: Bruce Buechler and Timothy R. Wheeler; (iv) counsel to Sun Finance and LHI Enterprises, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Jeremy Liss and David Agay; (v) Duff & Phelps Securities, LLC, 55 East 52nd Street, 31st Floor, New York, New York 10055, Attn: Joshua K. Benn and Eric R. Williams and (vi) Counsel to Catterton, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Eunu Chun.

DB02:8624737.2

068626.1001

*A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder."* Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by LHI Enterprises shall be deemed a Qualified Bid, which shall remain open and irrevocable until the closing of the Sale related to the Acquired Assets to the Successful Bidder (defined herein). In accordance with the Bidding Procedures, LHI Enterprises will receive copies of all Bids simultaneously with the Debtors. The Debtors shall inform counsel to LHI Enterprises whether the Debtors will consider such Bids to be Qualified Bids within one (1) calendar day after the Bid Deadline.

## Auction

If more than one Qualified Bid is received by the Bid Deadline (other than the Asset Purchase Agreement), the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (i) the amount and nature of the consideration, (ii) the proposed assumption of any liabilities, if any, (iii) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to Debtors of such modifications or delay; (v) the total consideration to be received by the Debtors; (vi) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (vii) the net benefit to the estate, taking into account LHI Enterprises' rights to the Breakup Fee and Expense Reimbursement, (viii) the impact of the Transaction on any actual or potential litigation; and (ix) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, *the Debtors may determine not to conduct the Auction.*

The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on the date established by the Court in the Bidding Procedures Order, at the offices of Debtors' counsel, at Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders, including LHI Enterprises, the Committee, and other invitees in accordance with the Asset Purchase Agreement. The Auction shall be conducted according to the following procedures:

(a) <u>The Debtors Shall Conduct the Auction.</u> The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline (such Qualified Bid the "Auction Baseline Bid"). Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Acquired Assets. All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders who have submitted Qualified Bids. LHI Enterprises, Sun Finance and Catterton (collectively or individually), as applicable, shall be permitted to credit bid the full amount of the Expense Reimbursement (as defined herein) and the Breakup Fee (as defined herein) pursuant to any Overbid in

connection with each round of bidding. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid and all Overbids.

(b)　Terms of Overbids. An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(i)　Minimum Overbid Increment. ***Any Overbid after the Auction Baseline Bid shall be made in increments of at least $250,000.*** Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash, or solely with respect to Sun Finance and Catterton (collectively or individually), as applicable, a credit bid under section 363(k) of the Bankruptcy Code of its allowed secured claims, and, in the case of a Bid by LHI Enterprises, Sun Finance and Catterton (collectively or individually), as applicable, a further credit bid of the Expense Reimbursement and the Breakup Fee.

(ii)　Remaining Terms are the Same as for Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid. To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Competing Transaction proposed by such Overbid.

(iii)　Announcing Overbids. The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

(iv)　Consideration of Overbids. The Debtors reserve the right, in their reasonable business judgment to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Competing Transaction at the prevailing Overbid amount.

DB02:8624737.2

068626.1001

(c)     <u>Backup Bidder.</u> Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of the Auction (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein). Following the Sale Hearing, if the Successful Bidder (defined herein) fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder (defined herein), the Debtors may designate the Backup Bidder to be the new Successful Bidder (defined herein), and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder (defined herein). The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Successful Bidder (defined herein) and (b) the Outside Backup Date.

(d)     <u>Additional Procedures.</u> The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

(e)     <u>Consent to Jurisdiction as Condition to Bidding.</u> LHI Enterprises, all Qualified Bidders and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Asset Purchase Agreement, the Auction or the construction and enforcement of any Competing Transaction Documents.

(f)     <u>Closing the Auction.</u> The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors and the Committee, is the highest and best Qualified Bid at the Auction (the "<u>Successful Bid</u>" and the Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed sale and transaction Documents memorializing the terms of the Successful Bid. The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

(g) <u>Sale Hearing.</u> The Debtors will seek a hearing (the "Sale Hearing") at which the Debtors will seek approval of the Transaction with the Successful Bidder. Objections, if any, to the sale of the Acquired Assets to the Successful Bidder and the transactions contemplated by the Asset Purchase Agreement must: (a) be in writing and filed with the Court no later than 4:00 p.m. (prevailing Eastern time) on the date established by the Court in the Bidding Procedures Order and be served such that they are actually received by (i) the Debtors, Lang Holdings, Inc., 514 Wells Street, Delafield, Wisconsin 53018, Attn: Laurie Gilner; (ii) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391, Attn.: Michael R. Nestor and David R. Hurst; (iii) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler PC, 65 Livingston Ave., Roseland, New Jersey 07068, Attn: Bruce Buechler and Timothy R. Wheeler; (iv) counsel to Sun Finance and LHI Enterprises, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Jeremy Liss and David Agay; and (v) counsel to Catterton, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Eunu Chun; and (vi) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, DE 19801, Attn: David Buchbinder.

(h) <u>Return of Good Faith Deposit.</u> The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (i) the closing of the transaction with the Successful Bidder (defined herein) and (ii) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

(i) <u>Reservation of Rights.</u> Except as otherwise provided in the Asset Purchase Agreement or the Sale Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Committee, to: (i) determine which bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (iv) reject any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) remove some or all of the Acquired Assets from the Auction; (vi) waive terms and conditions set forth herein with respect to all potential bidders; (vii) impose additional terms and conditions with respect to all potential bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding

Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

**B.      The Form of Asset Purchase Agreement.**

20.      As stated above, prior to the Petition Date, the Debtors extensively marketed and pursued the sale of substantially all of their assets.  The marketing efforts have continued postpetition.  As a result of those efforts and after significant negotiations, the Debtors and the Purchasing Entities entered into the Asset Purchase Agreement for the purchase of the Acquired Assets.  Pursuant to the Asset Purchase Agreement, the Debtors propose to sell, assign and transfer the Acquired Assets to LHI Enterprises free and clear of all liens, claims, encumbrances and other interests other than those expressly assumed by LHI Enterprises.  In addition, the Debtors propose to sell and transfer the GrandCo Assets to Sun Finance and Catterton free and clear of all liens, claims, encumbrances and other interests.  Any such interests against or in the Transaction Acquired Assets will attach to the proceeds of the sale, in the order of priority and with the same validity, force and effect that such interests may now have against such assets.  The sale of the Transaction Acquired Assets is subject to the Court's approval and the auction process proposed herein.

