# Exhibit 1

ASSET PURCHASE AGREEMENT

dated as of August 19, 2009

among

LHI ENTERPRISES, INC.,

LANG HOLDINGS INC.,

AND

THE OTHER SELLERS NAMED HEREIN

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ...............................................1
    1.1    Definitions...............................................................................................................1
    1.2    Rules of Construction ...........................................................................................13

ARTICLE II PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES ............13
    2.1    Purchase and Sale of Assets..................................................................................13
    2.2    Excluded Assets....................................................................................................16
    2.3    Assignment and Assumption of Liabilities............................................................16
    2.4    No Other Liabilities Assumed. .............................................................................17
    2.5    Revisions to Schedules to Sections 2.1 to 2.4.......................................................20
    2.6    Sellers Actions With Respect to Contracts ...........................................................21
    2.7    Trade Payables .....................................................................................................23
    2.8    Cure Payments......................................................................................................23
    2.9    Deemed Consents and Cures ................................................................................24

ARTICLE III BASIC TRANSACTION........................................................................................24
    3.1    Payment of Purchase Price at Closing. .................................................................24
    3.2    Second Closing. ....................................................................................................24
    3.3    Allocation of Purchase Price.................................................................................24

ARTICLE IV CLOSING ..............................................................................................................25
    4.1    Closing .................................................................................................................25
    4.2    Closing/Post-Closing Payments............................................................................25
    4.3    Deliveries by Sellers ............................................................................................26
    4.4    Deliveries by Purchaser ........................................................................................28
    4.5    Deliveries by Sun Finance ....................................................................................28
    4.6    Deliveries by Catterton ........................................................................................28
    4.7    Form of Instruments.............................................................................................28
    4.8    Further Assurances...............................................................................................28
    4.9    Withholding .........................................................................................................29

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS.................................29
    5.1    Organization, Standing .........................................................................................29
    5.2    Subsidiaries..........................................................................................................29
    5.3    Validity of Agreement; Power...............................................................................30
    5.4    No Conflicts or Violations ....................................................................................30
    5.5    Financial Statements and Related Matters.............................................................30
    5.6    Absence of Undisclosed Liabilities ......................................................................31
    5.7    Accounts Receivable.............................................................................................31
    5.8    Accounts Payable and Other Accrued Expenses ...................................................31
    5.9    Inventory..............................................................................................................31
    5.10   Title to Assets; Assets Necessary to Business. .....................................................32

5.11    Real Property. ...................................................................................................32
5.12    Intellectual Property.............................................................................................33
5.13    Contracts. .............................................................................................................35
5.14    Insurance ..............................................................................................................37
5.15    Taxes. ...................................................................................................................37
5.16    Employee Benefit Plans.........................................................................................38
5.17    Labor and Employment Matters ............................................................................39
5.18    Personnel Matters..................................................................................................40
5.19    Litigation; Orders..................................................................................................40
5.20    Compliance with Law; Permits..............................................................................40
5.21    Environmental Matters...........................................................................................40
5.22    Affiliate Transactions............................................................................................41
5.23    Relationships with Customers and Suppliers.........................................................41
5.24    Product Warranty ..................................................................................................41
5.25    Product Liability ...................................................................................................41
5.26    Brokers..................................................................................................................42
5.27    Absence of Certain Developments..........................................................................42
5.28    Bank Accounts Schedule .......................................................................................42
5.29    Cure Amounts .......................................................................................................42
5.30    Officers and Directors...........................................................................................42
5.31    Lien Searches ........................................................................................................42
5.32    Bankruptcy ............................................................................................................42
5.33    Compliance with Customs & International Trade Laws...........................................42
5.34    Information Accurate and Complete; Reliance.......................................................43
5.35    Warranties are Exclusive ......................................................................................44
5.36    Closing Date..........................................................................................................44

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER........................44
6.1     Organization..........................................................................................................44
6.2     Authority................................................................................................................44
6.3     Consents................................................................................................................44
6.4     Ownership and Transfer of Grandco Stock. ..........................................................44
6.5     Capitalization of Grandco. ....................................................................................45

ARTICLE VII PRE-CLOSING COVENANTS .......................................................................45
7.1     Consents and Approvals. .......................................................................................45
7.2     Access to Information and Facilities.......................................................................45
7.3     Conduct of the Business Pending the Closing. .......................................................46
7.4     Notification of Certain Matters..............................................................................49
7.5     Bankruptcy Actions ...............................................................................................49
7.6     Other Bids .............................................................................................................51
7.7     Non-Seller Subsidiaries .........................................................................................51
7.8     Bankruptcy Matters................................................................................................51
7.9     Financial Statements .............................................................................................52
7.10    Real Property. .......................................................................................................52
7.11    Benefits Plan Amendment. .....................................................................................52

ARTICLE VIII CONDITIONS TO CLOSING..................................................................52
    8.1    Conditions to Parties' Obligations..........................................................52
    8.2    Conditions to Purchaser's Obligations ...................................................53
    8.3    Conditions to Sellers' Obligations..........................................................57

ARTICLE IX TERMINATION...............................................................................58
    9.1    Termination.........................................................................................58
    9.2    Breakup Fee and Expense Reimbursement............................................59
    9.3    Effect of Termination or Breach ............................................................60

ARTICLE X POST-CLOSING COVENANTS .............................................................60
    10.1    Employees..........................................................................................60
    10.2    Employee Benefit Plans.......................................................................60
    10.3    WARN Act..........................................................................................61
    10.4    Payroll Reporting and Withholding .......................................................61
    10.5    Certain Consents .................................................................................62
    10.6    Name Changes ....................................................................................62
    10.7    Accounts Receivable; Collections .........................................................62
    10.8    Confidentiality ....................................................................................62
    10.9    Taxes.................................................................................................63

ARTICLE XI MISCELLANEOUS ..........................................................................64
    11.1    Non-Survival of Representations and Warranties....................................64
    11.2    Expenses. ...........................................................................................64
    11.3    Amendment.........................................................................................64
    11.4    Waivers .............................................................................................64
    11.5    Notices ..............................................................................................64
    11.6    Counterparts; Electronic Execution .......................................................66
    11.7    Headings ............................................................................................66
    11.8    SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY ..............66
    11.9    Governing Law ...................................................................................67
    11.10    Binding Nature; Assignment.................................................................67
    11.11    No Third Party Beneficiaries ................................................................67
    11.12    Severability .......................................................................................67
    11.13    Construction.......................................................................................67
    11.14    Public Announcements .........................................................................68
    11.15    Disclosure Schedules ..........................................................................68
    11.16    Entire Understanding ..........................................................................68
    11.17    Closing Actions...................................................................................68
    11.18    Conflict Between Transaction Documents ..............................................68
    11.19    Final Schedules ..................................................................................68
    11.20    Time Periods ......................................................................................69

**EXHIBITS**

Exhibit A                  Form of Bidding Procedures Order

| Exhibit B | Intentionally Omitted |
|---|---|
| Exhibit C | Form of Sale Order |
| Exhibit D-1 | Form of Release and Waiver (DIP Credit Agreement) |
| Exhibit D-2 | Form of Release and Waiver (Pre-Petition Secured Amount) |
| Exhibit E | Form of Assignment and Assumption Agreement |
| Exhibit F | Form of Bill of Sale |
| Exhibit G | Form of Intellectual Property Assignments |

## SCHEDULES

| Schedule 2.1(a)(vi) | Owned Real Property |
|---|---|
| Schedule 2.1(a)(vii) | Assumed Facility Leases |
| Schedule 2.1(a)(viii) | Assumed Equipment Leases |
| Schedule 2.1(a)(xii) | Assumed Contracts |
| Schedule 2.1(a)(xiii) | Assumed Employee Benefit Plans |
| Schedule 2.2(a)(i) | Excluded Owned Real Property |
| Schedule 2.2(a)(iii) | Excluded Facility Leases |
| Schedule 2.2(a)(iv) | Excluded Equipment Leases |
| Schedule 2.2(a)(v) | Miscellaneous Excluded Contracts |
| Schedule 2.2(a)(ix) | Other Excluded Assets |
| Schedule 2.3(a)(i) | Cure Amounts |
| Schedule 2.3(a)(v) | Assumed Trade Payables |
| Schedule 2.6(c) | Designated Contracts |
| Schedule 2.6(e) | Specified Leases |
| Schedule 5.1 | Foreign Qualifications |
| Schedule 5.2 | Subsidiaries |
| Schedule 5.4 | No Conflicts or Violations |
| Schedule 5.5(a) | Financial Statements |
| Schedule 5.5(b) | Indebtedness |
| Schedule 5.6 | Absence of Undisclosed Liabilities |
| Schedule 5.7 | Accounts Receivable |
| Schedule 5.8 | Accounts Payable and Other Accrued Expenses |
| Schedule 5.9 | Inventory Consignment, Bailment or Warehousing Arrangements |
| Schedule 5.11(a) | Owned Real Property |
| Schedule 5.11(c) | Facility Leases |
| Schedule 5.12(a) | Intellectual Property |
| Schedule 5.12(b) | Intellectual Property Liens |
| Schedule 5.12(g) | Intellectual Property Inspections and Audits |
| Schedule 5.13(a) | Material Contracts |
| Schedule 5.13(b) | Material Contract Matters |
| Schedule 5.14 | Insurance |
| Schedule 5.15(c) | Tax Returns |
| Schedule 5.16(a) | Employee Benefit Plans |
| Schedule 5.16(d) | Employee Benefit Plans Matters |
| Schedule 5.16(e) | Post-Termination Benefits Obligations |
| Schedule 5.17 | Labor and Employment Matters |
| Schedule 5.18 | Personnel Matters |

| | |
|---|---|
| Schedule 5.19 | Litigation; Orders |
| Schedule 5.21 | Environmental Matters |
| Schedule 5.22 | Affiliated Transactions |
| Schedule 5.23 | Customers and Suppliers |
| Schedule 5.26 | Brokers |
| Schedule 5.27 | Absence of Certain Developments |
| Schedule 5.28 | Bank Accounts |
| Schedule 5.29 | Cure Amounts |
| Schedule 5.30 | Officers and Directors |
| Schedule 5.33 | Compliance with Customs and International Trade Laws |
| Schedule 7.3 | Conduct of the Business Pending the Closing |
| Schedule 8.2(f) | Required Third Party Approvals |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 19th day of August (the "Effective Date"), 2009, by and among LHI Enterprises, Inc., a Delaware corporation ("Purchaser"), Lang Holdings, Inc., a Delaware corporation ("ParentCo"), Turner Acquisition, Inc., a Delaware corporation ("Turner"), Avalanche Publishing Acquisition, Inc., a Delaware corporation ("Avalanche Acquisition"), Avalanche Publishing, Inc., a California corporation ("Avalanche Publishing"), The Lang Companies, LLC, a Delaware limited liability company ("Lang"), and The Lang Store, Ltd., a Wisconsin corporation ("Lang Store", and together with ParentCo, Turner, Avalanche Acquisition, Avalanche Publishing and Lang, "Sellers", and each individually, a "Seller").

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1 Definitions. Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"409A Penalties" has the meaning set forth in Section 5.16(g) hereof.

"Accounts Receivable" means all accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1(a) hereof.

"Acquired Owned Real Property" has the meaning set forth in Section 2.1(a)(vi).

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets pursuant to one (1) or more transactions, the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of any Seller (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one (1) or more Third Parties and any Seller.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by contract, through the ownership of voting securities or otherwise.

"Affiliated Group" means an "affiliated group" as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which any Seller is or has been a member.

"Agreement" means this Asset Purchase Agreement, including all of the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 3.3 hereof.

"Assignment and Assumption Agreements" has the meaning set forth in Section 4.3(a)(ii) hereof.

"Assumed Contracts" has the meaning set forth in Section 2.1(a)(xii).

"Assumed Employee Benefit Plans" has the meaning set forth in Section 2.1(a)(xiii).