21.      The significant terms of the Asset Purchase Agreement, a copy of which is attached to the Sale Order as <u>Exhibit 1</u>, are:[5]

(a)      <u>Closings.</u>  At the Closing, LHI Enterprises shall (i) be assigned the Acquired Assets and (ii) in consideration of the Acquired Assets (x) pay to the Debtors the GrandCo Assets and (y) assume the Assumed Obligations ((x) and (y), collectively, the "<u>Purchase Price</u>").  Immediately thereafter Sun Finance and

---

[5]      The following description of the Asset Purchase Agreement is a summary of the terms set forth in the Asset Purchase Agreement attached to the Sale Order as <u>Exhibit 1</u>.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Asset Purchase Agreement.  To the extent that this summary differs in any way from the terms set forth in the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

Catterton will purchase from the Debtors the GrandCo Assets for Twenty Five Million Dollars ($25,000,000) (the "Credit Bid Amount"), which will be paid first, by the offsetting the Debtors' obligations under the DIP Credit Agreement and second, by offsetting the Debtors' obligations under the Pre-Petition Facility. (Asset Purchase Agreement, §§ 3.1, 3.2.)

(b)     Acquired Assets. As set forth more fully in Section 2.1 of the Asset Purchase Agreement, LHI Enterprises will acquire (i) all cash, net of overdrafts and marketable and other securities; (ii) all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature; (iii) any other rights, claims or causes of action of Debtors against third parties arising prior to the Closing Date; (iv) all bank accounts, safety deposit boxes, lock boxes and the like; (v) all Inventory; (vi) the Acquired Owned Real Property; (vii) the Assumed Facilities Leases, including all rights to security deposits held pursuant thereto; (viii) the Assumed Equipment Leases; (ix) all tangible personal property; (x) all Intellectual Property owned, licensed, used or held for use by Debtors' along with all income, royalties, damages and payments due or payable to Debtors as of the closing date or thereafter; (xi) all Company Systems; (xii) all rights of the Debtors under the Assumed Contracts, including all security deposits thereunder, all contractual rights of the Debtors to indemnification, exculpation, advancement or reimbursement of expenses, and all rights to proceeds under insurance policies; (xiii) all rights of the Debtors under the Assumed Employee Benefit Plans; (xiv) all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials;[6] (xv) all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies; (xvi) all goodwill as a going concern and all other intangible property of the Debtors; (xvii) all Tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the closing date or any Tax Return; and (xviii) all of the equity interests of Palmer Marketing LLC ("Palmer LLC") issued to Lang, representing 51% of the outstanding units of Palmer LLC; and (xix) all such other properties, assets and rights (contractual or otherwise) of the Debtors as of the closing date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, which are not Excluded Assets. (Asset Purchase Agreement, § 2.1; Sale Order, ¶¶ 4-7.)

(c)     Excluded Assets. As set forth more fully in Section 2.2 of the Asset Purchase Agreement, Excluded Assets include (i) all Avoidance Actions (and the proceeds thereof); (ii) all Owned Real Property of Debtors other than the Acquired Owned

---

[6] After the Closing Date, the Debtors will have reasonable access to the Books and Records to enable the orderly administration of these Chapter 11 Cases in compliance with Local Rule 6004-1(b)(iv)(J).

DB02:8624737.2                                                                     068626.1001

Real Property, including the Owned Real Property set forth on Schedule 2.2(a)(ii); (iii) all Facility Leases of the Debtors other than the Assumed Facility Leases, including the Facility Leases set forth on Schedule 2.2(a)(iii); (iv) all equipment leases of Debtors other than the Assumed Equipment Leases, including the equipment leases set forth on Schedule 2.2(a)(iv); (v) all Contracts of the Debtors set forth on Schedule 2.2(a)(v); (vi) all assets, rights, pre-payments, deposits and refunds of any Employee Benefit Plan of the Debtors other than the Assumed Employee Benefit Plans; (vii) originals of each Debtors' minute books and stock books; (viii) the equity securities or other ownership interest of the Debtors; (ix) all other assets listed on Schedule 2.2(a)(ix). (Asset Purchase Agreement, § 2.2.)

(d)     <u>Assumed Liabilities.</u> LHI Enterprises will assume only those liabilities set forth in Section 2.3 of the Asset Purchase Agreement, which include (i) Cure Amounts for the Assumed Executory Contracts, up to the maximum amount set forth on Schedule 2.3(a)(i) to the Asset Purchase Agreement; (ii) any Cure Amount for a Designated Contract that becomes an Assumed Executory Contract pursuant to Section 2.6(c) of the Asset Purchase Agreement; (iii) all obligations under the Assumed Executory Contracts arising after the closing date; (iv) the sponsorship and obligations of the Assumed Employee Benefit Plans, other than any Liabilities associated with such Assumed Employee Benefit Plans arising in connection with any breach of any representation, warranty or covenant hereunder; (v) postpetition trade payables or other liabilities, if any, expressly set forth on Schedule 2.3(a)(v); (vi) with respect to the Rehired Employees, the obligations with respect to any unpaid wages and salaries, unused vacation or sick leave earned and accrued (to the extent not paid) as of the closing date, but not including any bonus, retention or severance obligations; and (vii) the Designated Remaining Executory Contract Obligations. (Asset Purchase Agreement, § 2.3.)