"Assumed Equipment Leases" has the meaning set forth in Section 2.1(a)(viii).

"Assumed Executory Contracts" means the Assumed Contracts and the Assumed Leases.

"Assumed Facility Leases" has the meaning set forth in Section 2.1(a)(vii).

"Assumed Leased Facilities" means the Leased Facilities identified in the Assumed Facility Leases.

"Assumed Leases" has the meaning set forth in Section 2.1(a)(viii).

"Assumed Obligations" has the meaning set forth in Section 2.3(a) hereof.

"Assumption Notice" has the meaning set forth in Section 2.6(c) hereof.

"Auction" means the auction conducted by Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets in the event a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bidding Procedures Order).

"Auction Deadline Date" means September 28, 2009.

"Avalanche Acquisition" has the meaning set forth in the preamble hereto.

"Avalanche Publishing" has the meaning set forth in the preamble hereto.

"Avoidance Actions" means any causes of action arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid Deadline" means September 23, 2009.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in the form of Exhibit A or such other form consented to by Purchaser in its sole discretion.

"Bidding Procedures Order Deadline Date" means September 4, 2009.

"Books and Records" means all records and lists of the Business, including (i) all inventory, merchandise, analysis reports, marketing reports, research and development materials and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to customers, suppliers or personnel of Sellers or of the Business (including customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (iii) all records relating to all product, business and marketing plans of Sellers, (iv) all accounting records, Tax records and Tax Returns and (v) all books, ledgers, files, reports, plans, drawings and operating records of every kind; provided, however, that "Books and Records" shall not include the originals of any Seller's minute books, stock books or Tax Returns.

"Breakup Fee" has the meaning set forth in Section 8.2(d)(iii) herein.

"Business" means the activities carried on by Sellers, including the development, sourcing, production, marketing, sale and distribution of calendars, back-to-school products, greeting cards, stationery, organization items and specialty products.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of Delaware are authorized by Law to close.

"Catterton" means Catterton Partners V, L.P. and Catterton Partners V Offshore, L.P.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

"Chapter 11 Cases" means the cases commenced by Sellers under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1 hereof.

"Closing Date" has the meaning set forth in Section 4.1 hereof.

"COBRA" has the meaning set forth in Section 5.16(e) hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any Contract or other binding agreement or arrangement (written or oral) with any labor union or organization, works council or other employee representative.

"Company Intellectual Property" has the meaning set forth in Section 5.12(b) hereof.

"Company Systems" has the meaning set forth in Section 5.12(f) hereof.

"Contract" means any agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, whether written or oral, and with respect to any Contract to which any Seller is a party, such contract which any Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Contract Retention Period" has the meaning set forth in Section 2.6(c) hereof.

"Credit Bid Amount" has the meaning set forth in Section 3.2(b) hereof.

"Cure Amount" has the meaning set forth in Section 2.3(a)(i) hereof.

"Customs & International Trade Laws" means any Law, Executive Order, permit, license, award, or other decision or requirement having the force or effect of law, of any Governmental Authority, concerning the importation of merchandise, the export or re-export of products (including technology and services), the terms and conduct of international transactions, and the making or receiving of international payments, including the Tariff Act of 1930, as amended, and other Laws and programs administered or enforced by U.S. Customs and Border Protection ("Customs"), U.S. Immigration and Customs Enforcement, and their predecessor agencies, the Export Administration Act of 1979, as amended, the Export Administration Regulations, the International Emergency Economic Powers Act, as amended, the Trading With the Enemy Act, as amended, the Arms Export Control Act, the International Traffic in Arms Regulations, any other export control regulations administered by an agency of the U.S. government, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), as amended, Executive Orders of the President regarding embargoes and restrictions on transactions with designated entities (including countries, terrorists, organizations and individuals), the embargoes and restrictions administered by the U.S. Office of Foreign Assets Control, the Money Laundering Control Act of 1986, as amended, requirements for the marking of imported merchandise, prohibitions or restrictions on the importation of merchandise made with the use of slave or child labor, the Foreign Corrupt Practices Act, as amended, the antiboycott regulations administered by the U.S. Department of Commerce, the antiboycott regulations administered by the U.S. Department of the Treasury, legislation and regulations of the U.S. and other countries implementing the North American Free Trade Agreement and other free trade agreements to which the U.S. is a party, the antidumping and countervailing duty Laws, and Laws adopted by the Governmental Authorities of other countries concerning the ability of U.S. persons to own businesses or conduct business in those countries, restrictions by other countries on holding

foreign currency or repatriating funds, or otherwise relating to the same subject matter as the U.S. statutes and regulations described above.

"Designated Contracts" has the meaning set forth in Section 2.6(c) hereof.

"Designated Remaining Executory Contract Obligations" has the meaning set forth in Section 2.6(c) hereof.

"DIP Amount" means the sum of all outstanding obligations of any kind under the DIP Facility as of the Closing Date.

"DIP Credit Agreement" means that certain Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of July 16, 2009, among Lang, as the borrower, the Guarantors party thereto, each Lender from time to time party thereto, and Sun Finance, as Administrative Agent and Collateral Agent.

"DIP Facility" means the credit facility governed by the DIP Credit Agreement and the DIP Order.

"DIP Order" means, collectively, those certain interim or final orders entered by this Court approving the DIP Facility.

"Disclosure Schedules" means the Schedules delivered pursuant to Article V hereof.

"Effective Date" has the meaning set forth in the preamble hereto.

"Electronic Delivery" has the meaning set forth in Section 11.6 hereto.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any Liability.

"Environmental Laws" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2 hereof.

"Excluded Contracts" has the meaning set forth in Section 2.2(a)(v) hereof.

"Excluded Environmental Liabilities" means any Liability (including any investigatory, corrective or remedial obligation) arising under Environmental Laws and relating to (i) Sellers or any predecessor or Affiliate of any Seller, (ii) the operation of the Business prior to the Closing, (iii) any Excluded Asset, (iv) any property, facility, or location other than the Acquired Owned Real Property and the Assumed Leased Facilities, or (v) any operations, events, conditions, or circumstances occurring or existing on or prior to the Closing Date, including any Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to Hazardous Substances occurring or existing on or prior to the Closing Date (whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any Disclosure Schedule).

"Excluded Equipment Leases" has the meaning set forth in Section 2.2(a)(iv) hereof.

"Excluded Facility Leases" has the meaning set forth in Section 2.2(a)(iii) hereof.

"Excluded Leases" has the meaning set forth in Section 2.2(a)(iv) hereof.

"Excluded Liabilities" has the meaning set forth in Section 2.4 hereof.

"Executive Officer" of a Person means its chairman, chief executive officer, chief financial officer, president, any vice president, secretary, controller, treasurer or general counsel.

"Exhibits" means the exhibits attached hereto.

"Expense Reimbursement" has the meaning set forth in Section 8.2(d)(iii)(B) hereof.

"Facilities" means collectively the premises at which Sellers operate.

"Facility Leases" means all right, title and interest of Sellers in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which a Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, a Leased Facility.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Grandco" means LHI Lang Holding Corp., a Delaware corporation.

"Grandco Debt" means that certain Promissory Note to be issued by Grandco to Purchaser prior to the Closing.

"Grandco Stock" has the meaning set forth in Section 3.1 hereof.

"Guaranty" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon the Indebtedness, obligation or other Liability of any other Person (other than by endorsements of instruments in the ordinary course of collection), or guaranties of the payment of dividends or other distributions upon the shares of any other Person.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under applicable Law, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Highest and Best Bid" has the meaning set forth in Section 8.2(d)(iii)(H) hereof.

"Indebtedness" means, with respect to any Person as of any date of determination, without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts, (v) all obligations arising from deferred compensation arrangements, (vi) all obligations of such Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, (vii) all Guaranties of such Person in connection with any of the foregoing, (viii) all capital lease obligations, (ix) all deferred rent, (x) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables incurred in the Ordinary Course of Business which are not past due), (xi) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) all obligations (determined on the basis of actual, not notional, obligations) with respect to interest rate protection agreements, interest rate swap agreements, foreign currency exchange

agreements, or other interest or exchange rate hedging agreements or arrangements, (xiii) all other liabilities classified as non-current liabilities in accordance with GAAP as of the date of determination of such Indebtedness, and (xiv) all fees, accrued and unpaid interest, premiums or penalties related to any of the foregoing.

"Insider" means, any Executive Officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical data, financial and marketing plans, customer and supplier lists and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by any Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, and fuels and other and similar items.

"Knowledge of Sellers" means, as of the date of measurement, the knowledge after reasonable inquiry of Laurie Gilner, Chuck Fraelich, Thomas O'Donoghue and John Sanders.

"Lang" has the meaning set forth in the preamble hereto.

"Lang Store" has the meaning set forth in the preamble hereto.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Latest Balance Sheet" has the meaning set forth in Section 5.5(a) hereof.

"Leased Facilities" means any land, buildings, structures, improvements, fixtures or other interest in real property which any Seller has the right to use, or which is used or

8

intended to be used by any Seller or used or intended to be used in, or otherwise related to, the Business other than the Owned Real Property.

"Liability" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that any Purchaser is a successor, transferee or continuation of Sellers or the Business, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" or "Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate, is or could reasonably be expected to be materially adverse to, or materially impairs the value of, the Acquired Assets or results in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Acquired Assets or the Business, taken as a whole, or which materially impairs the ability of Sellers to perform their obligations under this Agreement or has a material adverse effect on or prevents or materially delays the consummation of the transactions contemplated hereby; provided, that the act of filing the Chapter 11 cases in and of itself shall not constitute a Material Adverse Change.

"Material Contract" has the meaning set forth in Section 5.13(b) hereof.

"Miscellaneous Excluded Contracts" has the meaning set forth in Section 2.2(a)(v) hereof.

"Multiemployer Plan" means any "multiemployer plan" (as defined in ERISA Section 3(37)) contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any Liability.

"Net Working Capital" means an amount determined as of the Closing equal to the amount of all current assets, including receivables, inventory and prepaid expenses included in the Acquired Assets (but excluding cash), less an amount equal to current liabilities, including accounts payable and accrued liabilities included in the Assumed Obligations (but excluding all Indebtedness).

"Notice" means any summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or any other Governmental Authority, or any other entity or any individual, and shall include the imposition of any Lien on property owned, leased, occupied or used by any Seller pursuant to any Environmental Law.

"Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Sellers in the usual and ordinary course in the manner Sellers operated prior to the commencement of the Chapter 11 Cases (including with respect to quantity and frequency).

"Owned Real Property" means all land, together with all buildings, structures, fixtures and other improvements located thereon owned by Sellers.

"Palmer LLC" means Palmer Marketing, LLC, a Delaware limited liability company.

"ParentCo" has the meaning set forth in the preamble hereto.

"Permits" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Permitted Lien" means, with respect to each Owned Real Property: (A) zoning, building codes and other land use Laws regulating the use or occupancy of such Real Property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business thereon; and (B) easements, covenants, conditions, restrictions and other similar matters of record affecting title to such real property which do not or would not materially impair the use or occupancy of such real property in the operation of the Business conducted thereon.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"Petition Date" means July 16, 2009, which is the date of the filing of the Chapter 11 petitions of Sellers.

"Pre-Petition Credit Agreement" means that certain Credit Agreement dated as of November 4, 2003, among Lang, Lang Store, Avalanche Publishing, and Turner, as borrowers, and Catterton, as successors-in-interest to Bank of America, National Association, as successor-in-interest to LaSalle Bank, National Association, as Administrative Agent (as defined in the Pre-Petition Credit Agreement), as amended, modified, or supplemented from time to time.

"Pre-Petition Secured Amount" means certain obligations due and owing under the Pre-Petition Credit Agreement in an amount equal to difference between the Credit Bid Amount and the DIP Amount, which amount, for the avoidance of doubt, does not represent all of Purchaser's and/or its Affiliates' Claims under the Pre-Petition Credit Facility as of the Closing Date.