(e)     <u>Excluded Liabilities.</u> LHI Enterprises will not assume any liabilities of the Debtors other than the Assumed Obligations specifically designated in the Asset Purchase Agreement. LHI Enterprises expressly is not assuming the following liabilities, among others: (i) all claims or liabilities of any Debtor that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases that are not Assumed Executory Contracts; (ii) all liabilities of any Debtor or Palmer LLC relating to Taxes; (iii) all liabilities for taxes now or hereafter attributable to the Acquired Assets or the business for any taxable periods ending on or before the closing date; (iv) all accounts payable of the Debtors or any predecessor or affiliate thereof arising prior to the closing date; (v) all liabilities in respect of indebtedness of the Debtors or any predecessor or affiliate thereof; (vi) all Excluded Environmental Liabilities; (vii) all liabilities pursuant to the WARN Act relating to any action or inaction of the Debtors prior to or upon the closing date; (viii) except for Cure Amounts payable by LHI Enterprises as contemplated in Section 2.7 of the Asset Purchase Agreement, all liabilities of the Debtors resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of the Debtors (or any of their current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties

or assets or any properties or assets previously used by the Debtors at any time, except for Cure Amounts payable by LHI Enterprises as contemplated in the Asset Purchase Agreement; (ix) all liabilities arising out of any proceeding commenced against the Debtors or any predecessor or affiliate thereof after the closing date and arising out of or relating to any occurrence or event happening prior to the closing date; (x) all Liabilities under any Assumed Executory Contract which arises after the closing date but arises out of or relates to any breach that occurred prior to the closing date; (xi) all liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the Business or any act or omission of any Debtor or any predecessor or affiliate thereof prior to the closing date; (xii) all liabilities arising out of or relating to the litigation filed in the United States District Court for the Central District of California, with the caption <u>Kittrich Corporation v. The Lang Companies, LLC</u>, doing business as Turner Licensing, 2:09-cv-01907-MMM-CT; (xiii) all liabilities arising out of, or relating to, any indemnification obligations of any Debtor, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of contract, and liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of the Debtors; (xiv) except for the Assumed Obligations, all liabilities with respect to the employees or former employees of the Debtors arising prior to the closing date; (xv) all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any Debtor or any ERISA Affiliate, or with respect to which any Debtor or any ERISA Affiliate has any Liability; (xvi) all liabilities arising out of or relating to services, products or product or service warranties of the Debtors or any predecessor or affiliate thereof to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the closing date; (xvii) all liabilities of any Debtor to any current, former or prospective shareholder or other equity interest holder of any Debtor, including all liabilities of the Debtors related to the right to or issuance of any capital stock or other equity securities; (xviii) all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Debtor in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; (xix) except for the Designated Remaining Executory Contract Obligations, all Liabilities of Debtors arising out of, or relating to, any Designated Contract, unless and until such Designated Contract is assumed by LHI Enterprises; (xx) all Liabilities of Debtors or any predecessor or Affiliate of any Debtor based upon such Person's acts or omissions occurring after the Closing; and (xxi) all Liabilities of Debtors to LHI Enterprises, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise. (Asset Purchase Agreement, § 2.4.)

DB02:8624737.2

068626.1001

(f)     Designated Contracts.  At least one (1) day prior to the closing date, LHI Enterprises will deliver to the Debtors a list of Scheduled Contracts that it wishes to designate as "Designated Contracts," which contracts will be automatically deemed removed from all Schedules as of the closing date. Except as otherwise set forth in Section 2.6(d), Debtors will not seek to reject the Designated Contracts for a period of sixty (60) days following the closing date (the "Contract Retention Period").  LHI Enterprises may, at its sole discretion and at any time during the Contract Retention Period, deliver to the Debtors one (1) or more written notices (each, a "Rejection Notice") notifying the Debtors of its intent not to assume any Designated Contract(s).  Upon receipt of a Rejection Notice, the Designated Contract(s) identified in such Rejection Notice will automatically be deemed an Excluded Contract for all purposes under the Asset Purchase Agreement.  LHI Enterprises may, at its sole discretion and at any time during the Contract Retention Period, deliver to the Debtors one (1) or more written notices (each, an "Cure Notice") requesting assumption and assignment of any Designated Contract(s).  To the extent that any Designated Contract is a Facility Lease, Debtor hereby grants Purchaser a license to use and possess the Facility which is leased pursuant to such Facility Lease.  Such license shall commence on the Closing Date and shall terminate on the earlier of the date such Facility Lease is rejected and the last day of the Contract Retention Period.  Notwithstanding anything in the Asset Purchase Agreement to the contrary, on the date any Designated Contract is assumed and assigned to LHI Enterprises pursuant to Section 2.6(c), such Contract will be deemed a Scheduled Contract for all purposes under the Asset Purchase Agreement.  With respect to any Designated Contract, LHI Enterprises shall perform all of Debtors' ordinary course obligations under such Designated Contract and shall compensate Debtors for the ordinary course costs, in each case first arising after the Closing Date and actually incurred by Debtors after the Closing under such Designated Contract until the earlier of the date such Designated Contract is assigned to LHI Enterprises, the date LHI Enterprises delivers a Rejection Notice with respect to such Designated Contract, or the last day of the Contract Retention Period (the "Designated Remaining Executory Contract Obligations").  The covenants set forth in Section 2.6(c) shall survive the Closing.  (Asset Purchase Agreement, § 2.6(c); Sale Order, ¶ 25.)

(g)     Rejection of Certain Leases.  Debtors shall reject the Facility Leases listed on Schedule 2.6(e) to the Asset Purchase Agreement (the "Specified Leases") effective as of January 31, 2010.  The Debtors hereby grant LHI Enterprises a license to use and possess the Facility which is leased pursuant to each of the Specified Leases. Such license shall commence on the Closing Date and shall terminate on January 31, 2010. With respect to each Specified Lease, LHI Enterprises shall perform all of Debtors' ordinary course obligations under such Specified Lease and shall compensate Debtors for the ordinary course costs, in each case first arising after the Closing Date and actually incurred by Debtors after the Closing under such Specified Lease until January 31, 2010.