"Proceeding" means any action, claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or cause of action of whatever kind or character.

"Proration Items" has the meaning set forth in Section 10.9(e) hereof.

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Purchaser" has the meaning set forth in the preamble hereto.

"Qualified Bid" or "Qualified Bids" has the meaning set forth in Section 7.5(b) hereof.

"Qualifying Bid" has the meaning set forth in Section 8.2(d)(iii)(G) hereof.

"Rehired Employees" means each employee of Sellers who accepts an offer of employment by Purchaser as described in Section 10.1 hereof.

"Rejection Notice" has the meaning set forth in Section 2.6(c) hereof.

"Release" means any release, emission, disposal, leaching or migration into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Substances) or any structure, facility or property.

"Restricted Names" has the meaning set forth in Section 10.6 hereof.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Motion" has the meaning set forth in Section 7.5(a) hereof.

"Sale Order" means the Final Order of the Bankruptcy Court, in the form of Exhibit C or such other form consented to by Purchaser in its sole discretion, to be entered by the Bankruptcy Court pursuant to Sections 363, 365 and 1146(c) of the Bankruptcy Code, which Final Order, amongst other approvals, approves the sale of the Business and the Acquired Assets to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

"Sale Order Deadline" means September 30, 2009.

"Scheduled Contracts" has the meaning set forth in Section 2.6(a) hereof.

"Schedules" means the schedules attached hereto (including the Disclosure Schedules).

"Second Closing" has the meaning set forth in Section 3.2(a) hereof.

"Seller" or "Sellers" have the meanings set forth in the preamble hereto.

"Specified Leases" has the meaning set forth in Section 2.6(e) hereof.

"Subsidiary" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Sun Finance" means Sun Lang Finance, LLC, a Delaware limited liability company.

"Surveys" means a survey for each Owned Real Property prepared by a licensed surveyor satisfactory to Purchaser, and conforming to 2005 ALTA/ACSM Minimum Detail Requirements for Urban Land Title Surveys, including Table A Items Nos. 1, 2, 3, 4, 6, 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(b), 13, 14, 16, 17 and 18, and such other standards as the Title Company and Purchaser require, certified to Purchaser, Purchaser's lender(s) and the Title Company.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, customs duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign), whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

"Title Commitments" means a commitment for an ALTA Owner's Title Insurance Policy 2006 Form (or other form of policy acceptable to Purchaser) for each Owned Real Property issued by a title insurance company selected by Purchaser, together with a copy of all documents referenced therein.

"Title Policies" means title insurance policies from a title insurance company selected by Purchaser insuring Purchaser's fee simple title to each Owned Real Property as of the Closing Date (including all recorded appurtenant easements insured as separate legal parcels) with gap coverage from Sellers through the date of recording, subject only to Permitted Liens, in such amount as Purchaser reasonably determines to be the value of the real property insured thereunder.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"Turner" has the meaning set forth in the preamble hereto.

"United States Foreign Corrupt Practices Act" means the Foreign Corrupt Practices Act of 1977, as amended, and all Laws issued thereunder.

"WARN Act" has the meaning set forth in Section 5.17(c) hereof.

1.2 Rules of Construction.    Unless the context otherwise clearly indicates, in this Agreement:

        (a) the singular includes the plural;

        (b) "includes" and "including" are not limiting;

        (c) "may not" is prohibitive and not permissive; and

        (d) "or" is not exclusive.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1 Purchase and Sale of Assets.

        (a) Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of

all Liens (other than Permitted Liens), whether arising prior to, on or subsequent to the Petition Date, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Article III, all rights, titles and interests of every kind and nature of Sellers (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of Sellers as of the Closing Date other than the Excluded Assets, whether tangible or intangible, real or personal and wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt all of the following properties, assets and rights (all of the assets to be sold, assigned, transferred and delivered pursuant to this Section 2.1(a) shall be referred to herein as the "Acquired Assets"):

(i)     all cash (including checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities;

(ii)     all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(iii)     any rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date) and relating to the Acquired Assets, including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, other than the Avoidance Actions set forth in Section 2.2(a)(i);

(iv)     all bank accounts, safety deposit boxes, lock boxes and the like;

(v)     all Inventory;

(vi)     the Owned Real Property set forth on Schedule 2.1(a)(vi), and any part or parcel thereof (the "Acquired Owned Real Property");

(vii)     all of Sellers' rights existing under the Facility Leases set forth on Schedule 2.1(a)(vii) (the "Assumed Facility Leases"), including all rights to security deposits held pursuant thereto;

(viii)     the equipment leases set forth on Schedule 2.1(a)(viii) (the "Assumed Equipment Leases", together with the Assumed Facility Leases, the "Assumed Leases");

(ix)     all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal

digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties and or any other assets may be situated;

(x)     all Intellectual Property owned, licensed, used or held for use by Sellers (including all of the Intellectual Property set forth on Schedule 5.12(a)), along with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Sellers' possession or control;

(xi)     all Company Systems;

(xii)     all rights of Sellers under the Contracts of each Seller set forth on Schedule 2.1(a)(xii) (the "Assumed Contracts"), including all security deposits thereunder, all contractual rights of Sellers to indemnification, exculpation, advancement or reimbursement of expenses, and all rights to proceeds under insurance policies;

(xiii)     all rights of Sellers under all of the Employee Benefit Plans identified in Schedule 2.1(a)(xiii) (the "Assumed Employee Benefit Plans"), including all pre-payments, deposits and refunds thereunder, and any assets maintained pursuant thereto or in connection therewith;

(xiv)     all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials;

(xv)     all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records of Sellers held by such permitting, licensing and certifying agencies;

(xvi)     all goodwill as a going concern and all other intangible property of Sellers;

(xvii)     all Tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the Closing Date;

(xviii)     all of the equity interests of Palmer LLC issued to Lang, representing 51% of the outstanding units of Palmer LLC; and

(xix)     all such other properties, assets and rights (contractual or otherwise) of Sellers as of the Closing Date, whether tangible or intangible, real or personal and

wherever located and by whomever possessed which are not otherwise expressly set forth above as Acquired Assets and are not Excluded Assets.

2.2 Excluded Assets.

(a) Notwithstanding anything to the contrary in this Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Purchaser hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(i)     all Avoidance Actions (including the proceeds thereof);

(ii)     all Owned Real Property of Sellers other than the Acquired Owned Real Property, including the Owned Real Property set forth on Schedule 2.2(a)(i);

(iii)     all Facility Leases of Sellers other than the Assumed Facility Leases (the "Excluded Facility Leases"), including the Facility Leases set forth on Schedule 2.2(a)(iii);

(iv)     all equipment leases of Sellers other than the Assumed Equipment Leases (the "Excluded Equipment Leases", together with the Excluded Facility Leases, the "Excluded Leases"), including the equipment leases set forth on Schedule 2.2(a)(iv);

(v)     all Contracts of Sellers other than the Assumed Contracts, including those set forth on Schedule (v) (the "Miscellaneous Excluded Contracts", and together with the Excluded Leases, the "Excluded Contracts");

(vi)     all assets, rights, pre-payments, deposits and refunds of any Employee Benefit Plan of each Seller other than the Assumed Employee Benefit Plans;

(vii)     originals of each Seller's minute books and stock books;

(viii)     the equity securities or other ownership interest of each of Sellers; and

(ix)     all other assets listed on Schedule 2.2(a)(ix).

2.3 Assignment and Assumption of Liabilities.

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.3 hereto, Purchaser shall assume from Sellers and thereafter be responsible for the payment, performance or discharge of only the following liabilities and obligations of Sellers (all such liabilities and obligations assumed pursuant to this Section 2.3(a) shall be referred to herein as the "Assumed Obligations"):

(i)     any costs of cure with respect to the Assumed Executory Contracts, but only in an amount up to, and in no event exceeding, the amount set forth next to such Assumed Executory Contract on Schedule 2.3(a)(i) (the "Cure Amounts", or with respect to an individual Assumed Executory Contract, the "Cure Amount") (for the avoidance of doubt, it is

agreed and understood that to the extent no amount is set forth next to an Assumed Executory Contract on Schedule 2.3(a)(i), the Cure Amount is deemed to be zero);

(ii)    to the extent set forth next to any Designated Contract (as defined below) that becomes an Assumed Executory Contract pursuant to Section 2.6(c), any Cure Amount with respect to such Designated Contract;

(iii)    all obligations under the Assumed Executory Contracts arising after the Closing Date;

(iv)    the sponsorship and obligations of the Assumed Employee Benefit Plans, other than any Liabilities associated with such Assumed Employee Benefit Plans arising in connection with any breach of any representation, warranty or covenant hereunder;

(v)    the ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Petition Date through and including the Closing Date and the critical trade payables arising prior to the Closing Date, in each case specifically and expressly set forth on Schedule 2.3(a)(v);

(vi)    with respect to the Rehired Employees, the obligations with respect to any unpaid wages and salaries, unused vacation or sick leave earned and accrued (to the extent not paid) as of the Closing Date, but not including any bonus, retention or severance obligations; and

(vii)    the Designated Remaining Executory Contract Obligations.

For the avoidance of doubt, the Assumed Obligations shall not include any item listed in Sections 2.4(a)(i)-2.4(a)(xxi).

(b)    Section 2.3(a) shall not limit any claims or defenses Purchaser may have against any party other than Sellers. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Sellers as compared to the rights and remedies which such Third Party would have had against Sellers absent the Chapter 11 Cases and had Purchaser not assumed such Assumed Obligations.

2.4 No Other Liabilities Assumed.

(a)    Purchaser shall not be the successor to any or all of Sellers, and each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability (whether known or unknown) of any Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof)), whether relating to or arising out of the Business, the Excluded Assets, the Acquired Assets or otherwise, and whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Seller or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate other than the Assumed Obligations (any such obligations, the "Excluded Liabilities"); provided, that, in furtherance and

not in limitation of the foregoing, the Assumed Obligations do not include, and Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

(i)     all claims or Liabilities of any Seller that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases that are not Assumed Executory Contracts;

(ii)     all Liabilities of any Seller or Palmer LLC relating to Taxes (with respect to the Business or the Acquired Assets or otherwise), including Taxes that may arise as a result of (i) any claim, audit, investigation, assessment, or adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority, court or other Governmental Authority against any Seller or Palmer LLC or (ii) the sale of the Acquired Assets or the assumption of the Assumed Obligations, or the transfer of the Grandco Debt and the Grandco Stock by Sellers to Catterton and Sun Finance and the related discharge of debt pursuant to, this Agreement, and including any deferred Taxes of any nature;

(iii)     all Liabilities for Taxes now or hereafter attributable to the Acquired Assets or the Business for any taxable periods (or the portion thereof) ending on or before the Closing Date;

(iv)     all accounts payable of Sellers or any predecessor or Affiliate of Sellers arising prior to the Closing, except as specifically and expressly set forth on Schedule 2.3(a)(v), Cure Amounts payable by Purchaser pursuant to Section 2.7;

(v)     all Liabilities in respect of Indebtedness of Sellers or any predecessor or Affiliate of any Seller;

(vi)     all Excluded Environmental Liabilities (regardless of whether such Liabilities accrue to Sellers or to Purchaser in the first instance);

(vii)     all Liabilities pursuant to the WARN Act relating to any action or inaction of Sellers prior to or upon the Closing;

(viii)     except for Cure Amounts payable by Purchaser as contemplated in Section 2.7 of this Agreement, all Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers (or any of their current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by Sellers at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against Sellers whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened, including the Proceedings set forth on Schedule 5.19;

(ix)     all Liabilities arising out of any Proceeding commenced against Sellers or any predecessor or Affiliate of any Seller after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

(x)     all Liabilities under any Assumed Executory Contract which arises after the Closing but arises out of or relates to any breach that occurred prior to the Closing;

(xi)     all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the Business or any act or omission of any Seller or any predecessor or Affiliate of any Seller prior to the Closing;

(xii)     all Liabilities arising out of or relating to the litigation filed in the United States District Court for the Central District of California, with the caption Kittrich Corporation v. The Lang Companies, LLC, doing business as Turner Licensing, 2:09-cv-01907-MMM-CT;

(xiii)     all Liabilities arising out of, or relating to, any indemnification obligations of any Seller, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers;

(xiv)     all Liabilities with respect to the employees or former employees, or both (or their representatives) of any Seller arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Seller;

(xv)     all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any Seller or any ERISA Affiliate, or with respect to which any Seller or any ERISA Affiliate has any Liability;

(xvi)     all Liabilities arising out of or relating to services, products or product or service warranties of Sellers or any predecessor(s) or Affiliate(s) of any Seller to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

(xvii)     all Liabilities of any Seller to any current, former or prospective shareholder or other equity interest holder of any Seller, including all Liabilities of Sellers related to the right to or issuance of any capital stock or other equity securities;

(xviii)     all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(xix) except for the Designated Remaining Executory Contract Obligations, all Liabilities of Sellers arising out of, or relating to, any Designated Contract, unless and until such Designated Contract is assumed by Purchaser;

(xx) all Liabilities of Sellers or any predecessor or Affiliate of any Seller based upon such Person's acts or omissions occurring after the Closing; and

(xxi) all Liabilities of Sellers to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise.