(h)  <u>Trade Payables.</u>  Debtors agree to deliver a list of the ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Petition Date through and including the date hereof and the critical trade payables arising prior to the date hereof during the time period set forth in <u>Section 11.19</u> to the Asset Purchase Agreement, which list shall include all relevant third parties and the liabilities incurred specifically with respect to each such third party (the "Complete Trade Payables List").  LHI Enterprises will promptly review this list and prepare a non-binding preliminary version of <u>Schedule 2.3(a)(v)</u> indicating which of the liabilities listed on the Complete Trade Payables List it intends at such time to be Assumed Obligations within three (3) days following receipt of the Complete Trade Payables List.  By the date that is two (2) days prior to the Bid Deadline, Debtors agree to deliver an updated Complete Trade Payables List current through the date that is four (4) days prior to the Bid Deadline.  LHI Enterprises will promptly review this list and prepare a binding version of <u>Schedule 2.3(a)(v)</u> indicating (i) which of the liabilities listed on the updated Complete Trade Payables List shall be Assumed Obligations within one (1) day following receipt of the updated Complete Trade Payables List, and (ii) a maximum amount per individual third party that LHI Enterprises shall be obligated to assume as Assumed Obligations at Closing (regardless of whether a related Contract is designated as an Assumed Executory Contract, an Excluded Contract, a Designated Contract or a Specified Lease).  For avoidance of doubt, the binding version of <u>Schedule 2.3(a)(v)</u> delivered pursuant to <u>Section 2.7(b)</u> of the Asset Purchase Agreement shall be determined in LHI Enterprises' absolute and sole discretion and may include all or none of the payables included in the non-binding preliminary version of <u>Schedule 2.3(a)(v)</u> delivered by LHI Enterprises pursuant to <u>Section 2.7(a)</u> to the Asset Purchase Agreement.  By the date that is two (2) days prior to the Closing, Debtors agree to deliver an updated Complete Trade Payables List including estimates of liabilities incurrent through the Closing Date.  LHI Enterprises will review this list and prepare an updated version of <u>Schedule 2.3(a)(v)</u> indicating which of the liabilities listed on the updated Complete Trade Payables List shall be Assumed Obligations within one (1) day following receipt of the updated Complete Trade Payables List; <u>provided</u>, that LHI Enterprises shall be obligated to assume as Assumed Obligations up to the maximum amount per individual third party (to the extent a Liability exists as of the Closing) the amounts indicated on the version of <u>Schedule 2.3(a)(v)</u> delivered by LHI Enterprises pursuant to <u>Section 2.7(b)</u> to the Asset Purchase Agreement.

(i)  <u>Cure Claims.</u>  With respect to each of the Scheduled Contracts assigned to LHI Enterprises on the closing date, LHI Enterprises will be responsible for paying all Cure Amounts set forth on Schedule 2.3(a)(i) in connection with the assignment and assumption of the Scheduled Contracts.  Within seven (7) days after the Bid Deadline, the Debtors will provide to LHI Enterprises an update to Schedule 2.3(a)(i).  If the actual costs of cure with respect to any Scheduled Contract is greater than the Cure Amount set forth on the originally delivered Schedule 2.3(a)(i), then LHI Enterprises will have the option, at its sole discretion at any time prior to the closing date, of (i) paying such excess and assuming such

DB02:8624737.2    068626.1001

Scheduled Contract, (ii) removing such Scheduled Contract from the Schedules adding such Assumed Executory Contract to the list of Designated Contracts delivered pursuant to Section 2.6(c), or (iii) removing such Scheduled Contract from the Schedules, adding such Scheduled Contract to the Schedules related to Excluded Contracts, and having such Scheduled Contract rejected by the Debtors in accordance with Section 2.6(d). (Asset Purchase Agreement, §§ 2.3(a)(i), 2.8.)

(j)     <u>Good Faith Deposit.</u>    $5,000,000 for Qualified Bidders other than LHI Enterprises. In lieu of a deposit, Sun Finance has provided DIP financing to ensure the continued operations of the Debtors. (Asset Purchase Agreement, § 8.2.)

(k)     <u>Breakup Fee and Expense Reimbursement.</u>    As provided in Section 8.2, the Breakup Fee (as defined herein) is equal to $750,000, with the Debtors being jointly and severally liable for such payment. In addition, if the transactions contemplated hereby are not consummated for any reason other than the material breach by LHI Enterprises, the Debtors will immediately pay (in cash) to LHI Enterprises an amount equal to the costs and out-of-pocket expenses incurred by LHI Enterprises in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of the Asset Purchase Agreement, up to a maximum of $500,000 (the "<u>Expense Reimbursement</u>"), with the Debtors being jointly and severally liable for such payment. (Asset Purchase Agreement, § 8.2.)

(l)     <u>Successor Liability.</u>   The Sale Order requests the Bankruptcy Court enjoin all entities from commencing, continuing or otherwise initiating any action or other proceeding against the Purchasing Entities, their successors and assigns, or the Transaction Acquired Assets, with respect to any successor liability claims (Sale Order, ¶¶ 8, 40, 41.)

(m)    <u>Representations and Warranties.</u> Representations and warranties do not survive the Sale; there is no post-Sale indemnity for breaches.

(n)    <u>Operations Pending Closing.</u> As provided in Section 7.3, until the Sale, the Debtors are subject to covenants limiting their operating flexibility in certain respects and are generally required to carry on their business in the ordinary course, taking into account their status as debtors-in-possession. (Asset Purchase Agreement, § 7.3.)