(b) The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create an Assumed Obligation or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Obligation and is not listed in Sections 2.4(a)(i)-2.4(a)(xxi).

(c) Subsequent to the Closing, Sellers jointly and severally agree to indemnify and hold Purchaser harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, Liability, Tax, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets, the Excluded Environmental Liabilities (regardless of whether such Liabilities are technical Liabilities of any Seller or Affiliate) and the Excluded Liabilities.

2.5 Revisions to Schedules to Sections 2.1 to 2.4.

(a) Notwithstanding anything in this Agreement to the contrary, Purchaser may revise the Schedules to Sections 2.1 to 2.4 at any time on or before one (1) day prior to the Auction to include in the definition of Acquired Asset or Excluded Obligations or exclude in the definition of Excluded Asset or Assumed Obligation, as applicable, any asset or property, or any portion, part or parcel of any such asset or property (other than Scheduled Contracts, which shall be governed by Section 2.6) or Excluded Obligation not otherwise included therein, as the case may be, and as a result thereof, Sellers agree to give required notice to any Third Party that should receive notice with respect to such asset or property or as otherwise reasonably requested by Purchaser. Notwithstanding anything in this Agreement to the contrary, Purchaser may revise the Schedules to Sections 2.1 to 2.4 at any time on or before one (1) day prior to the Closing Date in order to exclude from the definition of Acquired Asset or Excluded Obligations or include in the definition of Excluded Asset or Assumed Obligations, as applicable, any asset or property, or any portion, part or parcel of any such asset or property (other than Scheduled Contracts, which shall be governed by Section 2.6) or Assumed Obligation not otherwise excluded therefrom; provided, that such exclusion or inclusion, as the case may be, shall not serve to reduce or otherwise affect the Purchase Price.

(b) For purposes of clarification, nothing in this Section 2.5 shall limit Purchaser's rights under Section 2.6.

2.6 Sellers Actions With Respect to Contracts.

(a) Sellers' Obligation to Maintain Scheduled Contracts Until Closing. From and after the Effective Date, Sellers shall not reject or alter (or attempt to alter) the terms of any executory Contracts or unexpired leases to which any Seller is a party (collectively, the "Scheduled Contracts") unless otherwise agreed to in writing by Purchaser or as provided below in Section 2.6(d) of this Agreement. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Scheduled Contracts and take all other actions necessary to cause such Scheduled Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Scheduled Contracts are Assumed Executory Contracts at Closing or are assumed and assigned to Purchaser pursuant to Section 2.6(c) of this Agreement.

(b) Excluding or Adding Assumed Executory Contracts Prior to Closing. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assumed Executory Contracts which may be assigned by any such Seller to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code and which shall be set forth on the Schedules delivered pursuant to Section 2.1(a) of this Agreement. Purchaser shall have the right in its sole and absolute discretion to notify Sellers in writing of any Assumed Executory Contract that it does not wish to assume or a Scheduled Contract that it wishes to add as an Assumed Executory Contract up to one (1) day prior to the Closing. At the sole discretion and instruction of Purchaser, any such previously considered Assumed Executory Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assumed Executory Contracts, automatically deemed added to the Schedules related to Excluded Contracts, and rejected by Sellers in accordance with Section 2.6(d). At the sole discretion and instruction of Purchaser, any such previously considered Excluded Contract that Purchaser wishes to assume as an Assumed Executory Contract shall be automatically deemed added to the Schedules related to Assumed Executory Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser.

(c) Designated Contracts. At least one (1) day prior to the Closing, Purchaser shall deliver to Sellers Schedule 2.6(c), which shall comprise a list of Scheduled Contracts that Purchaser wishes to designate as "Designated Contracts". The Designated Contracts shall be automatically deemed removed from all Schedules related to Assumed Executory Contracts and Excluded Contracts, and shall not be Assumed Executory Contracts or Excluded Contracts as of the Closing Date. Except as otherwise set forth in Section 2.6(d), Sellers shall not seek to reject the Designated Contracts for a period of sixty (60) days following the Closing Date (the "Contract Retention Period"). Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to Sellers one (1) or more written notices (each, a "Rejection Notice") notifying Sellers of its intent not to assume any Designated Contract(s). Upon receipt of a Rejection Notice, notwithstanding anything in this Agreement to the contrary, the Designated Contract(s) identified in such Rejection Notice shall automatically be deemed Excluded Contracts for all purposes under this Agreement. Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to Sellers one (1) or more written notices (each, an "Assumption Notice") requesting assumption and assignment of any

Designated Contract(s).  Upon receipt of an Assumption Notice, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code the Designated Contract(s) set forth in the applicable Assumption Notice, and Purchaser shall be responsible for satisfying any costs of cure relating to such Designated Contracts.  To the extent that any Designated Contract is a Facility Lease, Seller hereby grants Purchaser a license to use and possess the Facility which is leased pursuant to such Facility Lease.  Such license shall commence on the Closing Date and shall terminate on the earlier of the date such Facility Lease is rejected and the last day of the Contract Retention Period.  Notwithstanding anything in this Agreement to the contrary, on the date any Designated Contract is assumed and assigned to Purchaser pursuant to this Section 2.6(c), such Contract shall be deemed an Assumed Executory Contract for all purposes under this Agreement.  With respect to any Designated Contract, Purchaser shall perform all of Sellers' ordinary course obligations under such Designated Contract and shall compensate Sellers for the ordinary course costs, in each case first arising after the Closing Date and actually incurred by Sellers after the Closing under such Designated Contract until the earlier of the date such Designated Contract is assigned to Purchaser, the date Purchaser delivers a Rejection Notice with respect to such Designated Contract, or the last day of the Contract Retention Period (the "Designated Remaining Executory Contract Obligations").  The covenants set forth in this Section 2.6(c) shall survive the Closing

(d) Rejection of Excluded Contracts.  As soon as practicable after the Closing Date, Seller shall reject all Excluded Contracts.  With respect to the Designated Contracts, on the date that Purchaser provides a Rejection Notice with respect to any Designated Contract, such Designated Contract will be deemed an Excluded Contract for all purposes under this Agreement, Sellers shall immediately reject such Excluded Contract, and all obligations arising thereafter in connection with such Excluded Contract shall be considered Excluded Liabilities under this Agreement.  Upon the expiration of the Contract Retention Period, all Designated Contracts that have not been deemed Assumed Executory Contracts pursuant to an Assumption Notice and have not been subject of a Rejection Notice shall be automatically deemed to be Excluded Contracts, Sellers shall immediately reject such Excluded Contracts, and all obligations arising thereafter in connection with such Excluded Contracts shall be considered Excluded Liabilities under this Agreement.  To the extent that any executory Contract or unexpired lease relating to the Business is not identified prior to the Closing Date or is not an Assumed Executory Contract, an Excluded Contract or a Designated Contract on the Closing Date, such executory Contract or unexpired lease shall be deemed an Excluded Contract and Sellers shall immediately reject any such executory Contract or unexpired lease upon discovery.  The covenants set forth in this Section 2.6(d) shall survive the Closing.

(e) Rejection of Certain Leases.  Notwithstanding anything to the contrary set forth in this Agreement, Sellers shall reject the Facility Leases listed on Schedule 2.6(e) (the "Specified Leases") effective as of January 31, 2010.  Seller hereby grants Purchaser a license to use and possess the Facility which is leased pursuant to each of the Specified Leases.  Such license shall commence on the Closing Date and shall terminate on January 31, 2010.  With respect to each Specified Lease, Purchaser shall perform all of Sellers' ordinary course obligations under such Specified Lease and shall compensate Sellers for the ordinary course costs, in each case first arising after the Closing Date and actually incurred by Sellers after the Closing under such Specified Lease until January 31, 2010.

2.7 Trade Payables.

(a) Sellers agree to deliver a list of the ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Petition Date through and including the date hereof and the critical trade payables arising prior to the date hereof during the time period set forth in Section 11.19, which list shall include all relevant third parties and the liabilities incurred specifically with respect to each such third party (the "Complete Trade Payables List"). Purchaser will promptly review this list and prepare a non-binding preliminary version of Schedule 2.3(a)(v) indicating which of the liabilities listed on the Complete Trade Payables List it intends at such time to be Assumed Obligations within three (3) days following receipt of the Complete Trade Payables List.

(b) By the date that is two (2) days prior to the Bid Deadline, Sellers agree to deliver an updated Complete Trade Payables List current through the date that is four (4) days prior to the Bid Deadline. Purchaser will promptly review this list and prepare a binding version of Schedule 2.3(a)(v) indicating (i) which of the liabilities listed on the updated Complete Trade Payables List shall be Assumed Obligations within one (1) day following receipt of the updated Complete Trade Payables List, and (ii) a maximum amount per individual third party that Purchaser shall be obligated to assume as Assumed Obligations at Closing (regardless of whether a related Contract is designated as an Assumed Executory Contract, an Excluded Contract, a Designated Contract or a Specified Lease). For avoidance of doubt, the binding version of Schedule 2.3(a)(v) delivered pursuant to this Section 2.7(b) shall be determined in Purchaser's absolute and sole discretion and may include all or none of the payables included in the non-binding preliminary version of Schedule 2.3(a)(v) delivered by Purchaser pursuant to Section 2.7(a).

(c) By the date that is two (2) days prior to the Closing, Sellers agree to deliver an updated Complete Trade Payables List including estimates of liabilities incurrent through the Closing Date. Purchaser will review this list and prepare an updated version of Schedule 2.3(a)(v) indicating which of the liabilities listed on the updated Complete Trade Payables List shall be Assumed Obligations within one (1) day following receipt of the updated Complete Trade Payables List; provided, that Purchaser shall be obligated to assume as Assumed Obligations up to the maximum amount per individual third party (to the extent a Liability exists as of the Closing) the amounts indicated on the version of Schedule 2.3(a)(v) delivered by Purchaser pursuant to Section 2.7(b).

(d) Notwithstanding anything to the contrary herein, nothing in this Section 2.7 shall limit Purchaser's rights under Section 2.5 and Section 2.6.