(o)    <u>Credit Bid.</u>   Sun Finance and Catterton have conditioned their obligation to complete the Transactions on the Bankruptcy Court entering an Order, binding on all parties in interest in the Chapter 11 Cases unconditionally allowing (i) a Claim by Sun Finance in an amount equal to the DIP Amount and (ii) a Claim by Catterton in an aggregate amount equal to the Pre-Petition Secured Amount, and authorizing and approving the credit bid by Sun Finance and/or Catterton contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code. (Asset Purchase Agreement, § 8.2(g); Sale Order, ¶¶ F, EE, FF and 16.)

DB02:8624737.2      068626.1001

(p) <u>Deadlines.</u> LHI Enterprises may terminate the Asset Purchase Agreement pursuant to Section 9.1 if the following milestones are not met:

    (i) entry of the Bidding Procedures by September 4, 2009;

    (ii) receipt of all Bids by September 23, 2009;

    (iii) completion of the Auction by September 28, 2009;

    (iv) entry of the Sale Order by September 30, 2009;

    (v) Closing Date no later than October 15, 2009.

    (Asset Purchase Agreement, § 9.1.)

(q) <u>Releases.</u> Release and waiver of any and all actions against Sun Finance, the DIP Lenders, the Prepetition Agent and Prepetition Lenders (including Catterton), as each are defined in the DIP Order from any and all claims and causes of action related to the DIP Credit Agreement, the DIP Order and Pre-Petition Credit Agreement, as applicable, including with respect to any aspects of the prepetition or postpetition relationship with the Debtors. (DIP Order, ¶ 19 and 20.)

(r) <u>Relief from Bankruptcy Rule 6004(h).</u> LHI Enterprises has conditioned its obligation to complete the Transactions contemplated by the Asset Purchase Agreement on the Bankruptcy Court entering an order approving the execution of the Asset Purchase Agreement by Debtors and the consummation by Debtors of the transactions contemplated herein that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure. (Asset Purchase Agreement, § 8.2(d); Sale Order ¶ B.)

22. Further, at least two (2) days prior to the closing, the Debtors will take all necessary action to change their names to a name that does not include the word "Lang" "Avalanche" or "Turner" or any other name or mark included in the Debtors intellectual property or any translations, adaptations, derivations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "<u>Restricted Names</u>"), as set forth in section 10.6 of the Asset Purchase Agreement.

23. Upon Closing, (i) Sun Finance will deliver to the Debtors fully executed releases and waivers from the DIP Lenders under the DIP Facility relating to aggregate borrowings under the DIP Facility and (ii) Catterton will deliver to the Debtors fully executed

releases and waivers of those claims under the Pre-Petition Facility to the extent that such claims are credit bid pursuant to the Asset Purchase Agreement and all Transactions contemplated thereby. LHI Enterprises will pay the Cure Amounts and assume the Assumed Obligations.

24. Within two (2) business days after Closing, the Debtors will file schedules listing (i) the Assumed Executory Contracts and (ii) the Designated Contracts. Further, as soon as practicable after the Contract Retention Period, the Debtors will file a cumulative and final schedule of Assumed Executory Contracts.

## C.     The Bidding Protections.

25. Section 8.2 of the Asset Purchase Agreement provides that upon the first to occur of (i) the date the Debtors consummate a proposal relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets pursuant to one (1) or more transactions, the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of any Debtor (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one (1) or more Third Parties (as defined in the Asset Purchase Agreement and any Debtor; or (ii) the date the Debtors confirm a plan under the Bankruptcy Code, the Debtors will immediately pay (in cash) to LHI Enterprises a breakup fee equal to $750,000 (the "Breakup Fee"), in each case, with the Debtors being jointly and severally liable for such payment; provided, however, that the Breakup Fee shall not be payable to LHI Enterprises if the Asset Purchase Agreement is terminated by Debtors pursuant to Section 9.1(c) of the Asset Purchase Agreement.

26. In addition, as stated above, if the Transactions contemplated hereby are not consummated for any reason other than the material breach by LHI Enterprises, the Debtors

will immediately pay (in cash) to LHI Enterprises the Expense Reimbursement, with the Debtors being jointly and severally liable for such payment.

**D.     The Form and Manner of Notice of Auction and Sale Hearing.**

27.     On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the notice attached as <u>Exhibit 2</u> to the Bidding Procedures Order (the "<u>Sale Notice</u>") to be sent by first-class mail postage prepaid, to the following: (i) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against any all or any portion of the Acquired Assets; (ii) the Office of the United States Trustee; (iii) the Environmental Protection Agency; (iv) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Acquired Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Acquired Assets or have any known interest in the relief requested by the Motion; (v) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (vi) counsel to LHI Enterprises; (vii) counsel to the prepetition and postpetition secured lenders; (viii) the United States Attorney's office; (ix) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (x) counsel to the Official Committee of Unsecured Creditors; (xi) all parties to any litigation involving the Debtors; (xii) all of the Debtors' current employees and former employees, if any, who were terminated immediately prior to the commencement of these cases, (xiii) all counterparties to any executory Contract or unexpired Lease of the Debtors; (xiii) all other known creditors and interest holders of the Debtors; and (xiv) all potential bidders previously identified or otherwise known to the Debtors.

28.     In addition to the foregoing, as soon as practicable but no later than five (5) business days after the entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice (modified for publication, as necessary) in The Wall Street Journal, national edition.

**E.     The Procedures For Assumption and Assignment of Scheduled Contracts.**

29.     To facilitate the Transactions and the possible assumption and assignment of the Scheduled Contracts,[7] the Debtors will serve a notice of potential assumption and assignment of the Scheduled Contracts (the "Cure Notice") on all non-Debtor parties to the Scheduled Contracts, on or before three (3) business days after the entry of the Bidding Procedures Order, by first class mail or hand delivery.  A copy of the Cure Notice is attached to the Bidding Procedures Order as Exhibit 3.