2.8 Cure Payments. Purchaser will be responsible for paying all Cure Amounts set forth on Schedule 2.3(a)(i) in connection with the assignment and assumption of the Assumed Executory Contracts. Within seven (7) days after the Bid Deadline, Sellers shall provide to Purchaser an update to Schedule 2.3(a)(i). If the actual costs of cure with respect to any Assumed Executory Contract is greater than the Cure Amounts set forth on the originally delivered Schedule 2.3(a)(i), then Purchaser shall have the option, at its sole discretion at any time prior to the Closing, of (i) paying such excess and assuming such Assumed Executory Contract, (ii) removing such Assumed Executory Contract from the Schedules related to

Assumed Executory Contracts and adding such Assumed Executory Contract to the list of Designated Contracts delivered pursuant to Section 2.6(c), or (iii) removing such Assumed Executory Contract from the Schedules related to Assumed Executory Contracts, adding such Assumed Executory Contract to the Schedules related to Excluded Contracts, and having such Assumed Executory Contract rejected by Sellers in accordance with Section 2.6(d).

2.9 Deemed Consents and Cures. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Executory Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign to Purchaser, and Purchaser is authorized to accept, such Assumed Executory Contracts pursuant to Section 365 of the Bankruptcy Code, and any applicable Cure Amount has been satisfied by Purchaser. If the consent required to effectuate the assignment of any Assumed Executory Contracts to Purchaser cannot be obtained pursuant to the Sale Order or other Bankruptcy Court Order, then the parties shall endeavor to obtain such consent pursuant to Sections 4.8, 7.1 and 10.5.

## ARTICLE III
## BASIC TRANSACTION

3.1 Payment of Purchase Price at Closing. At the Closing, Purchaser shall (a) be assigned the Acquired Assets and (b) in consideration of the Acquired Assets to be purchased by Purchaser pursuant to Section 2.1 from Sellers, (i) pay to Sellers 999,990 shares of the non-voting common stock of Grandco (the "Grandco Stock"), (ii) pay to Sellers the Grandco Debt and (iii) assume the Assumed Obligations ((i)-(iii) collectively, the "Purchase Price").

3.2 Second Closing.

(a) Immediately after the Closing and on the Closing Date, (i) Sellers agree to sell to Sun Finance, and Sun Finance agrees to purchase from Seller, 599,994 shares of the Grandco Stock owned by Sellers and sixty percent (60%) of the Grandco Debt, and (ii) Sellers agree to sell to Catterton, and Catterton agrees to purchase from Sellers, 399,996 shares of the Grandco Stock owned by Sellers and forty percent (40%) of the Grandco Debt (the closing of such sales and purchases, the "Second Closing").

(b) At the Second Closing, Sun Finance shall pay Sellers for 599,994 shares of the Grandco Stock and sixty percent (60%) of the Grandco Debt, and Catterton shall pay Sellers for 399,996 shares of the Grandco Stock and forty percent (40%) of the Grandco Debt, together in an amount equal to Twenty Five Million Dollars ($25,000,000.00) (the "Credit Bid Amount"), which will be paid first, by the offset of Sellers' obligations under the DIP Credit Agreement and second, by the offset of Sellers' obligations under the Pre-Petition Credit Agreement.

3.3 Allocation of Purchase Price. Purchaser shall, within the later of (i) ninety (90) days after the Closing Date, or (ii) thirty (30) days prior to the date by which Sellers' federal income Tax Returns must be filed, prepare and deliver to Sellers a schedule allocating the amount treated as the purchase price for federal, state and other applicable income tax purposes among the Acquired Assets (such schedule, the "Allocation"), in accordance with Section 1060 of the Code

and the Treasury regulations thereunder (and any similar provision of state, local, or foreign Law). The Allocation (including the amount of the purchase price for tax purposes) shall be binding upon Sellers. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law. Purchaser and Sellers shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.3 shall survive the Closing without limitation.

## ARTICLE IV
## CLOSING

4.1 <u>Closing</u>. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Kirkland & Ellis LLP, 300 N. LaSalle Street, Chicago, IL 60654 at 10:00 A.M. Central Standard Time as soon as practicable after the date on which the conditions set forth in <u>Article VIII</u> have been satisfied or waived but no later than three (3) days thereafter; or on such other date or place as Purchaser and ParentCo may determine (the "<u>Closing Date</u>").

4.2 <u>Closing/Post-Closing Payments</u>.

(a) At the Closing:

(i) Purchaser shall deliver to Sellers stock certificates representing the Grandco Stock, duly endorsed for transfer or with appropriate assignments separate from the certificates;

(ii) Purchaser shall deliver to Sellers a note or other document representing the Grandco Debt, duly endorsed for transfer or with appropriate assignments separate from the note; and

(iii) Purchaser shall pay the Cure Amounts.

(b) On the Closing Date, at the Second Closing:

(i) Sun Finance shall deliver to Sellers a fully executed release and waiver with respect to the DIP Amount, substantially in the form attached hereto as <u>Exhibit D-1</u>;

(ii) Catterton shall deliver to Sellers a fully executed release and waiver with respect to the Pre-Petition Secured Amount, substantially in the form attached hereto as <u>Exhibit D-2</u>;

(c) After the Closing Date, Purchaser shall pay all Cure Amounts with respect to all Designated Contracts that Purchaser assumes in accordance with <u>Section 2.6(c)</u> hereof.

4.3 Deliveries by Sellers.

(a) At the Closing, Sellers shall deliver or procure delivery to Purchaser of:

(i) physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(ii) one (1) or more assignments and assumptions of the Assumed Obligations, in the form attached hereto as Exhibit E (collectively, the "Assignment and Assumption Agreements"), duly executed by the applicable Seller or Sellers;

(iii) one (1) or more bills of sale, in the form attached hereto as Exhibit F, conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets, duly executed by Sellers;

(iv) Intellectual Property assignments in the forms attached hereto as Exhibit G each duly executed by the applicable Seller or Sellers and each in recordable form to the extent necessary to assign such rights;

(v) special warranty or limited warranty deeds (as customary in the applicable jurisdiction) with respect to each Acquired Owned Real Property, subject only to matters disclosed on the Title Commitment that are Permitted Liens;

(vi) an assignment and assumption of lease with respect to each of the Assumed Facility Leases;

(vii) a certified copy of the Sale Order, in recordable form, for the Acquired Owned Real Property;

(viii) certificates of title and title transfer documents to all titled motor vehicles;

(ix) an assignment and assumption agreement with respect to Sellers' Permits and warranties, whereby Sellers shall assign to Purchaser all of their respective rights in and to any Permits and warranties relating (directly or indirectly) to the Acquired Assets or the Business;

(x) such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Acquired Assets;

(xi) certified copies of the resolutions of the board of directors of each Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

(xii)   an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(xiii)   a certificate signed by each Seller, dated the Closing Date, in form and substance reasonably satisfactory to Purchaser, setting forth the Net Working Capital of the Sellers as of the Closing Date;

(xiv)   copies of all Third Party approvals and governmental approvals obtained pursuant to Section 7.1;

(xv)   all of the Books and Records;

(xvi)   originals (or, to the extent originals are not available, copies) of all Assumed Executory Contracts (together with all amendments, supplements or modifications thereto);

(xvii)   evidence of the required name changes of Sellers and their Affiliates as more fully set forth in Section 10.6 of this Agreement;

(xviii)   such other instruments as are necessary to vest in Purchaser good and marketable title in and to the Acquired Assets in accordance with the provisions hereof; and

(xix)   such other documents or instruments as are required to be delivered by any Seller at the Closing pursuant to the terms hereof or that Purchaser reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

(b) On the Closing Date, at the Second Closing:

(i)   Sellers shall deliver to Sun Finance stock certificates representing 599,994 shares of the Grandco Stock, duly endorsed for transfer or with appropriate assignments separate from the certificates;

(ii)   Sellers shall deliver to Sun Finance a note or other document representing 60% of the Grandco Debt, duly endorsed for transfer or with appropriate assignments separate from the note;

(iii)   Sellers shall deliver to Catterton stock certificates representing 399,996 shares of the Grandco Stock, duly endorsed for transfer or with appropriate assignments separate from the certificates; and

(iv)   Sellers shall deliver to Catterton a note or other document representing 40% of the Grandco Debt, duly endorsed for transfer or with appropriate assignments separate from the note.

4.4 <u>Deliveries by Purchaser</u>. At the Closing, Purchaser will deliver to Sellers:

(a) the Assignment and Assumption Agreements duly executed by Purchaser;

(b) stock certificates representing the Grandco Stock, duly endorsed for transfer or with appropriate assignments separate from the certificates;

(c) a note or other document representing the Grandco Debt, duly endorsed for transfer or with appropriate assignments separate from the note;

(d) certified copies of the resolutions of the board of directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby; and

(e) such other documents or instruments as are required to be delivered by Purchaser at the Closing pursuant to the terms hereof or that any Seller reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

4.5 <u>Deliveries by Sun Finance</u>. On the Closing Date, at the Second Closing, Sun Finance will deliver to Sellers a release and waiver with respect to the DIP Agreement in the form attached hereto as <u>Exhibit D-1</u>.

4.6 <u>Deliveries by Catterton</u>. On the Closing Date, at the Second Closing, Catterton will deliver to Sellers a release and waiver with respect to the Pre-Petition Secured Amount in the form attached hereto as <u>Exhibit D-2</u>.

4.7 <u>Form of Instruments</u>. To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Sellers.

4.8 <u>Further Assurances</u>. From time to time prior to and after the Closing and without further consideration, (i) Sellers, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby, to vest in Purchaser title to the Acquired Assets transferred hereunder and to permit Purchaser to perfect, record or protect its interests in the Acquired Assets, or to otherwise more fully consummate the transactions contemplated by this Agreement and (ii) Purchaser, upon the reasonable request of Sellers, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm any Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement. Sellers shall provide notice of the transactions contemplated by this Agreement and the Chapter 11 Cases to all parties entitled to such notice, including all environmental authorities in jurisdictions applicable to Sellers and all other Persons with current or potential claims with respect to any Excluded Environmental Liabilities or other Liabilities or obligations arising under Environmental Laws.

4.9 <u>Withholding</u>. Notwithstanding anything herein to the contrary, Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to each Seller such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or any provision of state, local or foreign Tax Law. To the extent that amounts are so withheld by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to each Seller in respect of which such deduction and withholding was made by Purchaser.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant on the date of this Agreement and on the Closing Date to Purchaser that the statements contained in this <u>Article V</u> are correct and complete.

5.1 <u>Organization, Standing</u>. Each Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, is qualified to do business in every jurisdiction in which it is required to be qualified and has all requisite corporate or similar power and authority and all Permits necessary to own, lease and operate its respective properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing or with active status as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, in good standing or to have such power or authority, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All jurisdictions in which Sellers are qualified to do business are set forth on <u>Schedule 5.1</u>.

5.2 <u>Subsidiaries</u>. <u>Schedule 5.2</u> sets forth each Subsidiary of ParentCo (i) its name and jurisdiction of organization, (ii) the number of authorized, issued and outstanding shares or equivalent thereof for each class of its capital stock or other equity interests and the holders thereof and (iii) the names and titles of its officers and directors. All of the issued and outstanding shares of capital stock or other equity interests of each Subsidiary of ParentCo have been duly authorized and are validly issued, fully paid, and non-assessable. Except as set forth on <u>Schedule 5.2</u>, ParentCo or one (1) or more of its Subsidiaries hold of record and own beneficially all of the outstanding shares of each Subsidiary of Sellers free and clear of any restrictions on transfer, Taxes, Liens, options, warrants, purchase rights, Contracts, commitments, equities, claims, and demands. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require ParentCo or any of its Subsidiaries to sell, transfer, or otherwise dispose of any capital stock or other equity interests of any of its Subsidiaries or that could require any Subsidiary of ParentCo to issue, sell, or otherwise cause to become outstanding any of its own capital stock or other equity interest (other than pursuant to this Agreement). There are no outstanding stock appreciation, phantom stock, profit participation, or similar rights with respect to any Subsidiary of ParentCo. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of any capital stock of any Subsidiary of ParentCo. No Seller is in default under or in violation of any provision of its

charter or bylaws or other similar organizational documents. Neither ParentCo nor any of its Subsidiaries controls directly or indirectly or has any direct or indirect equity participation in any corporation, partnership, trust, or other business association that is not a Subsidiary of ParentCo. Except as set forth on Schedule 5.2, no Seller is a member of (nor is any portion of the Business conducted through) any partnership or a participation in any joint venture or similar arrangement. Except as set forth on Schedule 5.2, neither ParentCo nor any of its Subsidiaries owns or has any right to acquire, directly or indirectly, any outstanding capital stock of, or other equity interests in, any Person.