30.     In the Cure Notice, the Debtors will identify the Scheduled Contracts and the cure amounts that the Debtors believe must be paid to cure all defaults under the Scheduled Contracts (the "Cure Amounts").  If no amount is listed on the Cure Notice to be served, the Debtors believe that there is no Cure Amount due.  The Debtors request that unless a non-Debtor party to a Scheduled Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Amount by the Sale Objection Deadline (as defined below) and serves a copy of such objection so as to be received no later than the Sale Objection Deadline (as defined below) on: (i) the Debtors, Lang Holdings, Inc., 514 Wells Street, Delafield, Wisconsin 53018, Attn: Laurie Gilner; (ii) counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391, Attn: Michael R. Nestor and David R. Hurst; (iii) counsel to the Official Committee of Unsecured Creditors, Lowenstein

---

[7]     The term "Scheduled Contracts" is defined in Section 2.6(a) of the Asset Purchase Agreement to mean all executory Contracts and unexpired Leases to which any Debtor is a party.

Sandler PC, 65 Livingston Ave., Roseland, New Jersey 07068, Attn: Bruce Buechler and Timothy R. Wheeler; (iv) counsel to Sun Finance and LHI Enterprises, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Jeremy Liss and David Agay; (v) counsel to Catterton, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Eunu Chun; and (vi) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801, Attn: David Buchbinder; such non-Debtor party should be forever barred and estopped from objecting to the Cure Amount and from asserting that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Scheduled Contract.

31.     Further, to the extent that LHI Enterprises is the Successful Bidder, such non-Debtor party will be deemed to have consented to the assumption and assignment of such Scheduled Contracts to LHI Enterprises to the extent that LHI Enterprises decides to have such executory contracts and unexpired leases assumed and assigned to it under the procedures provided for in the Asset Purchase Agreement if such non-Debtor party shall fail to object to the proposed assignment of the Scheduled Contract(s) to LHI Enterprises (including with respect to Designated Contracts assumed and assigned to LHI Enterprises in accordance with the Asset Purchase Agreement). In the event that LHI Enterprises is not the Successful Bidder for the Acquired Assets, the Debtors propose that the non-Debtor parties to the Scheduled Contracts have until the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption and assignment of such Scheduled Contracts solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; objections on all other grounds must be filed and served so as to be

received by the Sale Objection Deadline, including with respect to adequate assurance of future performance as it relates to LHI Enterprises.

32.     Within two (2) business days after the Closing Date, the Debtors will file a complete list of the Scheduled Contracts that were assumed and assigned as of the Closing Date, to LHI Enterprises or to the Successful Bidder, to the extent that the Successful Bidder is not LHI Enterprises.  In addition, the Debtors will file a complete list of Designated Contracts.

33.     To the extent that LHI Enterprises requests assumption and assignment of any Designated Contracts after the Closing Date, the Debtors shall serve the non-Debtor counterparties to such Designated Contracts with the notice of assumption, attached to the Bidding Procedures Order as Exhibit 4 (the "Assumption Notice").  Further, as soon as practicable after the Contract Retention Period, the Debtors will file a cumulative and final schedule of Assumed Executory Contracts.  Upon service of an Assumption Notice and payment by LHI Enterprises of the corresponding Cure Amount, the assumption and assignment of the listed Designated Contracts shall be deemed effective.

**F.     The Sale Hearing.**

34.     The Debtors request that the Court schedule the Sale Hearing on or about September 30, 2009.  The Debtors further request that the objection deadline with respect to the sale of the Acquired Assets and the Transactions contemplated by the Asset Purchase Agreement (including with respect to the sale GrandCo Assets to Sun Finance and Catterton, as described above) (the "Sale Objection Deadline") be, September 23, 2009 at 4:00 p.m. prevailing Eastern Time.

DB02:8624737.2                                                                                                          068626.1001

## AUTHORITY FOR REQUESTED RELIEF

**A.** **The Sale of the Acquired Assets in accordance with the Transactions Contemplated by the Asset Purchase Agreement is Within the Sound Business Judgment of the Debtors and Should be Approved.**

35. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

36. The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (i) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (ii) that adequate and reasonable notice has been provided to interested persons, (iii) that the debtors have obtained a fair and reasonable price, and (iv) that the sale was negotiated in good faith. See Abbotts Dairies, 788 F.2d at 143; see also Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Transactions and the Bidding Procedures is based

upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. See Lionel, 722 F.2d at 1071; see also Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

      37.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of

its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

38.     The Debtors submit that more than ample business justification exists to sell the Acquired Assets to the Successful Bidder (or Backup Bidder) pursuant to the Bidding Procedures.  The Debtors have significant liquidity issues that necessitate a prompt and orderly sale of the Acquired Assets to preserve and maximize the going concern value of such assets for the benefit of all creditors and other parties in interest.  Absent a prompt sale pursuant to the Bidding Procedures and timelines proposed, the Debtors believe that the going concern value of the Acquired Assets may be significantly compromised.  The Debtors believe that a targeted sale process is most likely to achieve the highest and best price for the Acquired Assets. Furthermore, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of their stakeholders.

39.     The notices described herein and in the Bidding Procedures Order are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Accordingly, the proposed sale of the Acquired Assets satisfies the second prong of the Abbotts Dairies standard.

40.     The Debtors have been actively marketing their assets since March 2009. Between late-March and early-July 2009, the Debtors had numerous meetings with a series of potential purchasers, but such meetings did not result in a sale prior to the Petition Date. However, those meetings did serve as the basis for negotiating and ultimately entering into the Asset Purchase Agreement for the sale of the Acquired Assets and Transactions contemplated thereby.