5.3 Validity of Agreement; Power. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The board of directors (or similar governing body) of each Seller has duly approved the Transaction Documents to which such Person is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. No other corporate or organizational proceedings on the part of any Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Person is a party and the consummation of the transactions contemplated thereby. All Transaction Documents to which any Seller is a party have been duly executed and delivered by such Person, except such Transaction Documents that are required by the terms hereof to be executed and delivered by such Person after the date hereof, in which case such Transaction Documents will be duly executed and delivered by such Person at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers, enforceable against Sellers in accordance with their terms.

5.4 No Conflicts or Violations. Except as set forth on Schedule 5.4, and to the extent any of the foregoing is not enforceable due to operation of the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Sellers do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority, under (i) any provision of the articles of incorporation or bylaws or other equivalent organizational document of any Seller, (ii) any Material Contract to which any Seller is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to any Seller or its property or assets.

5.5 Financial Statements and Related Matters.

(a) Set forth on Schedule 5.5(a) are copies of Sellers' (i) unaudited consolidated and consolidating balance sheets as of June 30, 2009 (the "Latest Balance Sheet") and the related statements of income and cash flows for the three (3)-month period then ended, (ii) unaudited consolidated and consolidating balance sheets and statements of income and cash flows for the fiscal year ended March 31, 2009, and (iii) audited consolidated and consolidating balance sheets and statements of income and cash flows for the fiscal year ended March 31, 2008. Each of the foregoing financial statements (including in all cases the notes thereto, if any) is accurate and

complete, is consistent with the Books and Records (which, in turn, are accurate and complete), presents fairly Sellers' financial condition and results of operations as of the times and for the periods referred to therein, and has been prepared in accordance with GAAP, subject in the case of unaudited financial statements to changes resulting from normal year-end adjustments for recurring accruals (which shall not be material individually or in the aggregate) and to the absence of footnote disclosure. All projections, estimates, financial plans or budgets previously delivered to or made available to Purchaser and its Affiliate(s) were based upon reasonable assumptions in light of all of the facts and circumstances at the time made and were provided to Purchaser or such Affiliate(s) in good faith.

(b) Schedule 5.5(b) sets forth, as of the date of this Agreement, all of the outstanding Indebtedness of Sellers. As of the Closing Date, there will not be any Indebtedness of Sellers except as set forth on Schedule 5.5(b) and except as may be incurred in accordance with Section 7.3.

5.6 Absence of Undisclosed Liabilities. No Seller has any obligations or Liabilities arising out of transactions entered into at or prior to the Closing, or any action or inaction at or prior to the Closing, or any state of facts existing at or prior to the Closing, except (i) obligations under Contracts described on Schedule 5.6 or under Contracts which are not required to be disclosed thereon (but not Liabilities for breaches thereof), (ii) Liabilities stated or adequately reserved against in the Liabilities side of the Latest Balance Sheet, (iii) Liabilities which have arisen after the date of the Latest Balance Sheet in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement (none of which is a material Liability for breach of contract, breach of warranty, tort or infringement or a claim or lawsuit or Liability under Environmental Laws) and (iv) Excluded Liabilities.

5.7 Accounts Receivable. Except as set forth on Schedule 5.7, all Accounts Receivable arising from services or sales by any Seller, whether or not earned thereby on the date hereof or on the Closing Date, constitutes a bona fide receivable resulting from a bona fide sale to a customer in the Ordinary Course of Business on commercially reasonable terms, the amount of which was actually due on the date thereof, is not subject to any valid counterclaim or setoff, and is collectible net of any reserves for doubtful accounts on any applicable Books and Records computed in accordance with GAAP.

5.8 Accounts Payable and Other Accrued Expenses. Set forth on Schedule 5.8 is a list of all accounts payable and other accrued expenses of Sellers as of the Latest Balance Sheet together with the name of each payee, the relationship (if any) to Sellers, the date each such payment is due and the nature of the transaction in which it was incurred if other than a trade payable incurred in the Ordinary Course of Business.

5.9 Inventory. The Inventory of Sellers (i) consists solely of materials and goods useable or saleable in the Ordinary Course of Business (taking into account the quantity and quality of the Inventory), (ii) is not defective, slow moving, obsolete or damaged, (iii) is fit and merchantable for their particular use, and (iv) is valued at lower of cost or market less applicable valuation reserves all in accordance with GAAP. Except as set forth on Schedule 5.9, none of the Inventory is subject to any consignment, bailment, warehousing or similar agreement.

5.10    Title to Assets; Assets Necessary to Business.

(a) Sellers have good and marketable title to, or a valid leasehold interest in or all rights to use, all assets reflected under the heading "assets" on the face of the Latest Balance Sheet, and as such balance sheet will be adjusted through the Closing Date to reflect transactions occurring in the Ordinary Course of Business since the date of the Latest Balance Sheet as may be effected in accordance with Section 7.3.

(b) To the Knowledge of Sellers, the assets of Sellers are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the Ordinary Course of Business.

(c) The Acquired Assets constitute all of the assets, including all Contracts, Permits and properties, necessary to conduct the Business as presently conducted. Following the Closing, Purchaser shall have the right to use without any restrictions or Liens of any kind other than Permitted Liens all of Sellers' assets other than Excluded Assets. Each asset that is material to the operation of the Business as presently conducted is an Acquired Asset.

(d) Subject to Bankruptcy Court approval, Sellers have the power and the right to sell, assign and transfer and Sellers will sell and deliver to Purchaser, and upon consummation of the transactions contemplated by this Agreement, Purchaser will acquire good and marketable title to the Acquired Assets, free and clear of all Liens.

(e) The Transaction Documents, when duly executed and delivered by Sellers to Purchaser at the Closing, will effectively vest in Purchaser good and marketable title to the Acquired Assets, subject only to the Assumed Obligations and Permitted Liens.

5.11    Real Property.

(a) Schedule 5.11(a) sets forth the address and description of all Owned Real Property. With respect to each Owned Real Property: (i) the applicable Seller has good and marketable indefeasible fee simple title free and clear of all encumbrances, except Permitted Liens; (ii) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Owned Real Property; (iii) there are no outstanding options, rights of first offer, or rights of first refusal to purchase such Owned Real Property (other than the rights of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (iv) Sellers are not a party to any agreement or option to purchase any real property or interest therein.

(b) No Seller has received any written notice of any pending or threatened expropriation, condemnation or other proceedings in the nature of eminent domain in connection with any parcel of the Owned Real Property or the Leased Facilities.

(c) Schedule 5.11(c) sets forth the title and parties to, and date of, each of the Facility Leases, and the address of each Leased Facility and a true and complete list of all Facility Leases (including all amendments, modifications, extensions, renewals, guaranties, and other agreements with respect thereto). In addition, except as set forth on Schedule 5.11(c), (i) there are no occupancy rights, subleases or licenses presently affecting the Leased Facilities; (ii)

Sellers have delivered to Purchaser true and complete copies of each of the Facility Leases (or in the case of an oral lease, a written summary of the material terms of such lease) and none of such leases has been amended, modified or terminated; (iii) the Facility Leases are at present and on the date of the Closing shall be legal, valid, binding, enforceable and in full force and effect unless any such Facility Lease shall have expired in accordance with its terms (and not because of any termination or other acceleration of the stated expiration date thereof); (iv) there is no option to purchase, right of first offer, right of first refusal or other provision granting any Seller or any other Person any right to acquire the Leased Facilities; (v) neither Sellers nor any other party to the Facility Lease is in breach or default under such Facility Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Facility Lease; and (vi) Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Facility Lease or any portion thereof.

(d) To the Knowledge of Sellers, there are no defects (latent, patent, or otherwise) in the buildings, improvements and structures and fixtures located on or at the Acquired Owned Real Property or at the Assumed Leased Facilities which would materially impair the conduct of the Business by Purchaser immediately following the Closing. To the Knowledge of Sellers, the mechanical, electrical, plumbing, HVAC and other systems servicing the Acquired Owned Real Property and the Assumed Leased Facilities are in good working order and repair, ordinary wear and tear excepted, and there are no defects (latent, patent, or otherwise) in such systems which could reasonably be expected to materially impair the conduct of the Business by Purchaser immediately following the Closing.

(e) The Owned Real Property and the Leased Facilities comprise all of the real property used or intended to be used, or otherwise related to, the Business.

5.12    Intellectual Property.

(a) Schedule 5.12(a) sets forth a complete and correct list of all of the following Intellectual Property that is owned by any Seller: (i) patents and patent applications, trademark and service mark registrations and applications, copyright registrations and applications, and internet domain names; (ii) material unregistered trademarks, service marks, copyrights and any other material unregistered Intellectual Property; and (iii) material computer software.

(b) Sellers (i) own and possess, free and clear of all Liens (other than Liens set forth on Schedule 5.12(b) or that will be discharged pursuant to the Sale Order), all right, title and interest in and to the Intellectual Property set forth on Schedule 5.12(a), and (ii) own and possess all right, title and interest in and to, or have a valid and enforceable right to use (pursuant to a written license agreement set forth on Schedule 5.13(a) or a license for commercially available, standard, off-the-shelf, unmodified software that is provided in executable form only and provided for Sellers' internal use only, with a replacement cost or annual license and maintenance fee of less than a total cost of Ten Thousand Dollars ($10,000) in the aggregate), in each case free and clear of all Liens (other than Liens set forth on Schedule 5.12(b) or that will be discharged pursuant to the Sale Order), all of the other Intellectual Property necessary for or used in the conduct of the Business as presently conducted by Sellers (together with all of Intellectual Property set forth on Schedule 5.12(a), collectively, the "Company Intellectual

Property"). To the Knowledge of Sellers, all of the Company Intellectual Property is valid, subsisting and enforceable. Each Seller has taken all actions necessary or commercially reasonable to maintain, protect, and enforce the Company Intellectual Property.

(c) No claims have been made or, to the Knowledge of Sellers, have been threatened, contesting the validity, use, ownership or enforceability of any of the Company Intellectual Property. No Seller has infringed, misappropriated or otherwise conflicted with, the operation of the Business as presently conducted does not infringe, misappropriate or otherwise conflict with, and the operation of the Business as conducted prior to the Closing has not infringed, misappropriated, or otherwise conflicted with, any Intellectual Property of any Third Party. To the Knowledge of Sellers, there are no facts which indicate a likelihood of any of the foregoing and no Seller has received any Notices regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any Third Party).

(d) To the Knowledge of Sellers, no Third Party has infringed, misappropriated or otherwise conflicted with any of the Company Intellectual Property.

(e) Sellers have entered into valid and enforceable written confidentiality agreements and valid and enforceable written proprietary rights agreements with all of their current and former consultants, contractors and employees, to the extent that any of the foregoing have developed, created or modified any Company Intellectual Property or have had access to any confidential Company Intellectual Property, (i) assigning ownership to Sellers of all Intellectual Property created, developed or modified by (A) such employees arising out of their employment or (B) such contractors or consultants engaged by Sellers arising out of their engagement; and (ii) requiring such employees, contractors and consultants to maintain the confidentiality of all Company Intellectual Property.