41.     To assist the Debtors in the marketing and sale of the Acquired Assets in these chapter 11 cases, the Debtors retained Duff & Phelps to act as the Debtors' exclusive investment bankers.  In addition to the marketing efforts described herein, the Bidding Procedures are designed to maximize the value received for the Acquired Assets.  The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely Bid.  Along with the Debtors' ample marketing process, the Bidding Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors have and are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to Bid on the Acquired Assets.  The proposed sale will be further subject to a market check through the solicitation of competing Bids in a Court-supervised auction process, as set forth in the Bidding Procedures.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and therefore the third prong of the Abbotts Dairies standard is satisfied.  As discussed below, the "good faith" prong of the Abbotts Dairies standard also is satisfied here.

**B.    The Asset Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code.**

42.     The Debtors request that the Court find that the Successful Bidder (or Backup Bidder) (as defined in the Bidding Procedures), including, with respect to the Asset Purchase Agreement, each of the Purchasing Entities, is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Acquired Assets.

43.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not

> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

44.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Scheduled Contracts are executory contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder (or Backup Bidder) with respect to both the Scheduled Contracts (as defined and described more fully below) and the Acquired Assets.

45.      As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential

purchaser to act in good faith in negotiating the sale of the Acquired Assets and the assignment of the Scheduled Contracts related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

46. Here, (a) the sale of the Acquired Assets to LHI Enterprises and the sale of the GrandCo Assets to Sun Finance and Catterton and (b) the assignment of certain of the Scheduled Contracts, which have been designated by LHI Enterprises in the Asset Purchase Agreement and/or designated by any Successful Bidder who is not LHI Enterprises in its Modified Asset Purchase Agreement, is or will be in good faith. As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Asset Purchase Agreement (or Modified Asset Purchase Agreement) will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. All negotiations have been and will continue to be conducted on an arm's-length, good faith basis. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue

influence over the process. Under the circumstances, the Successful Bidder (or Backup Bidder), including each of the Purchasing Entities should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Bidding Procedures are designed to prevent the Debtors or the Successful Bidder (or Backup Bidder); including each of the Purchasing Entities from engaging in any conduct that would cause or permit the Asset Purchase Agreement (or the Modified Asset Purchase Agreement), or the sale of the Acquired Assets to the Successful Bidder (or Backup Bidder), including each of the Purchase Entities, pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

47.     All parties in interest will receive notice of the sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Scheduled Contracts will be provided notice of possible assumption and assignment and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

## C.     The Proposed Sale and the Transactions Contemplated by the Asset Purchase Agreement Satisfy the Requirements of Section 363(f) of the Bankruptcy Code.

48.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest. See 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in

the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met). Because the Debtors expect that they will satisfy at least the second and

fifth of these requirements, approving the sale of the Acquired Assets and the subsequent sale of

the GrandCo Assets free and clear of all adverse interests is warranted. Furthermore, courts have

held that they have the equitable power to authorize sales free and clear of interests that are not

specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL

1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); Volvo White Truck Corp. v. Chambersburg

Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**D.      Assumption and Assignment of Scheduled Contracts Should Be Approved.**

        49.      To facilitate and effectuate the sale of the Acquired Assets, the Debtors

seek authority to assume and assign some of the Scheduled Contracts to the Successful Bidder

(or the Backup Bidder) to the extent required by such Successful Bidder (or Backup Bidder).

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that

the defaults under such contracts and leases are cured and adequate assurance of future

performance is provided. A debtor's decision to assume or reject an executory contract or

unexpired lease must only satisfy the "business judgment rule" and will not be subject to review

unless such decision is clearly an unreasonable exercise of such judgment. See Group of

Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943)

(applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code Section 365

and rejecting the test of whether the executory contract was burdensome in favor of whether

rejection is within the debtor's business judgment); <u>Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.</u>, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

50.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." <u>See</u> <u>Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  <u>See</u> <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

51.     The Successful Bidder (or the Backup Bidder) will require the assignment of certain Scheduled Contracts related to the Acquired Assets.  To the extent Scheduled Contracts are identified for assumption and assignment by the Successful Bidder (or the Backup Bidder), the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Scheduled Contracts will be satisfied at the Sale Hearing.  The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to Bid for Acquired Assets.  Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Acquired Assets and assuming and assigning to the Successful Bidder (or the Backup Bidder) the Scheduled Contracts would be in the best interests of their estates.

DB02:8624737.2                                                                                                    068626.1001

Moreover, the Debtors will provide all parties to the Scheduled Contracts an opportunity to be heard.

52.     Specifically, the Debtors will serve the Cure Notice on or before three (3) business days after entry of the Bidding Procedures Order on the non-Debtor parties to the Scheduled Contracts. The Cure Notice will, among other things, identify the Scheduled Contract and the respective Cure Amount, if any. The Debtors request that unless the non-Debtor party to Scheduled Contract files and serves a Cure Amount Objection on or before the Sale Objection Deadline, such non-Debtor party should be forever barred and estopped from objecting to the Cure Amount and from asserting any additional amounts due or defaults exist, or conditions to assumption and assignment must be satisfied under such Scheduled Contract.

**E.     The Breakup Fee and Expense Reimbursement are Reasonable and Appropriate.**

53.     Approval of the Breakup Fee and Expense Reimbursement are governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535. Here, the Breakup Fee and Expense Reimbursement should be approved because they will provide a benefit to the Debtors' estates.

54.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive

bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, "[i]f the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

55.    In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee or expenses: (i) the presence of self-dealing or manipulation in negotiating the break-up fee; (ii) whether the fee harms, rather than encourages, bidding; (iii) the reasonableness of the break-up fee relative to the purchase price; (iv) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (v) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (vi) the correlation of the fee to a maximization of value of the debtor's estate; (vii) the support of the principal secured creditors and creditors committees of the break-up fee; (viii) the benefits of the safeguards to the debtor's estate; and (ix) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

56.    Whether evaluated under the "business judgment rule" applied by many courts[8] or the Third Circuit's "administrative expense" standard, the Breakup Fee and Expense Reimbursement should be approved. First, all negotiations between the Debtors and LHI

---

[8]    See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

Enterprises have been conducted on a good faith, arm's-length basis. Second, based on the Debtors' pre-filing solicitation process, the Debtors have determined that the Breakup Fee and Expense Reimbursement are necessary to attract and retain a stalking horse bidder. Specifically, the initial expressions of interest received by the Debtors from LHI Enterprises indicated that LHI Enterprises would not be willing to act as a stalking horse without some form of Bid protection in the event the Debtors determined to sell the Acquired Assets to another bidder. The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder. Therefore, absent authorization of the payment of the Breakup Fee and Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest and best available offer for the Acquired Assets.