(f) Immediately subsequent to the Closing, the Company Intellectual Property and computer systems, including software, hardware, networks, interfaces, platforms and related systems owned or used by Sellers (collectively, the "Company Systems") will be owned by or available for use by Purchaser on terms and conditions substantially similar to those under which Sellers owned or used the Company Intellectual Property and Company Systems immediately prior to the Closing. Sellers own or have a valid and enforceable right to use all Company Systems, free and clear of all Liens (other than Liens set forth on Schedule 5.12(b) or that will be discharged pursuant to the Sale Order). Each Company System is adequate for its intended functions, operations, purposes and capabilities and is sufficient for the immediate and future needs of the Business as currently contemplated by Sellers.

(g) Except as set forth on Schedule 5.12(g), no other party to any Assumed Contract that provides a license to any Intellectual Property has requested or initiated an audit or other review or inspection of any Facilities or any Books and Records. Sellers have provided Purchaser with true and correct copies of all licenses to Intellectual Property, in each case together with all amendments, waivers or other changes thereto, as well as an accurate and complete summary of all material terms in such licenses, including exclusivity, initial term and renewal term of the license, royalty terms, minimum royalty payments and transfer fees.

5.13   Contracts.

(a) Except as set forth on <u>Schedule 5.13(a)</u>, no Seller is a party to or bound by, whether written or oral, any:

(i)   Collective Bargaining Agreement, pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees or any other Employee Benefit Plan, arrangement or practice;

(ii)   settlement, conciliation or similar agreement which imposes any payment or other material obligations on any Seller after the execution date of this Agreement;

(iii)   management agreement or Contract for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis (A) providing annual cash or other compensation in excess of Seventy-Five Thousand Dollars ($75,000), (B) providing for the payment of any cash or other compensation or benefits as a result of the execution of this Agreement or the consummation of the transactions contemplated hereby, or (C) otherwise restricting its ability to terminate the employment of any employee at any time for any lawful reason or for no reason without Liability;

(iv)   Contract with any Government Authority;

(v)   Contract relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset or group of material assets of Sellers or any letter of credit arrangements, or any Guaranty therefor;

(vi)   Contract under which any Seller is a (A) lessee of or holds or operates any personal property owned by any other Person, except for any lease of personal property under which the aggregate annual rental payments do not exceed One Hundred Thousand Dollars ($100,000) in any twelve-month period or (B) lessor of or permits any Person to hold, operate or occupy any property, real or personal, owned or controlled by any Seller;

(vii)   Contract or group of related Contracts (other than purchase and sale orders entered into in the Ordinary Course of Business) with the same party or group of Affiliated parties continuing over a period of more than six (6) months from the date or dates thereof, not terminable by any Seller upon thirty (30) days or less notice without penalty or involving more than One Hundred Thousand Dollars ($100,000);

(viii)   Contract relating to the ownership of, investments in or loans and advances to any Person, including investments in joint ventures and minority equity investments;

(ix)   assignment, license, royalty or other Contract with respect to any Intellectual Property, including any Contract under which any Seller is a licensor or licensee (excluding licenses for commercially available, standard, off-the-shelf, unmodified software that is provided in executable form only and provided for Sellers' use only, with a replacement cost and/or annual license and maintenance fee of less than a total cost of Ten Thousand Dollars ($10,000) in the aggregate), and Contract affecting any Seller's ability to use any Intellectual Property;

(x)     Contract that contains any provision pursuant to which any Seller is obligated to indemnify or make any indemnification payments to any Person (other than Contracts entered into in the Ordinary Course of Business where such obligation would not reasonably be expected to result in Liabilities in excess of Twenty-Five Thousand Dollars ($25,000) per year);

(xi)     agent, sales representative, sales or distribution Contracts (other than purchase and sale orders entered into in the Ordinary Course of Business);

(xii)     Contract relating to the marketing or advertising of any Seller's products or services;

(xiii)     power of attorney or other similar Contracts or grant of agency;

(xiv)     Contract prohibiting any Seller, now or in the future, from freely engaging in any business or competing anywhere in the world or restricting its use or disposition of any Intellectual Property, including any nondisclosure, non-competition, settlement, coexistence, standstill or confidentiality agreements;

(xv)     Contract (A) providing for any Seller to be the exclusive provider of any product or service to any Person or the exclusive recipient of any product or service of any Person or that otherwise involves the granting by any Person to the any Seller of exclusive rights of any kind, (B) providing for any Person to be the exclusive provider of any product or service to any Seller or (C) granting to any Person a right of first refusal or right of first offer on the sale of any part of the business of any Seller;

(xvi)     Contract providing for any Seller to guarantee, grant or otherwise promise to any Person the sale or provision of any product or service at the best, lowest or otherwise most favored price or terms; and

(xvii)     any other individual Contract that is otherwise material to the assets, operations or financial condition of Sellers, taken as a whole.

(b) All of the Contracts set forth or required to be set forth on Schedule 5.13(a) are referred to herein as the "Material Contracts", and each individually, a "Material Contract". Except as disclosed on Schedule 5.13(b), (i) to the Knowledge of Sellers, no Material Contract has been breached or canceled by the other party, and there is no anticipated breach by any other party to any contract set forth on Schedule 5.13(a), (ii) except for defaults that will be cured through the Cure Amounts listed on Schedule 2.3(a)(i) or arising solely as a consequence of the commencement of the Chapter 11 Cases, no Seller nor any other party thereto is in default or breach in any material respect under the terms of any Material Contract and, to the Knowledge of Sellers, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or breach thereunder, (iii) no Seller has assigned, delegated or otherwise transferred to any Person any of its rights, title or interest under any Material Contract, and (iv) each Material Contract is legal, valid, binding, enforceable and in full force and effect and, subject to the terms of this Agreement, will continue as such following the consummation of the transactions contemplated hereby.

(c) Sellers have provided Purchaser with true and correct copies of all Material Contracts, in each case together with all amendments, waivers or other changes thereto and Schedule 5.13(a) contains an accurate and complete description of all material terms of all oral Contracts referred to therein.

5.14    Insurance. Schedule 5.14 lists and describes all policies of insurance owned, held, or maintained by or for the benefit of any Seller or insuring the property or assets of any Seller, including the type and amount of coverage and the expiration dates of the policies and the claims history for the past five (5) years. The Sellers have made available to Purchaser all policies of insurance owned, held, or maintained by or for the benefit of any Seller or insuring the property or assets of any Seller. Except as set forth on Schedule 5.14, (a) current premiums and any other obligations under such insurance have been paid and all such policies are valid and enforceable and in full force and effect on the date hereof and no Seller is in default with respect to its obligations under any such insurance policies, and (b) no Seller has received any Notice within the last ninety (90) days threatening suspension, revocation, modification or cancellation of any insurance policy or a material increase in any premium in connection therewith or informing any Seller that any coverage listed on Schedule 5.14 will or may not be available in the future on substantially the same terms as now in effect. No Seller has been denied insurance coverage within the past three (3) years. To the Knowledge of Sellers, the insurance coverage of each Seller is of a kind and type routinely carried by Persons engaged in similar lines of business. Except as set forth on Schedule 5.14, no Seller has any self-insurance or co-insurance programs. The reserves set forth on the Latest Balance Sheet are adequate to cover all anticipated Liabilities with respect to self-insurance or co-insurance programs listed on Schedule 5.14.

5.15    Taxes.

(a) Each Seller and Palmer LLC has filed all material Tax Returns that it was required to file. All filed Tax Returns were correct and complete in all material respects. All material Taxes owed by any Seller and Palmer LLC and all Taxes with respect to the Acquired Assets (in each case, whether or not shown on any Tax Return) have been paid. No Seller nor Palmer LLC is the beneficiary of any extension of time within which to file any Tax Return. With respect to each Seller and Palmer LLC, no claim has ever been made by a Governmental Authority in a jurisdiction where such party does not file Tax Returns that such Seller or Palmer LLC or the Business is or may be subject to taxation by that jurisdiction.

(b) Each Seller and Palmer LLC has withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other Third Party, and all Forms W-2 and 1099 (or any other applicable form) required with respect thereto have been properly completed and timely filed.

(c) None of the Acquired Assets (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" or "tax-exempt bond financed property" within the meaning of Section 168 of the Code or (iii) is a "long-term contract" within the meaning of Section 460 of the Code.

(d) No Seller nor Palmer LLC has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e) None of the Assumed Liabilities is an obligation to make a payment that will not be deductible under Section 280G of the Code. No Seller nor Palmer LLC is a party to any Tax allocation or sharing agreement. No Seller nor Palmer LLC (i) has been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was ParentCo) or (ii) has any Liability for the Taxes of any Person (other than any Seller) under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise.

(f) There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the Acquired Assets.

(g) Palmer LLC is and since formation has been a partnership for federal income tax purposes and has not made any election under Treasury Regulation § 301.7701-3 to be treated as an association taxable as a corporation

5.16    Employee Benefit Plans.

(a) Schedule 5.16(a) sets forth a complete and accurate list of each Employee Benefit Plan. Sellers have provided to Purchaser true and correct copies of each Employee Benefit Plan and all material documents pursuant to which such Employee Benefit Plans are maintained, funded and administered (including all plan documents, amendments thereto, summary plan documents, trust documents, annual reports, actuarial reports, service agreements and group insurance Contracts). Each Employee Benefit Plan has been established, maintained, funded and administered in compliance with its terms, all applicable requirements of ERISA, the Code, and other applicable Laws. Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it may rely, and nothing has occurred that could adversely affect the qualified status of such Employee Benefit Plan.

(b) Neither Sellers nor any ERISA Affiliates maintain, contribute to or have any liability or potential liability (including liability with respect to any partial "withdrawal" or a "complete withdrawal" within the meaning of Sections 4205 and 4203 of ERISA, respectively) to any "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code or any Multiemployer Plan. Sellers do not have any liability with respect to any "employee benefit plan" (as defined in Section 3(3) of ERISA) solely by reason of being treated as a single employer under Section 414 of the Code with any trade, business or entity other than Sellers.

(c) No event or condition has occurred in connection with which any Seller or any ERISA Affiliate could be reasonably likely to be subject to any material Liability, fine, excise tax, or Lien with respect to any Employee Benefit Plan or any other "employee benefit plan" (within the meaning of Section 3(3) of ERISA) under ERISA, the Code or any other applicable Law or under any agreement or arrangement pursuant to or under which any Seller or any ERISA Affiliate is required to indemnify any Person against such Liability or have any joint

and several Liability. There are no pending or, to the Knowledge of Sellers, threatened claims, suits, audits or investigations related to any Employee Benefit Plan (other than non-material, routine claims for benefits) that could become a Liability of Purchaser.

(d) Except as set forth on Schedule 5.16(d), the consummation of the transactions contemplated by this Agreement (alone or in connection with any subsequent event, including a termination of employment) will not (i) accelerate the vesting or payment of any economic benefit provided or made available under any Employee Benefit Plan, (ii) increase the amount of or forfeit any economic benefit provided or made available under any Employee Benefit Plan, or (iii) accelerate or increase the funding obligation under any Employee Benefit Plan.

(e) Sellers and any ERISA Affiliates have complied with the health care continuation requirements of Part 6 of Subtitle B of Title I, Section 4980B of the Code and any similar state Law of ERISA ("COBRA"); and, except as set forth on Schedule 5.16(e), no Seller or ERISA Affiliate has any obligations under any Employee Benefit Plan, or otherwise, to provide post-termination health or life insurance benefits to any Person, except as specifically required under COBRA.

(f) With respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan, applicable Law and GAAP. None of the Assumed Employee Benefit Plans has any material unfunded Liabilities.

(g) Each "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) maintained by any Seller or Palmer LLC has been operated in compliance with Section 409A of the Code and applicable guidance thereunder (which applicable guidance, since December 31, 2008, has been the final regulations under Section 409A of the Code) and, on and after December 31, 2008, has been set forth in a written document that complies with the requirements of Section 409A of the Code and the final regulations thereunder, and no amount under any such plan is or has been subject to the interest or additional Tax (the "409A Penalties") set forth under Section 409A(a)(1)(B) of the Code nor is there any reasonable basis for any party to assert that any amount under any such plan is or has been subject to the 409A Penalties.