57. The Debtors submit that authorization of the Breakup Fee and Expense Reimbursement will not chill bidding for the Acquired Assets. The Breakup Fee and Expense Reimbursement were negotiated items and the Debtors believe that the Breakup Fee and Expense Reimbursement are appropriate under the circumstances because: (i) LHI Enterprises is providing a substantial benefit to the estates by acting as a stalking horse bidder for the Acquired Assets; (ii) the Acquired Assets have been marketed to allow all known and potentially interested parties an adequate opportunity to offer better terms to the Debtors; (iii) the Asset Purchase Agreement will provide a floor by which other Bids may be judged; (iv) the Breakup Fee and Expense Reimbursement afforded to LHI Enterprises were material inducements for LHI Enterprises' entry into the Asset Purchase Agreement; and (v) the terms of the Asset Purchase Agreement, including the Breakup Fee and Expense Reimbursement, taken as a whole, amount to the highest and best offer for the Acquired Assets in the Debtors' business judgment.

DB02:8624737.2
068626.1001

58.     Moreover, the promise of a Breakup Fee and Expense Reimbursement will ensure that the Debtors receive serious Qualified Bids.  The Breakup Fee and Expense Reimbursement will provide the incentives needed to induce a bidder to increase its Bid prior to the Auction for the Acquired Assets.  Further, the Asset Purchase Agreement with LHI Enterprises will establish a Bid standard or minimum for other bidders, further ensuring that during the Auction the Debtors receive the highest or best Bid possible for the Acquired Assets. Accordingly, the higher the stalking horse bid, the higher the floor for bidding at the Auction for the Acquired Assets.  Thus, even if LHI Enterprises is offered the Breakup Fee and Expense Reimbursement, and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Acquired Assets will be sold will reflect their true worth.  Accordingly, to achieve the optimal Bid at the Auction on the Acquired Assets, it is appropriate to offer the Breakup Fee and Expense Reimbursement to LHI Enterprises.

59.     The Breakup Fee and Expense Reimbursement are fair and reasonable in amount and well within market.  First, paying the Breakup Fee of $750,000 (3% of the purchase price), and Expense Reimbursement in the maximum amount of $500,000, on account of LHI Enterprises' risk that the Debtors sell the Acquired Assets to another bidder is reasonable and customary in this type of transaction.  After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as a percentage of the purchase price as being appropriate under the facts and circumstances of the case.  See In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (fee of 3% permitted); In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); Tama Beef Packing, Inc., 321 B.R.

496 (B.A.P. 8th Cir. 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); In re Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D. Del. Nov. 4, 2003) (fee of 5.1% permitted); In re FSC Corp., Case No. 00-B-04659 (Bankr. N.D. Ill. Feb. 28, 2000) (break-up fee of 3.4% plus reimbursement of expenses is reasonable); In re Hechinger Investment Company Inc., Case No. 99-2261 (PJW) (Bankr. D. Del. Oct. 1, 1999) (fee of 3.0% upheld); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Feb. 17, 1998) (fee of 4.0% upheld); Integrated Resources, 147 B.R. 650, 662 (S.D.N.Y. 1992) (expert testified that outside of bankruptcy break-up fees average 3.3%).

60. Second, payment of the Breakup Fee and Expense Reimbursement is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Breakup Fee and Expense Reimbursement only if the Debtors consummate a proposal, other than with LHI Enterprises, relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets; or if the Debtors consummate a plan under the Bankruptcy Code. The Breakup Fee and Expense Reimbursement were negotiated in good faith and were the product of arm's-length negotiations.

61. The Debtors have demonstrated a sound business justification for authorizing the Breakup Fee and Expense Reimbursement and their clear necessity and benefit to these estates. Thus, the Debtors request that this Court approve and authorize the Breakup Fee and Expense Reimbursement.

**F. Credit Bidding Should Be Authorized under Section 363(k) of the Bankruptcy Code**

62. A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under

section 363(k) of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured credit is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

63.     As a secured creditors, Sun Finance and the Catterton (collectively or individually) as applicable, are entitled to credit bid some or all of their claims for their collateral pursuant to section 363(k) of the Bankruptcy Code.  Because Sun Finance and Catterton (collectively or individually), as applicable, hold claims that are secured by substantially all of the Acquired Assets, Sun Finance and Catterton (collectively or individually), as applicable, should be allowed to credit bid the face value of any of their secured claims in order to effectuate the Transactions under the Asset Purchase Agreement.

## G.     Relief from the Ten-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

64.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The

Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

65. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, commentators suggest that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. See id.

66. Accordingly, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

67. The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee; (ii) counsel to the Creditors' Committee; (iii) the Debtors' prepetition and postpetition secured lenders; (iv) counsel to LHI Enterprises; and (v) parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) enter the

proposed Bidding Procedures Order, substantially in the form attached hereto as Exhibit A; (ii)

enter the proposed Sale Order, substantially in the form attached hereto as Exhibit B, and (iii)

grant such other and further relief as is just and proper.


Dated: Wilmington, Delaware
    August 19, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Michael R. Nestor (No. 3526)
David R. Hurst (No. 3743)
Patrick A. Jackson (No. 4976)
Kevin P. Garland (No. 5171)
Pilar G. Kraman (No. 5199)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel for the Debtors and
Debtors In Possession*