5.17    Labor and Employment Matters. Except as set forth in Schedule 5.17:

(a) No Seller is a party to any Collective Bargaining Agreement or has any relationship with any union, labor organization, or other employee representative;

(b) No union organizing or decertification activities are underway or, to the Knowledge of Sellers, threatened, no other question concerning representation exists, and no such matters have occurred within the last three (3) years;

(c) There is no labor strike, slowdown, work stoppage, walkout or other material labor dispute pending or, to the Knowledge of Sellers, threatened against any Seller, and no such dispute has occurred within the last three (3) years. With respect to this transaction, any notice required under any Law has been or prior to Closing will be given. No Seller has implemented

any plant closing or mass layoff of employees that could implicate the Worker Adjustment and Refraining Notification Act of 1988, as amended or any similar Laws (collectively, the "WARN Act"), and no such layoffs will be implemented without advance notice to Purchaser.

5.18    Personnel Matters.    Schedule 5.18 contains an accurate and complete list of the names, job classifications, dates of hire, wage rates, base compensation, and any supplemental or bonus compensation (including any retention or stay bonus arrangements) for all Persons employed by or providing independent contract services to Sellers. To the Knowledge of Sellers, no key executive employee and no group of employees or independent contractors of any Seller has any plans to terminate his, her or its employment or relationship with any Seller.

5.19    Litigation; Orders.    Except as set forth on Schedule 5.19, (a) there are no Proceedings or Orders pending or, to the Knowledge of Sellers, threatened against or affecting any Seller at law or in equity, in the United States or elsewhere, or before or by (or that could come before) any arbitrator or Governmental Authority (including any Proceedings with respect to the transactions contemplated by this Agreement), (b) there have been no Proceedings or Orders pending against or affecting any Seller during the past three (3) years, (c) no Seller is subject to any grievance or arbitration Proceedings under any Collective Bargaining Agreement or otherwise, and (d) no Seller is subject to any Order of any Governmental Authority (or settlement enforceable therein), and no Seller has received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed, from a legal standpoint, to any Liability or disadvantage which may be material to the Business.

5.20    Compliance with Law; Permits.    Each Seller and each Seller's current and former officers, directors, partners, agents and employees have, in all material respects, complied with and are in material compliance with, and are not in default in any respect with, all applicable Laws and Orders of any Governmental Authority relating to the operation of the Business and no written notices have been received by, and no claims filed against, any Seller alleging a violation of any such Laws or Orders. Sellers hold and are, in all material respects, in compliance with all Permits of all Governmental Authorities required for the conduct of the Business and the ownership of their properties, and Schedule 5.20 sets forth a list of all such Permits. No notices have been received by any Seller alleging the failure to hold any Permit. All Permits issued to Sellers will be transferred to and available for use by Purchaser immediately after the Closing.

5.21    Environmental Matters.

(a) Except as set forth on Schedule 5.21, each Seller is and has at all times been in compliance with all Environmental Laws, which compliance has included obtaining and complying at all times with all Permits required pursuant to Environmental Laws.

(b) Except as set forth on Schedule 5.21, no Seller nor any predecessor or Affiliate of any Seller has received any Notice, report or other information regarding any actual or alleged violation of, or any Liabilities (including any investigatory, remedial or corrective obligation) under, Environmental Laws.

(c) Except as set forth on Schedule 5.21, no Seller nor any predecessor or Affiliate of any Seller has treated, stored, disposed of, arranged for or permitted the disposal of,

transported, handled, Released, or exposed any Person to, any substance, including any Hazardous Substances, or owned or operated any property or Facility contaminated by any substance, so as to give rise to any current or future Liabilities, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, or any material investigatory, corrective or remedial obligations, pursuant to CERCLA or any other Environmental Laws.

(d) No Seller nor any predecessor or Affiliate of any Seller, has manufactured, produced, sold, marketed, installed or distributed products or items containing asbestos or other Hazardous Substances and none of the foregoing Persons have any Liability with respect to the presence or alleged presence of asbestos or other Hazardous Substances in any product or item or at or upon any property or Facility.

(e) Sellers have provided to Purchaser true and correct copies of all environmental audits, reports and other documents materially bearing on environmental, health and safety matters relating to the past or current operations, properties or Facilities of the Business.

5.22   Affiliate Transactions. Except as disclosed on Schedule 5.22, no Insider is a party to any agreement, Contract, commitment or transaction with any Seller or has any interest in the Acquired Assets or any property, real or personal or mixed, tangible or intangible of any Seller.

5.23   Relationships with Customers and Suppliers. Sellers have provided Purchaser with a true and accurate list of (a) the names and addresses of the top twenty (20) customers of Sellers (on a consolidated basis) (by dollar volume of sales to such customers) and (b) a list of the names and addresses of the top twenty (20) suppliers of Sellers (on a consolidated basis) (by dollar volume of purchases from such suppliers), for the fiscal years ended within the last three (3) years. Except as set forth on Schedule 5.23 no Seller has received any indication from any material customer or supplier of such Seller to the effect that, and no Seller has any reason to believe that, such customer or supplier will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, buying or supplying as the case may be, materials, products or services from or to any such Seller (whether as a result of the consummation of the transactions contemplated hereby or otherwise).

5.24   Product Warranty. Each product manufactured, sold, leased, or delivered by any Seller has been in conformity with all applicable contractual commitments and all express and implied warranties, and no Seller has any Liability (and there is no basis for any present or future action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability) for replacement or repair thereof or other damages in connection therewith, subject only to the reserve for product warranty claims set forth on the face of the Latest Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Sellers.

5.25   Product Liability. No Seller has any Liability (and there is no basis for any present or future action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any Liability) arising out of any injury to individuals

or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by any Seller.

5.26    Brokers.  Except as set forth on Schedule 5.26, no Seller has incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

5.27    Absence of Certain Developments.  Except as set forth on Schedule 5.27 and except as expressly contemplated by this Agreement, since the date of the Latest Balance Sheet, no Seller has taken any action that would require the consent of Purchaser pursuant to Section 7.3.

5.28    Bank Accounts Schedule.  Schedule 5.28 lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) for each Seller.

5.29    Cure Amounts.  Schedule 5.29 sets forth all of the costs of cure to be satisfied in order for Sellers to assume and assign Contracts under Section 365 of the Bankruptcy Code.

5.30    Officers and Directors.  Schedule 5.30 lists all officers, directors and equivalent senior executives and members of governing bodies of each Seller.

5.31    Lien Searches.  Sellers have delivered to Purchaser true and correct copies of all Tax Liens, and judgment search results for each Seller for the jurisdiction of incorporation or organization of each Seller, the jurisdiction of the principal office of each Seller and all jurisdictions in which assets of each Seller are located (including results of state and county searches).

5.32    Bankruptcy.  Sellers have filed petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court and are parties to the Chapter 11 Cases.

5.33    Compliance with Customs & International Trade Laws.  Except as set forth on Schedule 5.33, and without in any way limiting the representations and warranties otherwise provided in Article V of this Agreement:

(a) Sellers and their respective Affiliates are in compliance with all applicable Customs & International Trade Laws, and at no time since January 1, 2003 have Sellers or any of their respective Affiliates committed any violation of the Customs & International Trade Laws, and there are no unresolved questions or claims concerning any liability of Sellers or any of their respective Affiliates with respect to any such Laws;

(b) Neither Sellers nor any of their respective Affiliates is subject to any pending civil or criminal investigation, litigation, audit, compliance assessment, focused assessment, penalty Proceeding or assessment, liquidated damages Proceeding or claim, forfeiture or forfeiture action, record-keeping inquiry, assessment of additional duty for failure to properly mark imported merchandise, notice to properly mark merchandise or return merchandise to Customs custody, claim for additional Customs duties or fees, denial Order, suspension of export privileges, government sanction, or any other action, Proceeding or claim by a Governmental

Authority involving or otherwise relating to any alleged or actual violation of the Customs & International Trade Laws or relating to any alleged or actual underpayment of Customs duties, fees, Taxes or other amounts owed pursuant to the Customs & International Trade Laws, and each of the Sellers and their respective Affiliates has paid all Customs duties and fees, all other import duties and fees, and brokerage fees owed for merchandise imported by them or imported on their behalf into the United States;

(c) Neither Sellers nor any of their respective Affiliates has made or provided any false statement or omission to any Governmental Authority or to any purchaser of products, in connection with the importation of merchandise, the valuation or classification of imported merchandise, the duty treatment of imported merchandise, the eligibility of imported merchandise for favorable duty rates or other special treatment, country-of-origin marking, North American Free Trade Act (NAFTA) Certificates, marking and labeling requirements for textiles and apparel, other statements or certificates concerning origin, quota or visa rights, export licenses or other export authorizations, U.S.-content requirements, licenses or other approvals required by a foreign Governmental Authority, or any other requirement relating to the Customs & International Trade Laws;

(d) Neither Sellers nor any of their respective Affiliates nor any agent acting on behalf of the Sellers or any of their respective Affiliates has made, either directly or indirectly, any payment, offer, gift, promise to give, or authorized or otherwise participated in, assisted in or facilitated any payment or gift that is prohibited by the United States Foreign Corrupt Practices Act; and

(e) None of the products or materials imported by, for or on behalf of Sellers or any of their respective Affiliates for which final liquidation has not yet occurred is subject to or otherwise covered by an antidumping duty Order or countervailing duty Order that remains in effect or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by agencies of any Governmental Authority.

5.34    Information Accurate and Complete; Reliance.  Without limiting the specific language of any other representation or warranty herein, all information furnished or to be furnished by, or on behalf of, Sellers to Purchaser in this Agreement, the other Transaction Documents, in the Exhibits or Schedules attached hereto, or otherwise delivered or disclosed or to be delivered or disclosed by, or on behalf of, Sellers to Purchaser or any of Purchaser's Affiliates is or will be accurate and complete, includes or will include all material facts required to be stated therein and does not or will not contain any untrue statement of a material fact or omit any material fact necessary to make the statements therein not misleading.  There is no fact which has not been disclosed to Purchaser which has or could reasonably be expected to have a Material Adverse Effect on Sellers or the Business.  Notwithstanding any right of Purchaser to investigate fully the affairs of Sellers and their Affiliates, and notwithstanding any knowledge of facts determined or determinable by Purchaser pursuant to such investigation or right of investigation, Purchaser has the right to rely fully upon the representations and warranties of Sellers contained herein and in the Exhibits and Schedules or in any other document delivered in connection with the transactions contemplated hereby.

5.35    Warranties are Exclusive.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED OBLIGATIONS) OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR NON-INFRINGEMENT.   ANY OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR EQUITY.   PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER ARE PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

5.36    Closing Date.  All of the representations and warranties contained in this Article V and elsewhere in this Agreement and all information delivered in any Schedule, attachment or Exhibit hereto or in any writing delivered by Sellers to Purchaser are true and correct on the date of this Agreement and shall be true and correct on the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers on the date of this Agreement and on the Closing Date that the statements contained in this Article VI are correct and complete.

6.1 Organization.  Purchaser is a corporation validly existing and in good standing under the Laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

6.2 Authority.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser and do not and will not violate any provisions of its organizational documents, any applicable Law or any contract or Order binding upon Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

6.3 Consents.  No notice to, filing with, authorization of, exemption by, or consent (other than the approval of the Bankruptcy Court) of any Person is required in order for Purchaser to consummate the transactions contemplated hereby.

6.4 Ownership and Transfer of Grandco Stock.  Purchaser is the record and beneficial owner of the Grandco Stock, free and clear of any and all Liens.  Purchaser has the requisite corporate power and authority to sell, transfer, assign and deliver the Grandco Stock as provided in this Agreement, and such deliver will convey to Sellers good and marketable title to the Grandco Stock, free and clear of any and all Liens.